IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

DAVID McCHESNEY,

Plaintiff,

v.

Civil Action No.
9:10-CV-1409 (GTS/DEP)

SAMUEL BASTIEN, IV,

Defendant.

---

APPEARANCES: OF COUNSEL:

FOR PLAINTIFF:

DAVID McCHESNEY, *Pro Se*
#25527
Central New York Psychiatric Center
P.O. Box 300
Marcy, New York 13403-0300

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN
Attorney General of
the State of New York
The Capitol
Albany, NY 12224

MICHAEL McCARTIN, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff David McChesney, a convicted sex offender who has been

civilly committed to the Central New York Psychiatric Center ("CNYPC") for

participation in sex offender treatment, has commenced this action pursuant

to 42 U.S.C. § 1983 claiming violation of his civil rights stemming from his

ongoing confinement following expiration of his prison sentence.  In his

complaint – one of several filed by McChesney in this court – plaintiff alleges

a single cause of action for deprivation of liberty without due process of law

based upon his alleged involuntary detention at another psychiatric facility

operated by the New York State Office of Mental Health ("OMH") for a period

of sixty days, from October 5, 2007 until December 4, 2007.[1]  As relief,

---

[1]        Plaintiff has commenced seven separate actions in this court related to his
involuntary civil confinement.  In *McChesney v. Hogan, et al.*, No. 9:08-CV-0163 (filed
Feb. 11, 2008), plaintiff complained of various policies at the CNYPC ranging from those
addressing receipt of food packages and telephone access to mail censorship and the use
of short chain restraints, and maintained that the adoption and implementation of those
policies by the various defendants named in his complaint resulted in violation of his rights
under the First, Fourth, Eighth, and Fourteenth Amendments.  That action resulted in the
entry of summary judgment dismissing plaintiff's claims.  *See id.* at Dkt. Nos. 49 and 50.
In *McChesney v. Miller, et al.*, No. 9:08-CV-0195 (filed Feb. 21, 2008), plaintiff asserted a
medical indifference claim under the Eighth Amendment.  McChesney voluntarily
dismissed that action, and judgment was entered in favor of the defendants.  *See id.* at
Dkt. Nos. 5 and 6.  In *McChesney v. Hogan, et al.*, No. 9:08-CV-0563 (filed June 10,
2008), plaintiff alleged three instances on which he was assaulted by fellow patients on
two separate days, and argued that the attacks resulted from defendants' failure to
properly protect him from harm in violation of his constitutional rights.  The complaint in
that action was dismissed upon defendants' motion for summary judgment, and judgment
was entered in favor of defendants.  *See id.* at Dkt. Nos. 36 and 37.  In *McChesney v.
Hogan, et al.*, No. 9:08-CV-1186 (filed Nov. 6, 2008) and *McChesney v. Hogan, et al.*, No.
9:08-CV-1290 (filed Nov. 28, 2008) plaintiff claimed, *inter alia*, that the Sex Offender
Treatment Program ("SOTP") administered at the CNYPC is predicated in part upon
religious tenets, and he is being forced, contrary to his beliefs as an atheist, to practice
religion in violation of his First Amendment rights. The first filed of those two actions

(continued...)

plaintiff seeks compensatory damages in the sum of $500 for each day of confinement, with interest.

Defendant has moved for summary judgment seeking dismissal of the complaint as a matter of law on the grounds that 1) the facts demonstrate that plaintiff did not suffer a deprivation of a constitutional right; 2) plaintiff has failed to demonstrate defendant's personal involvement in the alleged constitutional violation; and, 3) in any event, defendant is entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendant's motion be denied.

## I. BACKGROUND[2]

The facts relevant to plaintiff's single due process claim are largely undisputed. Instead, both the complaint and defendant's motion present narrow issues of law relating to plaintiff's civil confinement for a discreet period of time following the expiration of his initial commitment order.

---

[1](...continued)
remains pending, and the second was dismissed and judgment entered in favor of the defendants. *See McChesney v. Hogan, et al.*, No. 9:08-CV-1290, at Dkt. No. 9. *In McChesney v. Bastien*, No. 9:10-CV-0047 (filed Jan. 13, 2010), plaintiff alleged the same claim as in the instant action. After the defendant moved to dismiss, the action was dismissed without prejudice at plaintiff's request. *See id.* at Dkt. No. 11.

[2] In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Plaintiff was released from a New York State prison facility on April 6, 2007, following completion of a two-year sentence for violating parole.  Upon completion of his prison sentence, plaintiff consented to an order, issued on April 5, 2007 by the New York State Supreme Court pursuant to New York Correction Law § 402, authorizing his transfer out of the New York State prison in which he was then incarcerated and his commitment to a facility operated by the OMH.[3,4]  Defendant's Rule 7.1(a)(3) Statement of Undisputed Material Facts ("Local Rule 7.1(a)(3) Statement") (Dkt. No. 12-9) ¶ 3.  At the time, plaintiff was transferred into the Saint Lawrence Psychiatric Center ("SLPC").  *Id.*  The April 5, 2007 commitment order authorized plaintiff's retention until October 5, 2007.

---

[3]        New York Correction Law § 402 outlines the procedures to be followed for the commitment of a mentally ill inmate, requiring that the prison superintendent must first apply to the court for appointment of two examining physicians, and then petition the court again for a commitment order, providing a copy of the petition to the inmate, the inmate's friend or relative, and to the Mental Hygiene Legal Service.  *See* N.Y. Corr. Law § 402; *see also Harkavy v. Consilvio* ("*Harkavy I*"), 7 N.Y.3d 607, 612, 825 N.Y.S.2d 702, 859 N.E.2d 508 (2006). The Correction Law also provides the inmate with an opportunity to request a hearing before a judge after receiving a copy of the petition but before being committed to a psychiatric hospital.

[4]        On September 21, 2006, the New York Court of Appeals issued its decision in *Harkavy I*, holding that the Correction Law protocol, rather than procedure outlined in New York Mental Hygiene Law ("MHL") Article 9, was the appropriate mechanism, absent any clear legislative directive, for seeking authorization for the involuntary civil commitment of a convicted sex offender nearing release from incarceration for treatment.  *See Harkavy I,* 7 N.Y.3d at 614, 825 N.Y.S.2d 702, 859 N.E.2d 508.

In the wake of a decision of the New York Court of Appeals disapproving of the use of the procedures set forth in Mental Hygiene Law ("MHL") Article 9 for civil confinement of convicted sex offenders, *see Harkavy I*, 7 N.Y.3d at 614, 825 N.Y.S.2d 702, finding, *inter alia*, "[t]hat recidivistic sex offenders pose a danger to society that should be addressed through comprehensive programs of treatment and management[,]" the New York State Legislature enacted MHL Article 10, known as the Sex Offender Management and Treatment Act ("SOMTA"). The SOMTA created a new statutory scheme of procedures to be used with respect to convicted sex offenders requiring civil commitment or supervision following completion of their prison terms and became effective on April 13, 2007, just days after the Supreme Court's issuance of its order authorizing plaintiff's involuntary commitment pursuant to Correction Law § 402.[5] That new statutory regimen provides elaborate measures both for "case review" of the "detained sex offender", also known as the "respondent", before his or her release from civil confinement to determine whether further confinement under the SOMTA is necessary, as well as for detention beyond a specified release date, if

[5] *See generally* N.Y. Mental Hyg. Law Art. 9; *see also Mental Hygiene Legal Servs. v. Cuomo*, 785 F. Supp. 2d 205, 210 (S.D.N.Y. Mar. 29, 2011); *Harkavy v. Consilvio* ("*Harkavy II*"), 8 N.Y.2d 645, 653, 870 N.E.2d 128 (2007).

necessary, before such case review is complete.[6]

In the case at bar, although the case review process apparently had begun before the expiration of the April 5, 2007 commitment order on October 5, 2007, it had not been completed, and plaintiff had not been notified that a review of his status had been referred to a case review team. Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 12-9) ¶ 6. Likewise, the State did not make any effort to file a securing petition before October 5, 2007, and no hearing was held to determine whether there was probable

---

[6] Pursuant to the MHL, "a person who is a detained sex offender [is] suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." N.Y. Mental Hyg. Law § 10.03 (e).

> [W]hen a "detained sex offender" nears release from confinement or parole, a "multidisciplinary staff" provides a "preliminary review" to determine whether that person should be referred for more extensive evaluation. [MHL] § 10.05(d). If they determine that additional evaluation is necessary, a "case review team" of three individuals, at least two of whom must be mental health professionals, determines whether that person (termed a "respondent" upon referral to the case review team) requires additional "civil management." [MHL] § 10.06(a). Additionally, "notice of referral shall be provided to the respondent." [MHL] § 10.05(e).

*Cuomo*, 785 F. Supp. 2d at 211. In the event that the detained person is released or nearing release before completion of the case review, the New York State Attorney General may file a securing petition to continue that person's confinement pending completion of the case review. *See* N.Y. Mental Hyg. Law § 10.06(f); *see also David NN. v. Hogan*, 53 A.D.3d 841, 845 n.3, 826 N.Y.S.2d 150 (3d Dep't 2008), *lv. denied*, 11 N.Y.3d 708, 897 N.E.2d 1084 (2008). The filing of such a petition triggers the respondent's right to a probable cause hearing, which must be held within seventy-two hours, to determine if cause exists to detain the respondent pending a trial. *See id.* at § 10.06(h).

cause to continue plaintiff's civil confinement at the SLPC pending completion of the case review.

Five days after the expiration of the original order of commitment, on October 10, 2007, an attorney with Mental Hygiene Legal Services sent defendant a letter on plaintiff's behalf advising that McChesney was aware that, in accordance with the April 5, 2007 order, his involuntary commitment status had expired, but that he desired to remain at the SLPC as a voluntary patient, "consistent with his original decision to consent to the 402 retention order. . .." Bastien Decl. (Dkt. no. 12-2) Exh. B. The letter included a Voluntary Request for Hospitalization, signed by McChesney on October 10, 2007, and further stated, "[p]lease note that Mr. McChesney is making this request for voluntary admission [pursuant to MHL § 9.21] based on his realization that he is in need of further treatment for his maladaptive behaviors, and his desire to avoid litigation concerning his legal status while being held at SLPC."[7] *Id.* Upon receipt of this correspondence, defendant

---

[7] Section 9.21 provides, in pertinent part, that

> [a] person requesting admission to a hospital, who is suitable for admission on a voluntary or informal status, shall be admitted only on such a voluntary or informal status. The hospital shall, in such case, have the discretion to admit the person on either such status, except that, if the person specifically requests admission on an informal status and is suitable therefor, he shall be admitted only on such informal status.

(continued...)

consulted with OMH counsel and was advised that plaintiff's current retention was lawful, and that conversion of plaintiff's status to voluntary was unnecessary. Bastien Decl. (Dkt. No. 12-2) ¶ 10.

On November 20, 2007, plaintiff filed a petition with New York State Supreme Court, St. Lawrence County, pursuant to Article 78 of the New York Civil Practice Law and Rules, seeking an order requiring the defendant, as director of the SLPC, to "discontinue [his] illegal retention of petitioner and permit petitioner to voluntarily apply for and be admitted under a voluntary status to the [SLPC] pursuant to the provisions of MHL article 9 for voluntary admission. . .." Complaint (Dkt. No. 1) Exh. C; Bastien Decl. (Dkt. No. 12-2) Exh. C. The Supreme Court granted McChesney's petition on Friday, November 30, 2007, and ordered the OMH to immediately release plaintiff from the SLPC to the Division of Parole, or if plaintiff so chose, to be voluntarily committed at the SLPC.[8] Complaint (Dkt. No. 1) Exh. C; Bastien Decl. (Dkt. No. 12-2) Exh. C. When defendant failed to comply with that directive, on December 4, 2007, McChesney obtained a second order from

---

[7](...continued)
N.Y. Mental Hyg. Law § 9.21(c).

[8] Because he had left his office no later than 5:15 p.m. that evening, defendant evidently did not receive notice of the order, which was sent to him by e-mail at 5:15 p.m., until Monday, December 3, 2007. Bastien Dec. (Dkt. No. 12-2) ¶ 12.

that court, requiring the OMH to comply with the prior order and immediately release him.[9] *David NN.*, 53 A.D.3d at 841, 862 N.Y.S.2d 150. At that time, the Supreme Court refused the Attorney General's request to review and sign an order to show cause allowing the OMH to hold McChesney pending an MHL Article 10 review. *See id.* In accordance with the second order issued by the Supreme Court, plaintiff was released into the custody of the Division of Parole on December 4, 2007. Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 12-9) ¶ 21.

On December 5, 2007, the OHM obtained an *ex parte* order to show

---

[9] On December 7, 2007, McChesney filed a petition seeking a writ of habeas corpus from the Supreme Court. *David NN.*, 53 A.D.3d at 842, 862 N.Y.S.2d 150. At that time, the court held an MHL Article 10 probable cause hearing before ruling on the petition and, finding probable cause to believe that petitioner was a "sex offender requiring civil management", directed that McChesney be held in an OMH facility pending trial, and dismissed his petition as moot. *Id.* That decision was affirmed upon McChesney's appeal to the Appellate Division, Third Department. 53 A.D.3d 841, 842 862 N.Y.S.2d 150. Many of the facts set forth herein were also recited in the decision of the Third Department. *See generally id.* It is worth noting that under the doctrine of collateral estoppel, or claim preclusion, once a court has decided an issue of fact or law necessary to its judgment, a party to the first action, or one in privity with the party, cannot relitigate that specific issue in a subsequent lawsuit. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 414 (1980); *Burgos v. Hopkins*, 14 F.3d 787, 792 (2d Cir. 1994); *Ryan v. N.Y. Telephone Co.*, 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487, 490 (1984). Under New York law, collateral estoppel applies only if 1) the issue in question was necessarily decided in the prior proceeding and is decisive of the present proceeding; and 2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding. *Burgos*, 14 F.3d at 792; *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir.1991). Applying collateral estoppel to the instant action, it would thus appear that both plaintiff and defendant, who were parties to that proceeding, are bound by the facts set forth in the decision of the Third Department.

cause from a different New York State Supreme Court justice, located in Chemung County, authorizing plaintiff's confinement at a different OMH facility pending an MHL Article 10 probable cause hearing. *David NN.*, 53 A.D.3d at 842, 862 N.Y.S.2d 150; *see also* Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 12-9) ¶ 22. As a result, McChesney was involuntarily admitted to an OMH facility pursuant to that order. *David NN.*, 53 A.D.3d at 842, 862 N.Y.S.2d 150

## II. PROCEDURAL HISTORY

On November 22, 2010, plaintiff commenced this action asserting a single claim for violation of his right to due process in association with his detention at the SLPC from October 5, 2007 to December 4, 2007. Issue was joined by defendant's service of an answer on May 16, 2011. *See* Dkt. No. 9.

Following the completion of pretrial discovery, defendant filed the pending motion for summary judgment on December 9, 2011, arguing that he is entitled to dismissal of plaintiff's complaint as a matter of law on the grounds that 1) plaintiff cannot show that his constitutional rights were violated; 2) defendant was not personally involved in any alleged constitutional violation; and, 3) even if a violation occurred, defendant is

entitled to protection from liability under the doctrine of qualified immunity. Despite the fact that the deadline for opposing defendant's motion has long since passed, plaintiff has failed to respond to that motion. Defendant's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgement Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the

governing law." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A moving party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of

summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Legal Significance of Plaintiff's Failure to Properly Respond to Defendant's Local Rule 7.1(a)(3) Statement

Plaintiff has neither opposed defendant's motion, nor responded to defendant's Statement of Undisputed Material facts, as required by Local Rule 7.1(a)(3). Before turning to the merits of plaintiff's claims, the court will therefore address as a threshold matter the legal significance of his failure to properly respond to that statement.

The consequences of this failure are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any

facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases);[10] *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[11]

Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with a failure to comply with the court's local rules. *See Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1

---

10 Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

11 As to any facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I will assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998).

(N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997). Thus, "a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 9:09-CV-308, 2011 WL 11003045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.) (citing *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 583 (S.D.N.Y. 2008) and *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). Where a plaintiff has been specifically notified of the consequences of failing to respond to a movant's Local Rule 7.1(a)(3) Statement but has failed to do so, and the facts contained within that statement are supported by the evidence in the record, the court will accept such facts as true. *Id.* (citing *Littman v. Senkowski*, 2008 WL 420011, at *2 (N.D.N.Y. 2008) (citing *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996)).

With his motion defendant served a court-authorized notice specifically warning plaintiff of the consequences of his failure to properly respond to defendant's Local Rule 7.1(a)(3) Statement.[12] That form advised the plaintiff as follows:

---

[12] Northern District of New York Local Rule 56.2 mandates that when summary judgment is sought against a *pro se* litigant the moving party must notify that *pro se* litigant of the consequences of failing to respond to the motion. *See* N.D.N.Y.L.R. 56.2. The local rule also advises that a sample notice can be obtained through the court.

> Pursuant to Local Rule 7.1 of the Northern District, you are required to submit the following papers in opposition to this motion (1) a **memorandum of law** (containing relevant factual and legal argument); (ii) **one or more affidavits** in opposition to the motion and (iii) **a short and concise statement of material facts** as to which you claim there are genuine issues in dispute. **These papers must be filed and served in accordance with the time set by Local Rule 7.1.**

Notification of Consequences of Failing to Respond to a Summary Judgment Motion (Dkt. No. 12-1) (emphasis in original).[13] The notification continued, warning the plaintiff as follows:

> If you do not submit a short and concise statement of material facts as to which you claim there are general issues in dispute, all material facts set forth in the statement filed and served by defendant(s) shall be deemed admitted.

*Id.*.

As the foregoing reflects, the plaintiff was squarely put on notice of the consequences of his failure to respond to defendant's motion. In view of the foregoing, despite plaintiff's *pro se* status, I recommend that the court accept defendant's assertions of facts as set forth in his Local Rule 7.1(a)(3)

---

[13] The court notes that, although tracking the language of a previous court-approved iteration, the court has revised the form, and the form used by defendant is not the current court-approved notification. The changes made, however, are not so material as to provide a basis to relieve the plaintiff from the consequences of his failure to respond to Defendant's Local Rule 7.1(a)(3) Statement.

Statement as uncontroverted when considering the pending motion.

C. Procedural Due Process

The sole claim alleged in plaintiff's complaint is that he was denied liberty without due process of law when he was held at the SLPC for the sixty- day period from October 5, 2007 until his eventual release on December 4, 2007, following the expiration of the original April 5, 2007 commitment order. In his motion, defendant contends that he entitled to summary judgment with respect to this claim because McChesney's commitment was legally authorized by the April 5, 2007 commitment order, which was obtained upon plaintiff's consent, and any violation of the provisions of MHL Article 10 in association with the effort to obtain a substitute order of retention fails to support a cognizable claim under section 1983. The essence of defendant's argument appears to be that as a detained sex offender, plaintiff does not enjoy a protectible liberty interest.[14]

1. Failure to Follow MHL Article 10

---

[14] It seems clear that at all times relevant, plaintiff was, as defendant asserts, a "detained sex offender" as defined by the SOMTA. *See State of New York v. Blair*, 69 A.D.3d 15, 16, 887 N.Y.S.2d 389 (4th Dep't 2009). Nonetheless, the plaintiff's retention beyond October 6, 2007 is entirely separate from that originally authorized by the Supreme Court, and its legality must be separately analyzed. *See David NN.*, 53 A.D.3d at 844, 862 N.Y.S.2d 150. Moreover, as will be seen, in this court's view it does not follow that as a detained sex offender plaintiff did not have a protectible liberty interest in being free from involuntary civil commitment.

At the outset, defendant correctly observes that to state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases). Accordingly, defendant's admitted failure to follow the procedures for case review and retention as set forth in the SOMTA alone is insufficient to support a section 1983 cause of action.

Plaintiff's claim in this action, however, is not premised merely upon defendant's failure to comply with the provisions of MHL Article 10. Instead, is seems quite clear that McChesney's section 1983 claims rests upon defendant's alleged failure to provide him with due process before detaining him beyond October 5, 2007.

To successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an

actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards.[15] *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). The threshold inquiry, then, turns upon whether the plaintiff possessed a cognizable liberty interest. *See Vitek*, 445 U.S. at 487, 100 S. Ct. at 1261.

2. Plaintiff's Liberty Interest

The Supreme Court has "recognized that for the ordinary citizen, commitment to a mental hospital produces a 'massive curtailment of liberty.'" *Id.* at 491-02, 100 S. Ct. at 1263 (quoting *Humphrey v. Cady*, 405 U.S. 540, 509, 92 S. Ct. 1048, 1052 (1972)). It is thus undeniable that "[i]nvoluntary confinement, including civil commitment, represents a significant deprivation of liberty, requiring due process." *Abdul v. Matiyn v. Pataki*, 9:06-CV-1503, 2008 WL 974409, at *10 (N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.)

---

[15] Defendant argues further that it is within the province of the state legislature to determine the method of procedure for procuring the confinement of persons dangerous to the community. Defendant's Memorandum of Law (Dkt. No. 12-20) (citing *Miller v. Director, Middletown State Hosp.*, 146 F. Supp. 674, 679 (S.D.N.Y. 1956). While that may be true, it is axiomatic that any procedures prescribed by the state in association with a liberty deprivation must comport with the constitutionally guaranteed right to due process. *See generally Vitek v. Jones*, 445 U.S. 480, 100 S. Ct. 1254 (1980).

(quoting *Fisk v. Letterman*, 401 F. Supp. 2d 362, 374 (S.D.N.Y. 2005) (citations omitted)).  In *Vitek*, the Court made clear that even convicted felons maintain the right to freedom from classification as mentally ill and involuntary psychiatric treatment.  *Vitek*, 445 U.S. at 493-94, 100 S. Ct. at 1264.  While Supreme Court has approved of the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public, *Abdul*, 2008 WL 974409, at *10 (citing *Kansas v. Hendricks*, 521 U.S. 346, 371, 117 S. Ct. 2072, 2086 (1997)), it is well established that "'even if ... involuntary confinement [is] initially permissible [and founded upon a constitutionally adequate basis], it [can] not constitutionally continue after that basis no longer exist[s].'"  *Mental Hygiene Legal Servs. v. Spitzer*, No. 07 Civ. 2935(GEL), 2007 WL 4115936, at * 6 (S.D.N.Y. Nov. 16, 2007) (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S. Ct. 2486, 2493 (1975) (citation omitted)), *aff'd sub nom.*, *Mental Hygiene Legal Servs. v. Paterson*, __ Fed. App'x __, 2009 WL 579445 (2d Cir. 2009).  It is thus beyond doubt that even as a detained sex offender, plaintiff maintains a liberty interest in being free from civil confinement.  *See State of New York v. Maurice G.*, 32 Misc. 3d 380, 403, 928 N.Y.S.2d 162 (Sup. Ct. Bronx Cnty. 2011) (observing

that "[t]he private interest in [an] article 10 petition is compelling – civil

management under article 10 is a significant deprivation of in individual's

liberty interest.") (citing *Hendricks*, 521 U.S. at 356, 117 S. Ct. at 2079);

*Spitzer*, 2007 WL 4115936, at *4-5).  In light of the foregoing principles, I

reject defendant's assertion that as a matter of law the plaintiff, as a detained

sex offender, cannot state a cognizable liberty interest.

Equally unavailing is defendant's fact-based assertion that by definition

plaintiff cannot be viewed as having suffered a deprivation of liberty during

the period of time that he sought voluntary admission to SLPC.  On October

10, 2007, plaintiff's attorney informed defendant in writing that his continued

detention of McChesney was without legal authority and that plaintiff wished

to apply under MHL § 9.13 for voluntary admission, enclosing a Voluntary

Request for Hospitalization form signed by McChesney.[16]  Significantly, and

consistent with his position that he was not legally being detained, that form

requested "admission" rather than "conversion to voluntary status"; on the

form, plaintiff also noted as the reason for his application, "expiration of

current commitment order and my realization that I need further treatment

---

[16]     MHL § 9.13 provides, in relevant part, that "[t]he director of any hospital may
receive as a voluntary patient any suitable person in need of care and treatment, who
voluntarily makes written application therefor."  N.Y. Mental Hyg. Law § 9.13(a).

[sic] maladaptive behaviors."  Bastien Decl. (Dkt. No. 12-2) Exh. B.  During

his deposition, plaintiff testified that he sought to make his status at the SLPC

voluntary so that he could "sign out."  Transcript of Plaintiff's Deposition (Dkt.

No. 12-8) pp. 29-30.  Plaintiff further acknowledged his awareness that if he

were hospitalized on voluntary status and wished to leave, the OMH could

not detain him without observing the requisite procedures, including obtaining

the evaluations of two psychiatrists that his involuntary commitment was

necessary.[17]  *Id.* at p. 30.  To be sure, the word "voluntary" itself denotes an

element of choice.[18]

Viewing the evidence in a light most favorable to the plaintiff, a

reasonable juror could conclude that plaintiff's request for voluntary

admission was, in fact, an effort to gain self-determination over whether he

could leave the facility, a decision he was unable to make as long he

---

[17]     Under the MHL, an individual voluntarily admitted to a psychiatric facility may give notice in writing at any time to the director of the facility that he or she desires to leave, and "the director shall promptly release the patient; provided, however that if there is reasonable ground for belief that the patient my be in need of involuntary care and treatment, the director may retain the patient for a period not to exceed seventy-two hours from receipt of such notice."  N.Y. Mental Hyg. Law § 9.13(b).  Before that 72-hour period expires, the director must either apply to court for an order authorizing involuntary retention upon notice to the patient, or release the patient.  *See id.*

[18]     "Voluntary" is defined as "[d]one or undertaken of one's own free will" and "capable of making choices; having the faculty of will."  AMERICAN HERITAGE DICTIONARY 1929 (4th. ed. 2000).

remained under involuntarily commitment. As such, it is plausible that a jury could find that plaintiff sought liberty, and that his liberty was restrained without due process of law. I therefore reject defendant's contention that McChesney's request for voluntary admission somehow vitiates his entitlement to be free from involuntary confinement, finding that material questions of fact remain as to whether plaintiff was denied his right to liberty from October 5, 2007 until the time it became clear that he sought release from the SLPC, on or about November 30, 2007.

3. Due Process

Having found the existence of triable facts surrounding whether plaintiff experienced a liberty deprivation, the inquiry turns to the sufficiency of the procedural safeguards associated with the alleged deprivation. "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Spitzer*, 2007 WL 4115936, at * 5 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 533, 124 S. Ct. 2633, 2648 (2004) (plurality opinion)).

The SOMTA expressly provides for notice and a hearing under the circumstances presented. For example, pursuant to MHL § 10.05, which is entitled "notice and case review", when persons qualifying as detained sex

offenders, like the plaintiff, are nearing release,120 days before the

anticipated release date the agency having custody of the detainee must

notify the Attorney General of the State, thereby triggering an obligation on

the part of the OMH to review the relevant records and determine whether

case review is warranted.  *See* N.Y. Mental Hyg. Law § 10.05(b).  If a referral

is made to the case review team, the respondent must receive notice of the

referral.  *See id.* at § 10.05(e).  If the case review team finds that the

detainee is a sex offender requiring civil confinement, within forty-five days of

the commissioner receiving notice of the anticipated released, the agency

must notify both the detainee and the Attorney General, in writing, and

provide a written report from a psychiatric examiner that includes a finding

that the respondent has a mental abnormality.  *Id.* at § 10.05(g).  Once that

determination is made, the Attorney General may file a sex offender civil

management petition.  *See* N.Y. Mental Hyg. Law § 10.06(a).  If at the time

such a petition is filed the respondent is at liberty, the court is required to

order his or her return to confinement for the purpose of a probable cause

hearing, which must commence within seventy-two hours of the person's

return to an OMH facility.  *See* N.Y. Mental Hyg. Law § 10.06(h).  If the

respondent is not at liberty when such petition is filed but becomes eligible for

release before a probable cause hearing is conducted, the court must order a stay of the release pending a probable cause hearing, which must occur within no later than seventy-two hours from the date of anticipated release. *See id.*

Notwithstanding the procedures set forth in the SOMTA, there is no dispute that prior to the expiration of the April 5, 2007 commitment order the case review team did not notify the Attorney General that plaintiff was nearing the end of his commitment period, or that an interim retention order pursuant to MHL § 10.06(f) would be required. Consequently, neither plaintiff nor the Attorney General was notified that the case review team had determined that plaintiff was, at the relevant time, a sex offender requiring civil confinement, and no probable cause hearing was conducted before October 5, 2007. In fact, no hearing at all was held until on or about December 7, 2007, after 1) McChesney had obtained an order and been released, 2) the defendant filed an *ex parte* order to show cause to return plaintiff to confinement, and 3) plaintiff filed a petition in the Supreme Court for habeas corpus relief seeking an order directing his release.

Nonetheless, in a somewhat convoluted argument, defendant evidently now maintains that McChesney cannot show a deprivation of liberty without

due process of law, contending that under the SOMTA he had no legitimate expectation of release. At the outset, defendant relies on MHL sections 10.05 (b) and (g), emphasizing that these subsections expressly provide that the "failure to give notice within [the required] time period shall not affect the validity of such notice or any subsequent action, including the filing of a sex offender civil management petition". N.Y. Mental Hyg. Law §§ 10.05(b) and (b). As a result, defendant argues, the failure to timely notify the Attorney General of plaintiff's impending release, complete a case review, and provide advance notice of the case review to the respondent results in no penalty, and detained sex offenders, like plaintiff, have no realistic expectation of release before case review is completed. Defendant's Memorandum of Law (Dkt. No. 12-10) pp. 9-11. Defendant further asserts under section 10.06(f) of the SOMTA, the Attorney General could have filed a "securing petition" at any time, and pursuant to sections 10.06(h) and (k) plaintiff would have been held until either a probable cause hearing was conducted, or until after the case review team had concluded that plaintiff was a sex offender requiring civil confinement.[19] *Id.* at pp 12-13. Defendant appears to argue that, based

[19] In *Cuomo*, a district judge in the Southern District of New York concluded that MHL § 10.06(k) is unconstitutional on its face to the extent that it provides for "[automatic] detention of *all* respondents as to whom there is probable cause to believe
(continued...)

upon the above referenced provisions, even if the required procedures had been followed, plaintiff would have been retained in any event, and consequently he had no legitimate expectation of being released upon the expiration of the April 5, 2007 order. *See id.* Following this reasoning, defendant urges that plaintiff cannot claim he was deprived of a substantial liberty interest. *See* Defendant's Memorandum of Law (Dkt. No. 12-10) pp. 9-15.

In my view, defendant's reasoning is flawed and fails to recognize the fundamental right that the procedures set forth in MHL Article 10 were seemingly designed to protect.[20] As the court recognized in *Spitzer*,

---

[19](...continued)
they qualify as sex offenders requiring civil management, without an individualized finding that no condition or combination of conditions of supervision could allow the respondent to be at liberty pending adjudication." 785 F. Supp. 2d at 225-26. (emphasis in original). In doing so, she rejected the defendant's argument that the determination that a respondent has a "mental abnormality" as defined by the SOMTA equates to a finding of dangerousness. *See id.* at 226; *contra State of New York v. Enrique T.*, 93 A.D.3d 158, 169, 937 N.Y.S.2d 203, 211 (1st Dep't 2012) ( "'a detained sex offender who suffers from a mental abnormality but is not a dangerous sex offender requiring confinement' (Mental Hygiene Law § 10.03 [r]) is not to be interpreted to mean a sex offender who is not dangerous at all. Rather, it should be interpreted to mean a sex offender who is not dangerous to the extent where his dangerousness must be managed by confinement."), *lv. to appeal dismissed*, 18 N.Y.3d 1876 (2012) .

[20] In his memorandum to the New York State Senate introducing the proposed legislation containing the SOMTA, Senator Volker described the enactment as providing" a muti-stage process designed to ensure that only the most dangerous offenders get confined." NEW YORK STATE SENATE SPONSORS MEMORANDUM, S.B. 3318, 230th Legis. (2007). The Senator further observed that under that act, "[e]very person in civil confinement will have at least annual reviews of [his or her] status. There are also a (continued...)

"[p]ersons affected by Article 10 are threatened with deprivation not merely of a liberty interest, but of liberty *tout court*, as the Act contemplates that those found within its scope may be confined against their will."  2007 WL 4115936, at *4.  While the state's interest in retaining mentally ill and dangerous felons prone to the commission of sexual offenses is no doubt compelling, "due process [nonetheless] requires that the nature and duration of commitment bear some relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S. Ct. 1845, 1858 (1972).  To accept defendant's reasoning would allow an agency such as the OMH to hold a civilly committed sex offender indefinitely, notwithstanding the expiration of an authorizing order, without affording that individual any due process whatsoever.

Case law is clear and well-established, however, that one cannot be civilly committed longer than reasonably necessary.  *See, e.g., Jackson*, 406 U.S. at 738, 92 S. Ct. at 1858.  Indeed, two decades ago the Supreme Court held that "keeping [a convicted felon against his will in a mental institution is improper absent a determination in civil commitment proceedings of current

---

[20](...continued)
variety of other hearings and procedures to ensure that when an individual's circumstances change, the level of supervision is increased, decreased, or terminated as appropriate." *Id.*

mental illness and dangerousness." *Foucha v. Louisiana*, 504 U.S. 71, 78, 112 S. Ct. 1780, 1784 (1992). Where, as here, the person is already confined, and thus presents no immediate danger to society, it seems that due process requires pre-deprivation notice and a hearing. *Bailey v. Pataki*, 722 F. Supp. 2d 443, 447 (S.D.N.Y. 2010). Without explanation, defendant did not follow the procedures set forth in the SOMTA, but instead failed to avail himself of the ability to file a securing petition before the case review was complete, as authorized by MHL § 10.06, to ensure both the protection of society and plaintiff's constitutional rights.

It seems clear that in enacting the SOMTA the State did not, as defendant now claims, intend to authorize the indefinite confinement of even detained sex offenders like plaintiff without providing the appropriate pre-deprivation process. *See* N. Y. STATE SENATE SPONSORS MEMORANDUM, S.B. 3318. In the first instance, defendant simply ignores the fact that while MHL § 10.06(h) requires that a detained sex offender be kept in the custody of the OMH during the pendency of a probable cause hearing, it also guarantees that a prompt hearing, or due process, will be provided by unequivocally requiring that such hearing take place within seventy-two hours of any order staying the release of a respondent who is not at liberty, or seventy-two hours

after a respondent who has been free is returned to confinement. In this case, there is no dispute that a hearing did not occur until sixty-one days after the release date set forth in plaintiff's original commitment order.

To the extent that defendant implies that plaintiff's detention was authorized by the SOMTA, that position was squarely rejected by the Third Department in the state court proceeding. Preliminarily, in its decision that court observed that the statutory language upon which defendant currently relies expressly contemplates the release of a detained person prior to determination of the case review team or the filing of a securing petition. *David NN.*, 53 A.D.3d at 844, 862 N.Y.S.2d 150 (citing N.Y. Mental Hyg. Law § 10.06 (f) and (h)). Perhaps more importantly, the court made clear its disapproval of the manner in which the state handled the plaintiff's retention, emphasizing that "[t]he state extended McChesney's confinement pursuant to Correction Law § 402 between October 5, 2007 and December 4, 2007 without authority." *David NN. v. Hogan*, 53 A.D.3d at 844, 826 N.Y.S.2d 150 (footnote omitted). Addressing the appropriate procedures to be employed when the OHM seeks to hold a detained sex offender beyond his or her release date, that court stated further,

> [MHL] § 10.06 (f) provides that when a detained person is released prior to a determination by the

> case review team, the Attorney General may file a securing petition to continue the person's confinement pending such a determination. Complying with this statute would have been the better course of action here, rather than detaining petitioner from October 5, 2007 until December 4, 2007 with no legal authority.

*Id.* at 845 n.3. It thus seems clear that defendant's retention of plaintiff, notwithstanding the expiration of the April 5, 2007, order was not authorized by the SOMTA.[21]

For the foregoing reasons, in light of plaintiff's request for voluntary admission at SLPC, I have concluded that based upon the record before the court material issues of fact remain as to whether, as the plaintiff maintains, he was deprived of his liberty without due process for the period of October 5, 2007 to November 30, 2007.[22] Accordingly, I recommend that defendant's motion directed to the merits of plaintiff's claim be denied.

---

[21] Defendant cites *United States v. Magassouba*, 544 F.3d 387 (2d Cir. 2008) for the proposition that his detention of plaintiff for the sixty-day period in issue was "harmless." In *Magassouba*, the Second Circuit found that the Attorney General's retention of the defendant, an alien and pre-trial detainee based upon criminal conspiracy charges, in a psychiatric hospital for a few weeks longer than authorized by a district court was without authority, but that the error was harmless "because [the defendant] was not subjected to psychiatric treatment during this unauthorized hospitalization, and his general confinement was otherwise authorized by the Bail Reform Act, 18 U.S.C. § 3142." *Id.* at 393. Here, however, the court cannot conclude as a matter of law that plaintiff's detention was harmless, especially in light of the fact that it was not legally authorized.

[22] Defendant seems to concede that after November 30, 2007, when the Supreme Court directed plaintiff's release, he was aware that plaintiff's continued confinement at the SLPC was no longer "voluntary".

D. Personal Involvement

Defendant next argues that he cannot be held liable under section 1983 because plaintiff has failed to allege facts showing that he was personally involved in the alleged constitutional deprivation.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

As the director of the SLPC, Bastien serves in a supervisory capacity. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways,

including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring.[23] *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, 556 U.S. 662,129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995). "[M]ere 'linkage in the . . . chain of command' is

---

[23] The Second Circuit has yet to address the impact of the Supreme Court's decision in *Iqbal* upon the categories of supervisory liability under *Colon*. Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States*, 674 F. Supp. 2d at 531, 542-44 (S.D.N.Y. 2009); *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued viability of some of the categories set forth in *Colon.*") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) . While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 346-47 (S.D.N.Y. 2010), *aff'd,* 2012 WL 498854 (2d Cir. Feb. 16, 2012); *Qasem v. Toro*, 737 F. Supp.2d 147, 151-52 (S.D.N.Y. 2010). This discord is irrelevant to the present action since it appears that liability, if any, would be premised upon a finding that defendant was personally involved under the first of the *Colon* prongs.

insufficient to implicate a [facility supervisor] in a § 1983 claim." *Wright*, 21 F.3d at 501.*Richardson*, 347 F.3d at 435 (citations omitted); *see also*, *e.g.*, *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (same).

While defendant Bastien has been sued by plaintiff individually as the "Chief Executive Officer of SLPC," Complaint (Dkt. No. 1) ¶¶ 4 and 5, the record before the court demonstrates that his liability in this case could be premised upon more than just his supervisory role. By his own admission, on October 10, 2007, Bastien received a letter from plaintiff's counsel advising of plaintiff's position that he was being held without legal authority. Bastien Decl. (Dkt. No. 12-2) ¶ 9. According to Bastien, after receiving that correspondence he consulted with OMH counsel, who advised that plaintiff was being lawfully detained based upon MHL Article 10 and the court's decision in *Harkavy II*. *Id.* at ¶ 10. Bastien also acknowledges plaintiff's filing of an Article 78 petition requesting an order directing the SLPC to cease its illegal retention of McChesney, that the petition was granted, and that he received notice of the court's directive that plaintiff be released on December 3, 2007. *Id.* at ¶¶ 11-13. Thereafter, Bastien began to make arrangements

for plaintiff's release. *Id.* Once an out-patient plan for plaintiff was completed, and Bastien was assured that all legal measures taken by the Attorney General in attempt to stay the release had been exhausted, he "ensured that plaintiff was released from SLPC on December 4, 2007 into the custody of the New York State Division of Parole." *Id.* at ¶¶ 13-15.

In light of these facts, and affording plaintiff the benefit of all favorable inferences that can be drawn from them, it is conceivable that a reasonable jury could conclude that defendant was personally involved in the decision of whether and when to release plaintiff from his civil detention, and therefore potentially exposed to liability as having been personally involved in the alleged constitutional violation. *See Thomas v. Sagaties*, No. 09 Civ. 5116(JGK), 2011 WL 5877767, at *8 (S.D.N.Y. Nov. 23, 2011). For these reasons, I recommend that defendant's motion for summary judgment on the issue of personal involvement be denied.

E. <u>Qualified Immunity</u>

Defendant's final contention in support of his motion for summary judgment is that even if the court finds that plaintiff suffered a deprivation of his right to due process, he is protected by the doctrine of qualified immunity.

Qualified immunity shields government officials performing

discretionary functions "from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)) (internal quotations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer[ ] possessed.' " *Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692 (1999)) (alterations in original). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 129 S. Ct. at 815.

In determining whether a government official is immune from suit, the court conducts a two-part inquiry. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). That inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a

constitutional right,[24] and if so, whether that right is clearly established.

*Nagle v. Marron*, 663 F.3d 100, 114 (2d Cir. 2011) (quoting *Saucier*, 533 U.S.

at 201, 121 S. Ct. at 2156); *Doninger*, 642 F.3d at 345 (citing cases).[25]   Until

recently, courts were required to perform the two-part qualified immunity

analysis in precisely that order.  *Doninger*, 642 F.3d at 345 (citing *Saucier*,

533 U.S. at 201, 121 S. Ct. 2151).[26]   "Following the Supreme Court's decision

in *Pearson v. Callahan*, however, we may now exercise our discretion in

deciding the order in which to conduct the qualified immunity [inquiry]."  *Id.*

(citing *Pearson*, 129 S. Ct. at 821).

"The relevant question after *Pearson* is 'which of the two prongs . . .

---

[24]     In making the first inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).

[25]     In *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415 (2d Cir. 2009), the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."  *Id.* at 433 n.11 (citation omitted).

[26]     Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."  *Pearson*, 555 U.S. at 231, 129 S. Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 524 (1991) (per curiam)).

should be addressed in light of the circumstances in the particular case at hand.' " *Okin*, 577 F.3d at 430 n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.'" *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

As the Supreme Court has noted, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established, the court must determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202, 121 S. Ct. at 2156 (citation omitted).  When deciding whether a right was clearly established at the relevant time, a court should consider if

> (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful.

*Doninger*, 642 F.3d at 343 (citing *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir.1998)).  In conducting its analysis, it is critical for the court to correctly define the right at stake with "reasonable specificity", *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (citation omitted), taking care to avoid a

description that is either overly broad and thereby eviscerates the protections of qualified immunity, or one that is so narrowly defined that the defense would only be overcome if " ' the very action in question has previously been held unlawful[,]' " *Nagle*, 663 F.3d at 114 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987)).

The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin*, 577 F.3d at 433 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity."[27] *Id.* at 433 (citing *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995)).

In this instance, the basis for defendant's assertion of qualified immunity is unclear.  Defendant seems to contend that because under MHL §§10.05(b) and (g) there are no penalties or forfeitures of the right to proceed in the event that the detaining agency, in this instance the OMH, fails to meet

---

[27]     "The 'subjective good faith of government officials' plays no part in the inquiry."  *Nagle*, 663 F.3d at 114 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816, 102 S. Ct. 2727 (1982)).

statutory deadlines, and these provisions have not been held unconstitutional, plaintiff was not entitled to release.[28] Defendant seems to have missed the point.

The question raised by plaintiff's complaint is not whether he was entitled to release between October 5, 2007 and December 5, 2007, but whether he was provided with notice and an opportunity to be heard before defendant extended McChesney's detainment beyond that date authorized by the original commitment order. Addressing the clearly established prong of the qualified immunity test, at the time in question,

> it [was] well established that involuntary commitment to a psychiatric facility entails "a massive curtailment of liberty," *Vitek v. Jones*, 445 U.S. 480, 491-92, 100 S. Ct. 1254, 63 L.Ed.2d 552 (1980), and thus cannot be done without affording the detainee adequate due process protection. *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L.Ed.2d 323 (1979) ("civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection"). The fact that a citizen has been previously convicted of an offense involving sexual violations in no way deprives him of this protection. "A criminal conviction and sentence of imprisonment ... do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric

[28] As was previously noted, the Third Department observed in *David NN.* that the statutory language in fact contemplates the release of a detained person prior to determination of the case review team for the filing of a securing petition. *See David NN.*, 53 A.D.3d at 844, 862 N.Y.S.2d 150 (citing N.Y. Mental Hyg. Law § 10.06 (f) and (h)).

> treatment without affording him additional due process protections." *Vitek*, 445 U.S. at 493-94, 100 S. Ct. 1254.
>
> Where a person is already confined (as because he is serving a criminal sentence), so that he presents no immediate danger to the community, full due process must be accorded before he can be transferred, upon completion of his sentence, to involuntary civil commitment.

*Bailey*, 722 F. Supp. 2d at 447; *see also Bloomfield v. Wurzberger*, No. 9:08-CV-619, 2009 WL 3335892, at *8-9. (N.D.N.Y. Oct. 15, 2009) (Treece, M.J.).

In this instance, though plaintiff was no longer serving a prison sentence, he was confined within the SLPC for six months before his commitment order expired. In other words, he remained under the care and control of the OMH, and MHL Article 10 provided defendant with the tools to both safeguard the concerns of the community and afford McChesney with the process to which he was entitled before his term of authorized confinement expired. To be sure, pursuant to section 10.06(f), if it appears that a respondent may be released before the case review team has made its determination, and if the Attorney General determines that the protection of the public safety so requires, he or she may file a securing petition to avoid that occurrence. *See* N.Y. Mental Hyg. Law § 10.06(f). As was previously noted, without explanation, defendant failed to avail himself of this procedure

prior to October 5, 2007.  Instead, defendant provided plaintiff with no notice or opportunity to be heard with regard to his continued retention after that date.  Indeed, it was not until two months later, when plaintiff had been released as twice ordered by the Supreme Court, that defendant pursued a securing petition.[29]  In light of the foregoing, I have concluded that plaintiff's right to due process under the circumstances was clearly established at the time in question.

While "[t]he matter of whether a right was clearly established at the pertinent time is a question of law[,] . . . the matter of whether a defendant official's conduct was objectively reasonable, *i.e.*, whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact."  *Kerman v. City of New York*, 374 F.3d 93, 108–09 (2d Cir. 2004) (citations omitted).  The Second Circuit has held that where there are unresolved factual issues, a jury should decide those issues through the use of special interrogatories.  *Lore v. City of Syracuse*, 470 F.2d 127, 162 (2d Cir. 2012) (citing cases).  In *Lore*, the court

---

[29]    I note that to the extent that defendant relies on "advice of counsel" to support a qualified immunity defense, the Second Circuit has determined that because the "clearly established" prong of the qualified immunity defense presents an objective inquiry, "reliance upon the advise of counsel . . . cannot be used to support the defense of qualified immunity." *In re Cnty. of Erie*, 546 F3d 222, 229 (2008); *Holmes v. Town of East Lyme*, No. 3:09cv2088, 2012 WL 1108557, *13 (D. Conn. Mar. 30, 2012) (quoting *Erie*).

found that the situation that confronted the defendant, what acts he performed, and his motivation for performing those acts all presented questions of fact for the jury. *See id.* Similar questions remain in this case, and must be resolved before the issue of qualified immunity can be addressed.

On the record before the court, viewing the facts most favorably to the plaintiff, I have concluded that defendant has failed to demonstrate as a matter of law that his conduct was objectively reasonable *See generally Bailey*, 772 F. Supp. 2d 443; *Bloomfield*, 2009 WL 3335892, at *8-9. I therefore recommend that defendant's motion for summary judgment on the basis of qualified immunity be denied.

## IV. SUMMARY AND CONCLUSION

Undeniably, the SOMTA expresses a legislative finding that recidivistic sex offenders pose a danger to society, such that detention of those with mental abnormalities rendering them dangerous is necessary to protect the public, reduce recidivism, and ensure offenders have comprehensive treatment and management. Nonetheless, at stake in this action is the right to be free from physical restraint, one of the most fundamental in our society, and one that has been jealously guarded by the courts. In view of the

significant restriction of liberty arising out of civil confinement, it has long been held that one cannot be deprived of his or her liberty by involuntary commitment without due process of law.

It is undisputed that the procedures set forth in the SOMTA, which would have allowed plaintiff notice and an opportunity to be heard before he was detained more than seventy-two hours after the date of his anticipated release, were not followed, and as a result plaintiff was detained at the SLPC for sixty-one days before he was afforded a probable cause hearing. Moreover, on the record before the court, affording plaintiff the benefit of all favorable inferences that can be drawn, I conclude that a reasonable juror could find that defendant was personally involved in the decisions regarding whether and when to release plaintiff. And, while the court in no way implies that defendant has proceeded with anything other than good faith, the fact that he may have relied on advice of counsel, or acted with good intentions, is insufficient to establish that his conduct was objectively reasonable in light of firmly established law.

Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 12) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: July 5, 2012
Syracuse, NY

David E. Peebles
U.S. Magistrate Judge



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

***1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq*. ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g.,Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Inc. v. Stewart and Stevenson Operations, Inc.*, 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton*, 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.*, 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

***2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

***3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

***4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

***5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

FN5. In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

***6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

***7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *SeeOsier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

***8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *SeeMeiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *SeeDavis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord*[*Davis,* 119 S.Ct. at 1671](#) ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

***9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

CONCLUSION

***10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and Donald Selsky, Director of Inmate Special Housing Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Ellen Lacy Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

***1** Anthony Robinson, a former inmate incarcerated by the New York State Department of Corrections ("DOCS"), sued two DOCS employees, alleging that they violated his right to due process in the course of a disciplinary proceeding and subsequent appeal. On September 9, 1997, defendants moved for summary judgment. Defendants argued that plaintiff failed to demonstrate that the fifty days of keeplock confinement that he received as a result of the hearing deprived him of a liberty interest within the meaning of the Due Process Clause. Plaintiff did not oppose the summary judgment motion, and Magistrate Judge David N. Hurd recommended that I grant it in a report-recommendation filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b) advisory committee's note. After reviewing the record, I conclude that there is no clear error on the face of the record. After being warned by defendants' motion that he must offer proof in admissible form that his disciplinary confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Robinson failed to offer any such proof. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Consequently, he cannot maintain a due process challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is approved; and it is further

ORDERED that defendants' motion for summary judgment is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

***2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton Annex; T.J. Howard, Hearing Officer; J. Maggy, Sergeant; Byron Wind, Officer; Barry Rock, Officer; and Philip Coombe, Jr., Acting Commissioner, Defendants.
**No. 95-CV-1733 (RSP/DNH).**

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, New York, Darren O'Connor, Esq., Asst. Attorney General, of Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

***1** This matter comes to me following a report-recommendation by Magistrate Judge David N. Hurd, duly filed on the 29th of August, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995, he and some other inmates were attacked while incarcerated at Clinton Correctional Facility. Compl., Dkt. No. 1, ¶ 2. Cotto alleges that as a result of this incident he was charged with engaging in violent conduct and conduct which disturbed the order of the facility. *Id.* Although Cotto was found guilty of these charges and sentenced to a term of one year in the Special Housing Unit and loss of six months good time, his sentence was reversed on administrative appeal. *Id.* Cotto brought this action pursuant to 42 U.S.C. § 1983, alleging various violations of his rights under the Eighth and Fourteenth Amendments. *Id.*

By motion filed March 3, 1997, defendants sought summary judgment. Dkt. No. 17. Plaintiff filed no papers in opposition to the motion. In his report-recommendation, the magistrate judge recommended that I grant defendants' motion pursuant to Local Rule 7.1(b)(3), which provides that, absent a showing of good cause, failure to respond to a motion shall be deemed consent to the relief requested. Dkt. No. 19, at 2. Cotto has filed no objections to the report-recommendation.

After careful review of all of the papers herein, including the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby approved, and it is further

ORDERED that defendants' motion for summary judgement is GRANTED and the complaint against them dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the Honorable Rosemary S. Pooler, for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

***2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Valery LATOUCHE, Plaintiff,

v.

Michael C. TOMPKINS, C.O., Clinton Correctional Facility; Dean E. Laclair, C.O., Clinton Correctional Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional Facility; Michael B. King, Sgt., Clinton Correctional Facility; D. Mason, C.O., Clinton Correctional Facility; B. Malark, C.O., Clinton Correctional Facility; John Reyell, C.O., Clinton Correctional Facility; Bob Fitzgerald, R.N., Clinton Correctional Facility; John Doe, C.O. (C.O. Gallery Officer Company Upper F–6); John Doe, C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of New York, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

***1** In this *pro se* action under 42 U.S.C. § 1983, plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), claims that defendants violated his Eighth Amendment rights as a result of a physical altercation. Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Dkt. No. 46) and plaintiff opposed the motion. (Dkt. No. 53). The motions were referred to United States Magistrate Judge Randolph F. Treece for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and Recommendation (Dkt. No. 60) recommending that defendants' motion be granted in part and denied in part. Specifically, Magistrate Judge Treece recommended awarding summary judgment dismissing the following: (1) plaintiff's claims for monetary relief against all defendants in their official capacity; (2) plaintiff's claims of medical indifference against defendant Fitzgerald; and (3) plaintiff's allegations of verbal harassment by defendant Mason. Magistrate Judge Treece also recommended denying defendants' motion for summary judgment on plaintiff's excessive force claims against defendants Tompkins, LaClair, Mason, Malark and Reyell and plaintiff's failure to protect claims against defendants Ludwig and King.

Defendants filed specific objections to portions of the Report and Recommendation arguing: (1) that the Magistrate Judge erred in "overlooking" plaintiff's failure to comply with Local Rule 7.1(a) (3); (2) that the Magistrate Judge erred when he failed to apply the *Jeffreys* exception as plaintiff's testimony was incredible as a matter of law; and (3) plaintiff's excessive force claims against defendant Reyell are subject to dismissal for lack of personal involvement. (Dkt. No. 61). Plaintiff does not object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C. § 636(b) (1)(c), this Court conducts a *de novo* review of these issues. The Court reviews the remaining portions of the Report–Recommendation for clear error or manifest injustice. *See* *Brown v. Peters,* 1997 WL 599355, *2–3 (N.D.N.Y.), *af'd without op.,* 175 F.3d 1007 (2d Cir.1999); *see also* *Batista v. Walker,* 1995 WL 453299, at *1 (S.D.N.Y.1995) (when a party makes no objection to a portion of the report-recommendation, the Court reviews that portion for clear error or manifest injustice). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

**DISCUSSION**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**I. Local Rule 7.1(a)(3)**

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [FN1]

FN1. Local Rule 7.1(a)(3) provides:

> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
>
> The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

***2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

> Q. ... Have you read the complaint?
>
> A. Yes, ma'am.
>
> Q. So, you are aware of its contents?
>
> A. Yes, ma'am.
>
> Q. Did anyone help you prepare the complaint?
>
> A. No, ma'am.
>
> Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See* *Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See* *Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also* *Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

FN2. While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

**II. *Jeffreys* Exception**

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

***3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

***4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See* *Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also* *Cruz v. Church,* 2008 WL 4891165, at *5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See* *Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**III. Reyell's Personal Involvement**

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" .[FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

FN3. Officer Rock is not a defendant herein.

***5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....
>
> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

> Q. What about Defendant Reyell, why are you suing Reyell?
>
> A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.
>
> Q. How so?
>
> A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.
>
> * * *
>
> Q. Reyell and another officer took your shirt off?
>
> A. Yes, ma'am.
>
> Q. Do you remember the other officer's name?
>
> A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

***6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

**CONCLUSION**

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



C

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Idris LITTMAN, Plaintiff,

v.

Daniel SENKOWSKI, Superintendent, Clinton Correctional Facility; D. Meier, Inmate Records Coordinator, Clinton Correctional Facility; John Doe # 1, Superintendent, Downstate Correctional Facility; and John Doe # 2, Inmate Records Coordinator, Downstate Correctional Facility, Defendants.

No. 9:05-CV-1104 (LEK/GHL).

Feb. 11, 2008.

Idris Littman, Dannemora, NY.[FN1]

FN1. Although this is the address of record for Plaintiff on this action's docket, DOCS' online “Inmate Lookup” Service indicates (as of the date of this Report-Recommendation) that Plaintiff is currently incarcerated at Upstate Correctional Facility, P.O. Box 2000, 309 Bare Hill Road, Malone, N.Y. 12953.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Jeffrey M. Dvorin, Esq., Assistant Attorney General, of Counsel, Albany, NY.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

***1** This matter comes before the Court following a Report-Recommendation filed on December 31, 2007, by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 22).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party “may serve and file specific, written objections to the proposed findings and recommendations,” FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Lowe's Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 22) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 18) is **GRANTED** and Plaintiff's claims against Senkowski and Meier are **DISMISSED with prejudice;** and it is further

**ORDERED,** that Plaintiff's claims against John Doe # 1 and John Doe # 2 be **DISMISSED** with prejudice due to the applicable statute of limitations (for the reasons set forth in Part III. A of the Report-Recommendation), or in the alternative, due to Plaintiff's failure to serve or even name those individuals, in violation of Fed. R. Civ. P 4(m), 16(f), and/or 41(b); and it is further

**ORDERED,** that any appeal taken from the Court's final judgment in this action would not be taken in good faith pursuant to 28 U.S.C.1915(a)(3); and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for a Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Plaintiff Idris Littman (“Plaintiff”), while an inmate at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Clinton Correctional Facility ("Clinton C.F."), commenced this *pro se* civil rights action pursuant to 42 U.S.C. § 1983.

Liberally construed, Plaintiff's Complaint alleges that four employees of the New York State Department of Correctional Services ("DOCS")-Clinton C.F. Superintendent Daniel Senkowski, Clinton C.F. Inmate Records Coordinator D. Meier, Downstate Correctional Facility Superintendent John Doe # 1, and Downstate C.F. Inmate Records Coordinator John Doe # 2-violated Plaintiff's rights under the Fourth, Eighth and Fourteenth Amendments when, between February of 2002 and September of 2002, they (1) negligently or perhaps recklessly miscalculated the "parole jail-time credits" to which he was entitled, resulting in his being incarcerated in DOCS two hundred and eighteen (218) days past his "maximum release date," and (2) negligently or perhaps recklessly refused to promptly correct the error once they were notified of it through the filing of Plaintiff's state habeas corpus proceeding on August 7, 2002, challenging the miscalculation. (*See generally* Dkt. No. 1 [Plf.'s Am. Compl.].)

***2** Currently pending before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 18.) [FN2] Despite having been advised of the potential consequences of failing to respond to Defendants' motion, and having been given three extensions of the time by which to so respond, Plaintiff has not responded. For the reasons that follow, I recommend that Defendants' motion be granted. In addition, I recommend that the Court dismiss Plaintiff's claims against John Doe # 1 and John Doe # 2 for failure to serve.

FN2. Defendants' motion for summary judgment is brought by Defendants Senkowski and Meier only. No indication exists on the docket that either John Doe # 1 or John Doe # 2 was ever named or served.

## I. LEGAL STANDARD GOVERNING UNOPPOSED MOTIONS

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN4]

FN3. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN4. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN5] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN6] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN7]

FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN6. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN7. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

What this burden-shifting standard means when a plaintiff has failed to respond to a defendant's motion for summary judgment is that "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." FN8 Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendant.FN9 However, the plaintiff's failure to respond to the defendant's motion for summary judgment lightens the defendant's burden on the motion.

FN8. *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

FN9. *See* *Champion,* 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits of Plaintiffs claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

More specifically, where a plaintiff has failed to respond to a defendant's statement of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true FN10 to the extent that (1) those facts are supported by the evidence in the record,FN11 and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.FN12 Here, I note that Plaintiff was so advised by Defendants on or about July 14, 2007. (Dkt. No. 18, Part 1, at 1-2 [Defendants' Notice of Motion].) Clearly, Plaintiff was aware of these potential consequences since he requested (and was granted) *three* extensions of the response-filing-deadline. (Dkt.Nos.19-21.)

FN10. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

FN11. *See* *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3, 2002 WL 449757 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

FN12. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

***3** Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [FN13] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.*[FN14] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [FN15]

FN13. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

FN14. *Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2, 2007 WL 894375 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40, 2007 WL 951447 (N .D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

FN15. *See* *Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as “modest”) [citing *Celotex Corp. v. Catrett, Ml* U.S. 317, 323-324 (1986) ]; *accord,* *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *cf.* *Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord,* *Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[FN16] However, in the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN17] Here, I note that Plaintiff's Complaint contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 1.) That having been said, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. [FN18] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN19] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) “largely unsubstantiated by any other direct evidence” and (2) “so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.” [FN20]

FN16. *See* *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) (“We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.”) [citations omitted]; *accord,* *Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN17. *See* *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) (“[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment.”); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff “was entitled to rely on [his verified amended complaint] in opposing summary judgment”), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) (“A verified complaint is to be treated as an affidavit for summary judgment purposes.”) [citations omitted].

FN18. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant “set forth specific facts showing that there is a genuine issue for trial”); *Patterson,* 375

Page 6

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN19. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN20. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants' Rule 7.1 Statement contains eleven paragraphs of factual assertions, each of which is supported by an accurate citation to the record. (*See generally* Dkt. No. 18, Part 2.) Plaintiff has failed to file a response to this Rule 7.1 Statement, despite having been specifically advised of the potential consequences of failing to file such a response. (Dkt. No. 18, Part 1, at 1-2 [Defendants' Notice of Motion].) [FN21] As a result, I accept each of the factual assertions as true. *See* N.D.N.Y. L.R. 7.1(a)(3) ( *"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

FN21. As explained above in Part I of this Report-Recommendation, I note that, clearly, Plaintiff was aware of these potential consequences since he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

requested (and was granted) *three* extensions of the response-filing-deadline. (Dkt.Nos.19-21.)

With a few modifications, I summarize these factual assertions below in a "chronology of material events." These modifications are mainly due to an effort to summarize each of the material facts in one comprehensive chronology, and an effort to omit certain facts that I do not find to be material to Defendants' motion. Among the facts that I do not find to be material is any reference to Exhibit B to Defendants' motion, which is a "Certificate of Credited Jail Time" issued by the Albany County Sheriff's Department at some point in 1996. (Dkt. No. 18, Part 3, at 8 [Ex. B to Simone Affirm.] .) I find this document to be of no real relevance to Defendants' motion since the document regards a credit of pre-trial and post-trial jail time Plaintiff earned (with regard to his original conviction of burglary) in 1996, while Plaintiff's Complaint and Defendants' motion regard a credit of parole jail time Plaintiff earned (with regard to another violation) in 2000 and 2001. Moreover, this document is potentially confusing since it regards an amount of jail time credit that, coincidentally, equals the exact same amount of jail time credit at issue in this action, namely 253 days. As a result, I find that the following "chronology of material events" accurately summarizes the material facts established by the record on Defendants' motion:

***Chronology of Material Events***

| | |
|---|---|
| **11/01/96** | Received by DOCS for service of sentence of 3-to-6 years for burglary. |
| **02/17/00** | Conditionally released from incarceration for burglary conviction. |
| **09/14/00** | Arrested on charges of grand larceny and criminal mischief. Charged (on 09/20/00) with violating terms of conditional release. Convicted (on 01/08/01) of parole violation, which was deemed to occur on 09/14/00. |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | |
|---|---|
| **09/14/00-05/24/01** (253-Day Period) | Served jail time. (At the time, this period of incarceration was deemed to be due to charges of grand larceny and criminal mischief.) |
| **05/24/01** | Released on pending charges of grand larceny and criminal mischief. |
| **05/25/01-08/02/01** (70-Day Period) | Served jail time due to parole violation. |
| **08/03/01** | Returned to DOCS custody as parole violator, in order to serve remainder of sentence for burglary. Received (on 08/06/01) Certificate from Division of Parole, crediting him with having already served **70 days** of "parole jail-time" based on incarceration between 05/25/01 and 08/02/01. |
| **03/26/02** | Pled guilty to crime of harassment. Though crime carried maximum of 15-days imprisonment, Plaintiff was sentenced to "time served." |
| **08/07/02** | Filed habeas corpus proceeding in state court, seeking additional "parole jail-time credit" of **253 days** with regard to remaining sentence for burglary, based on incarceration between 09/14/00 and 5/25/01, since his ultimate conviction of harassment carried only 15-day sentence. |
| **09/12/02** | Received decision by state court holding that he is entitled to additional "parole-time credit" of having already served 253 days based on incarceration between 09/14/00 and 5/25/01. |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | |
|---|---|
| **09/13/02** | Received amended Certificate from Division of Parole, increasing “parole jail time credit” from 70 days to 323 days (i.e ., based on addition of 253 days of “parole jail-time credit”). |
| **09/16/02** | Discharged from DOCS because maximum release date had been 02/13/04 (216 days earlier) under new calculation. |
| **08/28/05** | Signed Complaint in the current action. |

**III. ANALYSIS**

**A. Statute of Limitations**

***4** Defendants argue that (1) the statute of limitations for claims arising under Section 1983 is three years, (2) here, Plaintiff's Section 1983 claims accrued more than three years before August 28, 2002, when Plaintiff mailed his Complaint to the Clerk of Court, and (3) therefore, Plaintiff's Section 1983 claims are time barred. (Dkt. No. 18, Part 4, at 4 [Defs.' Mem. of Law].)

Because Plaintiff does not respond to Defendants' statute-of-limitations argument in their properly filed motion for summary judgment, the sole issue before the Court is whether that argument has, at the very least, facial merit. *See, supra,* Part I of this Report-Recommendation (describing the legal standard governing unopposed motions for summary judgment). After reviewing Defendants' memorandum of law, Rule 7.1 Statement, and the governing law, I answer that question in the affirmative. Even if I were to subject Defendants' statute-of-limitations argument to more rigorous scrutiny, I would accept that argument as persuasive.

“The applicable statute of limitations for § 1983 actions arising in New York requires claims to be brought within three years .” *Pinaud v. County of Suffolk,* 52 F.3d 1138, 1156 (2d Cir.1995) [citations omitted]; *see also Connolly v. McCall,* 254 F.3d 36, 40-41 (2d Cir.2001) (“[Plaintiff's] federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed by New York's three-year statute of limitations for personal injury actions ....”) [citations omitted]. Moreover, a claim arising under Section 1983 accrues “when the plaintiff knows or has reason to know of the harm that he seeks to redress.” *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) [internal quotation marks and citation omitted], *accord, Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002) [internal quotation marks and citations omitted].

Here, on August 6, 2001, the New York State Division of Parole issued a “Parole Jail Time Certificate” that did not credit Plaintiff with the 253 days of “parole jail time” for the period of September 14, 2000, to May 24, 2001. [FN22] I have trouble finding that Plaintiff had “reason to know” of the omission of the 253-day credit when the Certificate was issued, since at that time the omission appears to have been entirely proper in that the 253-day period of incarceration was due to the pending charges of grand larceny and criminal mischief, which Plaintiff was facing.

FN22. (Dkt. No. 18, Part 3, at 10 [Ex. C to Simone Affirm.].)

However, I do find that Plaintiff had “reason to know” of the omission (of the 253-day credit from the Certificate) by March 26, 2002, when he pled guilty to the crime of harassment, which carried a maximum penalty of 15-days' imprisonment. This is because the 15-day maximum penalty effectively *changed* the 253-day period in question from a period of incarceration due to the charges of grand larceny and criminal mischief to a period of incarceration due to a parole violation, warranting his immediate release on the parole violation.[FN23] (I note that Plaintiff has also alleged that, during this time period, he started to experience injuries as a result of his continued incarceration, including the denial of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

opportunity to attend the funeral of a relative, giving him added reason to scrutinize the Certificate.) FN24 In any event, he certainly had *actual knowledge* of the omission (of the 253-day credit from the Certificate) by August 7, 2002, when he filed a habeas corpus proceeding in state court, seeking the 253-day credit at issue.FN25 Under either of these two scenarios, the three-year limitations period had expired by the time Plaintiff signed the Complaint in this action, on August 28, 2005.

FN23. *See Littman v. Senkowski,* Index No. 02-940, Decision, at 3 (N.Y. Sup.Ct., Clinton County, filed Sept. 12, 2002) (Felstein, J.S .C.) ("This Court ... must ... attempt to understand the *implication* of [Plaintiff's] sentence [upon his conviction for the crime of harassment] in the present context [of parole jail-time credits].") [emphasis added] (attached as Ex. E to Simone Affirm., *see* Dkt. No. 18, Part 3, at 16).

FN24. (Dkt. No. 1, ¶ III.)

FN25. (Dkt. No. 18, Part 3, at 14 [Ex. E to Simone Affirm.].)

***5** I note that I am specifically persuaded by Defendants' argument that the three-year limitations period did *not* begin to run on September 12, 2002, when the state court issued its decision granting Plaintiffs habeas corpus petition. "The reference to 'knowledge of injury' [in the above-described standard] does not suggest that the statute [of limitations] does not begin to run until the claimant has received judicial verification that the defendants' acts were wrongful." *Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1995) [citations omitted], *accord, Shannon v. Selsky,* 04-CV-1939, 2005 U.S. Dist. LEXIS 3823, *13, 2005 WL 578943 (S.D.N.Y. March 10, 2005); *see also Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) ("We have held ... that a plaintiff's pursuit of a state remedy, such as an Article 78 proceeding, does not toll the statute of limitations for filing a claim pursuant to section 1983.") [citations omitted], *accord, LeBron v. Swaitek,* 05-CV-0172, 2007 U.S. Dist. LEXIS 81587, at *7, n. 5, 2007 WL 3254373 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.).

As a result, I recommend that the Court dismiss Plaintiff's claims against all four Defendants as time barred.

**B. Failure to State a Claim**

Defendants Senkowski and Meier argue that they had no discretion or control over (1) the Department of Parole's decision to credit only 70 days parole jail time in Plaintiff's original Division of Parole "Parole Jail Time Certificate," issued on August 6, 2002,FN26 and (2) any "failure" by the Department of Parole to issue an Amended Certificate before September 13, 2002.FN27 (Dkt. No. 18, Part 4, at 4-5 [Defs.' Mem. of Law].) Again, because Plaintiff does not respond to this argument, the sole issue before the Court is whether the argument has, at the very least, facial merit. After reviewing Defendants' memorandum of law, Rule 7.1 Statement, and the governing law, I answer that question in the affirmative.

FN26. (Dkt. No. 18, Part 3, at 10 [Ex. C to Simone Affirm.].)

FN27. (Dkt. No. 18, Part 3, at 12 [Ex. D to Simone Affirm.].)

After carefully considering Defendants' lack-of-discretion argument, I have concluded that it is, at its core, an attack on the pleading sufficiency of Plaintiff's Complaint. (*See, e.g.,* Dkt. No. 18, Part 4, at 5 [Defs.' Mem. of Law, arguing, "Plaintiff merely offers conclusory allegations ..." and "[s]uch allegations hardly provide an adequate basis ..."].) As stated above, I liberally construe Plaintiff's Complaint as alleging (in a conclusory fashion) that Defendants Senkowski and Meier acted with negligence or perhaps recklessness when they assisted in miscalculation of, or failed to correct, Plaintiff's "parole jail-time credits." The problem is that Plaintiff has alleged no facts plausibly suggesting that, during the relevant time period, Defendants Senkowski and Meier acted with the sort of recklessness (or intent) necessary to state a constitutional claim.FN28

FN28. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment.") *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ("There must be allegations of deliberate falsehood or of reckless disregard for the truth [to state a claim under

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Fourth Amendment].”); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ( “The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.”) [internal quotation marks and citations omitted]; *Madiwale v. Savaiko,* 117 F.3d 1321, 1326-27 (11th Cir.1997) ( “[A] warrant affidavit violates the Fourth Amendment when it contains omissions made intentionally or with a reckless disregard for the accuracy of the affidavit.”) [internal quotation marks and citation omitted].

At most, Plaintiff has alleged facts plausibly suggesting that Defendant Meier may have exhibited a hint of negligence by not *somehow* persuading the Division of Parole to issue an Amended Certificate between March 26, 2002 (when Plaintiff pled guilty to the crime of harassment, which carried a maximum penalty of 15-days imprisonment), and September 12, 2002 (when the state court issued its decision requiring such an Amended Certificate).[FN29] I hasten to add that Plaintiff has alleged no facts plausibly suggesting precisely *how* Defendant Meier could have so persuaded the Division of Parole, especially given the legal issue created by the sentence of “time served” that Plaintiff received on March 26, 2002. In any event, even if Plaintiff had alleged such facts, such an allegation of negligence would not be actionable under 42 U.S.C. § 1983.[FN30]

FN29. I note that Plaintiff has alleged no facts plausibly suggesting that the individual who signed the original Parole Jail Time Certificate on August 6, 2001 (apparently “Kathleen Jack”) made any sort of mistake whatsoever. This is because it was only after Plaintiff pled guilty to harassment, which carried a maximum penalty of 15-days imprisonment, on March 26, 2002, that the 253-day period in question effectively changed from a period of incarceration due to the charges of grand larceny and criminal mischief to a period of incarceration due to a parole violation.

FN30. *See, e.g., Farmer,* 511 U.S. at 835 (“[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence.”); *Daniels v. Williams,* 474 U.S. 327, 331-33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (stating that “injuries inflicted by governmental negligence are not addressed by the United States Constitution” and rejecting § 1983 claim based on alleged due process violation under Fourteenth Amendment); *Hudson v. Palmer,* 486 U.S. 517, 531, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1984) (“[T]he Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently deprives an individual of property ....”); *Franks,* 438 U.S. at 171 (“Allegations of negligence or innocent mistake are insufficient [to state a claim under the Fourth Amendment].”); *Riddick v. Modeny,* No. 07-1645, 2007 WL 2980186, at *2 (3d Cir. Oct.9, 2007) (“The protections afforded prisoners by the Due Process Clause of the Fourteenth Amendment are not triggered by the mere negligence of prison officials.”); *Billington v. Smith,* 292 F.3d 1177, 1190 (9th Cir.2002); (“The Fourth Amendment's ‘reasonableness' standard is not the same as the standard of ‘reasonable care’ under tort law, and negligent acts do not incur constitutional liability.”); *Myers v. Okla. County Bd. of County Com'rs,* 151 F.3d 1313, 1320 (6th Cir.1998) (“[A]ctions leading to a confrontation, such as the decision to enter the apartment, must be more than merely negligent to be “unreasonable” for purposes of the Fourth Amendment inquiry.”); *Madiwale,* 117 F.3d at 1326 (“Negligent or innocent mistakes do not violate the Fourth Amendment.”); *Sevier v. City of Lawrence, Kan.,* 60 F.3d 695, 699, n. 7 (10th Cir.1995) (“Mere negligent actions precipitating a confrontation [that was the subject of plaintiff's Fourth Amendment claim] would not, of course, be actionable under § 1983.”).

***6** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendants Senkowski and Meier based upon Plaintiff's failure to state a claim against them.

**C. Lack of Personal Involvement of Defendant Senkowski**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants argue that, in the alternative, Plaintiff's claims against Defendant Senkowski should be dismissed because Plaintiff has neither alleged facts plausibly suggesting, nor adduced any evidence establishing, the personal involvement of Defendant Senkowski in any of the constitutional violations alleged. (*See* Dkt. No. 18, Part 4, at 5-6 [Defs.' Mem. of Law].) Again, because Plaintiff does not respond to this argument, the sole issue before the Court is whether the argument has, at the very least, facial merit. After reviewing Defendants' memorandum of law, Rule 7.1 Statement, and the governing law, I answer that question in the affirmative.

For the sake of argument, I will set aside the issue of whether the allegations in Plaintiff's Complaint give Defendant Senkowski "fair notice" of Plaintiff's claim against him, sufficient to state such a claim, under Fed.R.Civ.P. 8 and 12. Even if this were so, no rational fact finder could find, based merely on the sworn assertions in Plaintiff's Complaint, that Defendant Senkowski was personally involved in any constitutional violation.

Specifically, in his Complaint, Plaintiff offers sworn assertions that (1) Defendant Senkowski, *solely by virtue of his position as Superintendent of Clinton C.F. during the relevant time period,* was "fully aware and informed about the facts that form the basis of this complaint," (2) "[a]ll defendants [,] despite full awareness of the erroneous refusal/failure to give me credit for parole jail time herein[,] refused and failed to properly calculate and give me credit for parole jail time to which I was entitled," and (3) "[e]ach defendant was well aware of my illegal detention and refused to correct the erroneous time computation." (Dkt. No. 1, ¶¶ II.D.3., II.D.6., II.D.12.)

However, the simple fact that allegations are sworn does not convert them into admissible evidence sufficient to create a factual issue for purposes of a motion for summary judgment. As explained above in Part I of this Report-Recommendation, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.

Here, there are no facts asserted in Plaintiff's Complaint specifying *why* Defendant Senkowski was personally involved in the miscalculation of, or failure to correct, Plaintiff's parole time credits, other than his role as the supervisor of the prison. For example, Plaintiff does not assert that he ever wrote or spoke to Defendant Senkowski about his claim to the 253-day credit at issue, nor does Plaintiff attach to his Complaint any relevant parole documents bearing Senkowski's signature (nor are any such documents attached to Defendants' motion papers).

***7** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Senkowski based on his lack of personal involvement in the constitutional violations alleged.

**D. Qualified Immunity**

Because I have already concluded that adequate grounds exist upon which to base a recommendation of dismissal of Plaintiffs claims against Defendants Senkowski and Meier, I need not, and do not, reach the merits of Defendants' alternative argument in favor of dismissal, namely, their qualified immunity argument (*see* Dkt. No. 18, Part 4, at 6-7 [Defs.' Mem. of Law] ) other than to note that (1) their argument appears to have facial merit and (2) Plaintiff has failed to respond to that argument.

**E. Failure to Serve or Even Name "John Doe # 1" and "John Doe # 2"**

On September 1, 2005, Plaintiff filed his Complaint in this action, which asserted claims against, *inter alia,* "John Doe # 1" (i.e., the Superintendent of Downstate C.F. during the relevant time period) and "John Doe # 2" (i.e., the Inmate Records Coordinator of Downstate C.F. during the relevant time period). (Dkt. No. 1.)

On December 14, 2005, Judge Kahn ordered, *inter alia,* that (1) "the Clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshall for service on the remaining defendants," and (2) "Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action." (Dkt. No. 6, at 3-4.) That same day, the Clerk's Office wrote Plaintiff a letter requesting him to complete USM 285 Forms for each of the remaining Defendants. (Dkt. No. 7.)

However, Plaintiff never returned a USM 285 Form for either John Doe # 1 (i.e., the Superintendent of Downstate C.F.) or John Doe # 2 (i.e., the Inmate Records Coordinator of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Downstate C.F.). (*See generally* Docket [reflecting no "Acknowledgment of Service" or "Summons Returned Unexecuted" for either of these two Defendants].) Nor did Plaintiff ever file, or even attempt to file, an Amended Complaint naming either of these two individuals. (*See generally* Docket.)

Because Plaintiff has not offered "good cause" for his failure to enable the Marshals Service to effect service on either John Doe # 1 (i.e., the Superintendent of Downstate C.F.) or John Doe # 2 (i.e., the Inmate Records Coordinator of Downstate C.F.), I find that Plaintiff has violated Fed.R.Civ.P. 4(m). Alternatively, I find that Plaintiff has violated Fed.R.Civ.P. 16(f) due to the fact that he violated Judge Kahn's Order of December 14, 2005, directing him to "comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action." (Dkt. No. 6, at 4.) Alternatively, I find that Plaintiff has violated Fed.R.Civ.P. 41(b) by failing to diligently prosecute his claims against John Doe # 1 and John Doe # 2.

As a result, should the Court decide for some reason not dismiss Plaintiff's claims against John Doe # 1 and John Doe # 2 based on the applicable statute of limitations (for the reasons described above in Part III.A. of this Report Recommendation), I recommend that, in the alternative, the Court dismiss Plaintiff's claims against John Doe # 1 and John Doe # 2 based on Plaintiff's failure to serve or even name them.

***8** I note that, under Fed.R.Civ.P. 4(m) and 16(f), the Court need not issue such an order only upon motion of defense counsel but may do so *sua sponte. See* Fed. R. Civ. 4(m) ("[T]he Court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time."); Fed. R. Civ. 16(f) ("[T]he judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just ...."). FN31 Furthermore, with regard to Fed.R.Civ.P. 41(b), which speaks only of a *motion* to dismiss on the referenced grounds, courts retain the "inherent power" to *sua sponte* "clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *see also Saylor v. Bastedo,* 623 F.2d 230, 238 (2d Cir.1980); *Theilmann v. Rutland Hospital, Inc.,* 455 F.2d 853, 855 (2d Cir.1972). Indeed, Local Rule 41.2(a) recognizes this authority. *See* N.D.N.Y. L.R. 41.2(a) ("Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge *shall* order it dismissed.") [emphasis added].

FN31. In the event the Court were to base its dismissal of Plaintiff's claims against the John Doe Defendants on Fed.R.Civ.P. 4(m), this Report-Recommendation would serve as the requisite notice to Plaintiff.

**F. Failure to Notify Court of Change in Address**

On December 14, 2005, Judge Kahn ordered Plaintiff, *inter alia,* to keep the Clerk's Office apprised of his current address. (Dkt. No. 6, at 6.) Specifically, Judge Kahn advised Plaintiff that he ***"is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so will result in the dismissal of this action."*** (*Id.*)

Moreover, Local Rule 10.1 imposes on a plaintiff a duty to promptly notify the Court of any change in his address. *See* N.D .N.Y. L.R. 10.1(b)(2) (imposing on plaintiffs a duty to **"immediately notify the Court of any change of address"**) [emphasis in original]. This duty has been found to also be imposed by Fed.R.Civ.P. 41(b). FN32

FN32. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 U.S. Dist. LEXIS 13929, at *2-3, 1997 WL 567961 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ("Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

Here, Plaintiff's current address of record in this action is "Clinton Correctional Facility, PO Box 2001, Dannemora, N.Y. 12929." (*See* Docket.) However, based on my review of the DOCS' online "Inmate Lookup" Service, it appears that Plaintiff's current address is Upstate Correctional Facility, P.O. Box 2000, 309 Bare Hill Road, Malone, N.Y. 12953. FN33 While I cannot determine when Plaintiff was apparently transferred

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

from Clinton C.F. to Upstate C.F., I note that Plaintiff's last filing in this action was dated September 11, 2007. (Dkt. No. 21.) I note also that in Plaintiff's filing dated July 3, 2007, his return address was not Clinton C.F. but was *Great Meadow C.F.* Thus, Plaintiff's failure to notify the Court of his current address appears to have persisted for some three to six months now. *Pro se* actions have been dismissed for failure to comply with a court order even where the failure was for four months. *See, e.g., Georgiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) (plaintiff had failed to comply with order directing him to answer interrogatories for more than four months).

FN33. *See* New York DOCS' "Inmate Lookup Service" http:// nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/ WINQ130 (last visited Dec. 31, 2007).

***9** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's Complaint for failure to notify the Court of his current address.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 18) be ***GRANTED*** for the reasons set forth above, and that Plaintiff's claims against Defendants Senkowski and Meier be ***DISMISSED* with prejudice;** and it is further

**RECOMMENDED** that Plaintiff's claims against John Doe # 1 and John Doe # 2 be ***DISMISSED* with prejudice** due to the applicable statute of limitations (for the reasons set forth above in Part III.A. of this Report-Recommendation), or, in the alternative, due to Plaintiff's failure to serve or even name those individuals, in violation of Fed.R.Civ.P. 4(m), 16(f), and/or 41(b); and it is further

**RECOMMENDED** that the Court certify in writing that any appeal taken from the Court's final judgment in this action would not be taken in good faith, for purposes of 28 U.S.C. § 1915(a)(3); and it is further

**ORDERED** that the Clerk's Office shall send a copy of this Report-Recommendation to Plaintiff at both (1) his address of record on the docket in this action and (2) Upstate Correctional Facility, P.O. Box 2000, 309 Bare Hill Road, Malone, N.Y. 12953.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.

Littman v. Senkowski
Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Faris ABDUL-MATIYN, Plaintiff,
v.
Governor George PATAKI, Governor; Allen, Correction Officer; Rowe, Correction Officer; Valezquez, Correction Officer; Benbow, Correction Officer; Johnson, Sullivan Correctional Facility Senior Parole Officer; John Doe, 1, Sullivan Correctional Facility Audiologist; John Doe 2, Sullivan Correctional Facility Counselor; Walsh, Sullivan Correctional Facility Superintendent; John Doe 3, Sullivan Correctional Facility Psychiatrist; John Doe # 4, Cnypc Psychiatrist; Elizabeth Farnum, Doctor; Debroize, Doctor; Forshee, Doctor; Pete Hanmer, Cnypc Primary Therapist; Tom Murphy; Jeff Nowicki; Sharon Barboza, Director Cnypc Sotp Program; Sawyer, Director, Cnypc; Cnypc Medical Staff; Michelle Payne, Former Cnypc Program Rehabilitation Counselor; Steve Capolo; and Linda Becker, Defendants.
**No. 9:06-CV-1503 (DNH)(DRH).**

April 8, 2008.

Faris Abdul-Matiyn, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General State of New York, Gerald J. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants Johnson, Walsh, Farnum, Debroize, Forshee, Hanmer, Murphy, Nowicki, Barboza, Sawyer, CNYPC Medical Staff, Capolo, and Becker.

Kloss, Stenger, Kroll & Lotempio, David W. Kloss, Esq., of Counsel, Buffalo, NY, for Defendants Allen, Rowe, Valezquez, and Benbrow.

***DECISION and ORDER***

DAVID N. HURD, District Judge.

***1** Plaintiff, Faris Abdul-Matiyn, brought this civil rights action pursuant to 42 U.S.C. § 1983. By a voluminous Report-Recommendation dated February 19, 2008, the Honorable David R. Homer, United States Magistrate Judge, addressed the numerous issues in this matter with the recommendations that:

1. The motion of Walsh and Johnson to sever be denied;

2. The motion of Walsh and Johnson to dismiss be granted as to plaintiff's conspiracy claim against defendant Johnson for failure to intervene, and denied in all other respect;

3. The state defendants' motion to dismiss be granted in all respects as to defendant Sawyer; granted in all respects as to plaintiff's claim for denial of access to the courts, and denied in all other respects;

4. The City defendants' motion to dismiss be denied in all respects;

5. The motion of defendant CNYPC Medical Staff to dismiss be granted; and

6. The complaint be dismissed without prejudice as to defendants George Pataki, Michelle Payne, and John Does I-IV.

No objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Homer, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Report-Recommendation is accepted and adopted in its entirety. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that:

1. Defendant Walsh and Johnson's motion to sever is DENIED;

2. Defendant Walsh and Johnson's motion to dismiss is GRANTED with regard to plaintiff's conspiracy claim against defendant Johnson for failure to intervene, and DENIED in all other respects;

3. The state defendants' motion to dismiss is GRANTED in all respects with regard to defendant Sawyer, GRANTED in all respects with regard to plaintiff's claim for denial of access to the courts, and DENIED in all other respects;

4. The City defendants' motion to dismiss is DENIED in all respects;

5. The motion of defendant CNYPC Medical Staff to dismiss is GRANTED; and

6. The complaint is DISMISSED without prejudice with regard to defendants George Pataki, Michelle Payne, and John Does I-IV.

7. The Clerk is directed to enter judgment accordingly, and the remaining defendants are instructed to file and serve answers with regard to the remaining claims on or before April 29, 2008.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Faris Abdul-Matiyn ("Abdul-Matiyn"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, [FN2] twelve DOCS employees [FN3] ("State defendants"), four New York City Corrections Officers ("City defendants"), and the Central New York Psychiatric Center ("CNYPC") Medical Staff ("CNYPC defendants"), violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments. Compl. (Docket No. 1). Presently pending are a motion to sever defendants Walsh and Johnson pursuant to Fed.R.Civ.P. 21 or, in the alternative, to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 17) and motions to dismiss from the State defendants (Docket Nos. 44, 47), [FN4] the City defendants (Docket No. 46), and defendant CNYPC Medical Staff defendants (Docket No. 55) pursuant to Fed.R.Civ.P. 12(b)(6). Abdul-Matiyn opposes all motions. Docket Nos. 45, 48, 62. For the following reasons, it is recommended that (1) the motion of Walsh and Johnson to sever be denied and their motion to dismiss be granted in part and denied in part, (2) the State defendants' motion be granted in part and denied in part, (3) the City defendants' motion be denied, and (4) the motion of the CNYPC Medical Staff be granted.

FN2. Abdul-Matiyn initially named twenty-six defendants. Compl. By an order entered January 26, 2007, the Court *sua sponte* dismissed three of the defendants. Docket No. 8. Defendants Pataki and Payne have not been served or otherwise appeared in this action. Likewise, defendants John Does I-IV have neither been served nor further identified. More than 120 days have elapsed since the complaint was filed. Accordingly, it is recommended that the complaint be dismissed without prejudice as to these six defendants pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN3. Two of the State defendants, Walsh and Johnson, are employed by Sullivan Correctional Facility and, while represented by the same attorney as the other State defendants, have filed separate motions.

FN4. The State defendants initially moved to dismiss which was later discovered to contain an error in the electronic scanning of the documents. Docket No. 47. By an order dated May 29, 2007 (Docket No. 44, Pt. 1), that motion was stricken from the record and replaced by Docket No. 47. Docket No. 49.

### I. Background

***2** The facts are presented in the light most favorable to Abdul-Matiyn as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Abdul-Matiyn "was released from Woodburn [Correctional Facility], after ... serv[ing] sixteen years and eight months ....“ Compl. at 13. Abdul-Matiyn thereafter "attended [and completed] sex therapy, alternative[s] to violence, [and] psychological programs ....“ *Id.* However, on May 5, 2005, Abdul-Matiyn was arrested and detained at Rikers Island due to a parole violation. *Id.*

Upon his arrival at Rikers Island, Abdul-Matiyn complained of "arthritis, back problems (pains), a history of heart problems, a history of blackouts ..," and kidney and bladder stones. *Id* . On July 6, 2005, Abdul-Matiyn requested a sick call because he was "having severe back pains, that were making it almost impossible for him to walk ... [and] a tightness in his chest and strong chest pains." *Id.* at 7. Abdul-Matiyn alleges that he was sent back to his cell, and despite his continued complaints, crippling pain, and pleas to go to the hospital, defendants Allen and Benbow ignored his requests. *Id.* at 7-8. Defendant Valezquez replaced Allen and "[Abdul-Matiyn] and the inmates informed [her] that [AbdulMatiyn] was having chest and back pains ... [so she] called the hospital and she was told to send [him] right down." *Id.* at 8. Benbow approached Valezquez to inquire where AbdulMatiyn was going and when Valezquez informed her that he was going to the hospital, Benbow allegedly referred to Abdul-Matiyn by a racial epithet and called the hospital, instructing them to put Abdul-Matiyn "on the burn". *Id.*

Defendant Rowe met Abdul-Matiyn upon his arrival at the hospital. *Id.* She informed him that he was "on the burn" and "[d]espite [Abdul-Matiyn's] persistent complaints of chest and back pains ..," Rowe did not let him see a doctor until over three and one-half hours later. *Id.* at 9. Abdul-Matiyn's chest pains had subsided, but he was still suffering from back pain and was prescribed methocarbamol. *Id.* Abdul-Matiyn contends that the physician informed him that due to the hospital's faulty equipment, the methocarbarnol was the only treatment available and that any persisting pain would have to be managed with Abdul-Matiyn's ability to use his mind to control the discomfort. *Id.*

Additionally, Abdul-Matiyn alleges that on another occasion where he was rushed to the clinic "due to severe pains [in his] chest, back and belly ..", he encountered Rowe, who stated that "they had something special in store for [Abdul-Matiyn]" and refused to provide Abdul-Matiyn with immediate medical treatment. *Id.* at 12. Abdul-Matiyn also contends that some of Rowe's saliva landed on his face and in his mouth while Rowe was speaking to him and attributed this exchange of bodily fluids to his contraction of Hepatitis B. *Id.* at 15.

***3** Abdul-Matiyn was supposed to be released from Rikers Island on May 5, 2006. *Id.* at 14. However, at the beginning of April, Abdul-Matiyn was summoned to meetings with the Sullivan Correctional Facility's mental health department. *Id.* at 16.[FN5] The mental health workers "stated that Albany told them to interview [Abdul-Matiyn] and to send Albany an evaluation;" however, despite Abdul-Matiyn's repeated requests, they would not tell him why Albany required an evaluation. *Id.* During the interview, Abdul-Matiyn was asked questions concerning his religion and alleged involvement with terrorists and terrorist organizations. *Id.* Additionally, Abdul-Matiyn contends that the mental health department was misconstruing prior conversations he had with them [FN6] about his religious beliefs, "distort[ing] and misinterpret[ing his statements] to have it appear that [he] was seeing and hearing things that were not there." *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN5. At some point Abdul-Matiyn was transferred to Sullivan Correctional Facility for housing, but the exact date is not reflected in the record.

FN6. Abdul-Matiyn states that he sporadically suffered from depression which caused trouble sleeping. Compl. at 16. When this occurred, he would "go to mental health and speak with someone and [ ] get something to help him sleep." *Id.*

After the evaluation interview, Abdul-Matiyn was seen by defendant Johnson. *Id.* at 17. Johnson asked Abdul-Matiyn to complete additional paperwork, allegedly because AbdulMatiyn's initial paperwork had been "messed up." *Id.* Abdul-Matiyn "asked if anything came up that would interfere with his release ....“ and Johnson responded "no unless something else comes up unexpectedly ....“ *Id.* Abdul-Matiyn continually asked correctional facility staff if there were new developments occurring in his case that would preclude his release; however, "[e]ach defendant expressed ... that they had no knowledge of anything that would prevent [him] from going home." *Id.*

On May 5, 2005, Abdul-Matiyn was met by Johnson and informed that he was "suppose[d] to have been examined by mental health the last two weeks before he was to be released [and] ... he had to be transferred to Marcy Psychiatric [Correctional Facility] to be evaluated." *Id.* at 18. Abdul-Matiyn alleges that he was told that his evaluation would be "three days to a week and no more than two weeks ....“ *Id.* Abdul-Matiyn was then strip-searched, shackled, and transported to CNYPC. *Id.* Abdul-Matiyn later alleged that Walsh authored and signed an application for involuntary commitment and that this information was readily known by other defendants. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶¶ 11, 13-14.

Upon arrival at CNYPC, defendant Murphy allegedly told Abdul-Matiyn that he would "be [t]here a lot longer than [two weeks because he was] one of the filthy animals [defendants] have to clean off our streets." Compl. at 19. "All of [Abdul-Matiyn's] property was taken from him," including religious texts and other items. *Id.* Additionally, Murphy informed Abdul-Matiyn that he would "be [t]here for the rest of [his] life." *Id.* Abdul-Matiyn continually asked what authority granted defendants the ability to keep him confined against his will, but defendants did not give him an answer. *Id.*

***4** Additionally, Abdul-Matiyn underwent a psychological evaluation upon arrival. *Id.* According to the psychologist, "she didn't see anything mentally wrong with [Abdul-Matiyn] ... and that she could not give [him] any answers to his legal questions except that Governor Pataki instructed them to lock up everyone convicted of a sexual offense by any means possible, and keep them locked up forever." *Id.*

While Abdul-Matiyn resided at CNYPC, the CNYPC defendants, "especially ... Hanmer, .. Murphy, .. Nowicki and ... Payne told [him] he had no constitutional rights ... to be allowed to practice his religion, have access to the courts or be told why he was [t]here at CNYPC." *Id.* at 20. Additionally, defendant Capolo allegedly refused Abdul-Matiyn's requests to pray, "tell[ing Abdul-Matiyn] that he was too busy to allow [Abdul-Matiyn] the opportunity to pray and [that he] would have to find another time after Capolo got off work to pray." *Id.* at 27. Abdul-Matiyn also contends that Payne "would taunt [him] everyday by making sarcastic statements about [Abdul-Matiyn] and his religion to groups of people whenever he was present." *Id.* Furthermore, although CNYPC provided kosher meals to Jewish residents and defendant Becker "told [Abdul-Matiyn] that they would consider obtaining a contract for halal meals [FN7] ...," none were purchased and Abdul-Matiyn was denied his special religious diet. *Id.* at 20.

FN7. "Halal" foods are those prepared in accordance with Islamic religious law. *See, e.g.,* Cyril Glasse, *The Concise Encyclopedia of Islam* 133, 144, 148 (1989).

Abdul-Matiyn also contends that while he was at CNYPC, he was "forcefully strip searched, on a few occasions and threatened with the threat of being injected with drugs if he refused to be striped [sic] searched or ... participate in the programs [t]here at CNYPC, even if his refusal [wa]s

due to his religion or if he w[as] physically ill." *Id.* at 23. AbdulMatiyn also alleges that Payne threatened him with the punishment of the "side room", where patients were allegedly "unmercifully beat, kick[ed] and stomp[ed] ....“ *Id.* at 28. Moreover, Abdul-Matiyn contends that his "room ha[d] not been clean in over six months and the times [he] ha[d] tried to clean his room with a wet towel; he was threatened with punishment ....“ *Id.* at 23. Abdul-Matiyn also complains that his confinement was discriminatory because "defendants ... came to the determination that they would imprison males convicted of sexual offenses ... [since] defendants are targeting only males convicted of sexual offenses and not females who commit the same or similar offenses." *Id.* at 25. This action followed.

**II. Discussion**

In his complaint, Abdul-Matiyn alleges that his First Amendment rights were violated because the CNYPC defendants failed to provide him with halal meals, did not allow him to pray, and impeded his access to the courts. Abdul-Matiyn also claims that he was unlawfully strip-searched and shackled on multiple occasions. Additionally, Abdul-Matiyn asserts Eighth Amendment violations for deliberate indifference to a serious medical need [FN8] and, liberally construing Abdul-Matiyn's complaint, failure to protect. Moreover, AbdulMatiyn contends that his due process rights were violated by his civil confinement and the conspiracy between Walsh and Johnson to have him civilly confined, as well as claiming that his equal protection rights were violated by CNYPC's discriminatory procedures confining only male sex offenders. Walsh and Johnson move to sever and, in the alternative, dismiss based upon the failure to (1) abide by the pleading requirements, (2) allege the personal involvement of Walsh, and (3) state a claim with respect to Johnson. The State defendants move to dismiss based upon (1) Abdul-Matiyn's failure to comply with pleading requirements, (2) failure to allege the personal involvement of Sawyer, (3) the submission of a conclusory complaint with respect to the First and Fourteenth Amendment claims, and (4) the fact that verbal harassment alleged on the part of Capolo is not actionable under § 1983. The City defendants move to dismiss based upon the failure to (1) comply with pleading requirements, (2) allege personal involvement, (3) exhaust administrative remedies,[FN9] and (4) allege a serious medical need. The CNYPC defendants move to dismiss based upon Eleventh Amendment immunity.

FN8. Abdul-Matiyn asserts multiple claims of serious medical conditions including *inter alia* back and chest pain, hearing loss, bladder and kidney stones, Hepatitis B, and arthritis. Compl. at 5,11, 12-13, 14. Because only the City defendants asserted an argument controverting Abdul-Matiyn's serious medical need, only the ailments directly pertaining to their involvement with his treatment will be discussed. Docket No. 46. These claims primarily concern the complaints of Abdul-Matiyn's chest and back pain. Compl. at 7-9.

FN9. "[F]ailure to exhaust is an affirmative defense ....“ *Jones v. Block,* 127 S.Ct. 910, 921 (2007); *see also Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir.2006). Thus, the City defendants' assertion of this affirmative defense in a motion to dismiss is premature but may be revisited at the summary judgment stage. *See Jones,* 127 S.Ct. at 921-22 (holding that an inmate is not required to plead exhaustion in the complaint). Accordingly, the City defendants' motion on this ground should be denied.

**A. Legal Standard**

***5** Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the nonmovant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at *3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King &*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See* *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest..... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,.. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ....“

*Id.* (citations and footnote omitted).

**B. Failure to Comply with Pleading Requirements**

"Under the Federal Rules, a 'short and plain' complaint is sufficient as long as it puts the defendant on notice of the claims against it." *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (*quoting* Fed.R.Civ.P. 8(a)). Additionally, the Federal Rules state that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances...." Fed.R.Civ.P. 10(b). However, "[a]t base, the Rules command us never to exalt form over substance." *Phillips,* 408 F.3d at 128 (*citing* Fed.R.Civ.P. 8(f)).

The majority of defendants cite Abdul-Matiyn's failure to number his complaint in paragraphs as a basis for dismissal. However, the Court has been "willing to overlook harmless violations of Rule 10(b) ..." where the spirit of the rule, "to facilitate [ ] the clear presentations of the matters set forth, so that allegations might easily be referenced in subsequent pleadings," is not offended. *Id.* (citations and internal quotations omitted). Thus, "where the absence of numbering or succinct paragraphs does not interfere with one's ability to understand the claims or otherwise prejudice the adverse party, the pleading should be accepted." *Id.* (citations omitted).

***6** In this case, it is clear that all defendants were able to reference easily the allegations in the complaint as each set forth multiple reasons to dismiss the complaint other than the failure to comply with Rule 10(b). Moreover, defendants were not clearly prejudiced as each motion and memorandum of law is extensively researched, cogently written, and, when viewed together, refute most of the bases upon which Abdul-Matiyn asserts constitutional violations.

Therefore, the motions of Walsh and Johnson, the State defendants, and the City defendants on this ground should be denied.

**C. Personal Involvement**

Certain defendants contend that Abdul-Matiyn has failed to establish their personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1)[T]he defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

**1. Walsh**

Walsh contends that "[o]ther than being named in the caption and identified as a party, [he] is never referred to in the complaint." Docket No. 17, Pt. 2 at 4. However, construing all of Abdul-Matiyn's submissions liberally, he alleges that "Walsh ... without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment .... " Docket No. 48 at ¶ 11. As discussed *infra* in subsection II(E)(2)(I), Abdul-Matiyn's involuntary civil confinement may constitute a due process violation. Thus, Walsh's alleged actions of authoring and signing the allegedly false report which served as the basis of Abdul-Matiyn's confinement may constitute direct participation in an alleged constitutional violation.

Accordingly, Walsh's motion to dismiss on this ground should be denied.

**2. Benbow, Allen, Rowe, and Valezquez**

The City defendants contend that there are no allegations that they were personally involved in the alleged deliberate indifference to Abdul-Matiyn's medical treatment because they were not personally involved with providing his medical care. However, defendants need not physically administer the care to be subject to Eighth Amendment liability.

***7** As discussed *infra* in subsection II(E)(1), construing all facts in the light most favorable to Abdul-Matiyn, the City defendants exhibited deliberate indifference to his medical treatment. Although the City defendants were not responsible for the actual medical care, they were responsible for seeing that Abdul-Matiyn received adequate treatment once they were aware of his serious medical need. Crediting Abdul-Matiyn's allegations, each City defendant ignored this responsibility by denying Abdul-Matiyn with medical treatment or severely delaying it. Therefore, the complaint suffices to allege that each was directly involved in the alleged deliberate indifference.

Thus, City the City defendants' motion on this ground should be denied.

**3. Sawyer**

The State defendants argue that "[o]ther than being named in the caption and identified as a party, Sawyer is never referred to in the complaint." Docket No. 47, Pt. 2 at 4. Reading all of Abdul-Matiyn's submissions together, he alleges that "superiors [are] liable for their [employees'] actions ... and Sawyer is responsible for the training for those employed at CNYPC and liable for their actions and inactions." Docket No. 48 at ¶ 22. Abdul-Matiyn continues by alleging negligent hiring and retention and vicarious liability. *Id.* at ¶¶ 23-26.

Sawyer cannot be held liable solely because he held a supervisory position over other defendants. Abdul-Matiyn does not specifically contend that Sawyer was directly involved or had knowledge of the alleged constitutional violations; however, even when reading the complaint in the light most favorable to Abdul-Matiyn, any liberally construed allegations of direct involvement and knowledge would still lack any factual basis. Additionally, although Abdul-Matiyn contends that there was negligent supervision, there is no fact asserted beyond his conclusory allegations that Sawyer created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing the other named defendants.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

**D. Severance**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

In the event of misjoinder of parties, "[a]ny claim against a party may be severed and proceed separately." Fed.R.Civ.P. 21. "While the decision whether to grant a severance motion is committed to the sound discretion of the trial court, the federal courts view severance as a procedural device to be employed only in exceptional circumstances." *Baergas v. City of New York,* No. 04-CV-2944 (BSJ/HBP), 2005 WL 2105550 at *3 (S.D.N.Y. Sept. 01, 2005) (citations and internal quotations omitted). The factors considered "when determining whether severance is appropriate [are]:

> (1) whether the claims arise out of the same transaction or occurrence, whether the claims present common questions of fact or law, (3) whether severance would serve judicial economy, (4) prejudice to the parties caused by severance, and (5) whether the claims involve different witnesses and evidence."

***8** *Id.* at *3-4 (citations omitted).

In this case, it is clear that severance is not warranted. The actions of Walsh and Johnson are the basis of Abdul-Matiyn's due process claim. Liberally reading all submissions, Abdul-Matiyn alleges that Walsh, "without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment" and signed it, leading to Abdul-Matiyn's involuntary civil confinement, potentially in violation of the Fourteenth Amendment. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶ 11. Additionally, Abdul-Matiyn contends that Johnson participated in the conspiracy to involuntarily confine him "by concealing what was taking place, and giving [him] misleading information concerning the situation." *Id.* at ¶ 13. Thus, the subsequent claims of involuntary confinement asserted against the CNYPC defendants directly relate to, and intertwine with, the allegations against Walsh and Johnson. Additionally, the same set of facts relating to who signed the papers and ordered that he be confined would be determined in both cases. Among other things, this would result in defendants calling duplicate witnesses. Thus, severing the litigation would not serve the interests of judicial economy and may lead to inconsistent findings in liability and damages which would prejudice all defendants.

Therefore, Walsh and Johnson's motion to sever should be denied.

### E. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

#### 1. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

***9** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, 16 and (3) the existence of chronic and substantial pain ." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id* . at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v.. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002). Courts have also failed to recognize chest pains as a serious medical condition. *See McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) (holding that keeping plaintiff "waiting for twenty-five minutes and then sen[ding] him back to his cell without treating his chest pains does not amount to a constitutional deprivation.").

However, considering Abdul-Matiyn's claims together and reading all allegations in a light most favorable to him, it appears that he has alleged a serious medical condition. Abdul-Matiyn contends he had a history of back pain and that the back pain he was experiencing on July 6, 2005 was so severe that it was "making it almost impossible to walk ...." Compl. at 7. This pain began at 11:30 a.m. and was not addressed until after 3 p.m. *Id.* at 7-9. Additionally, the back pain was accompanied by severe chest pain. *Id.* at 7. This pain lasted far longer than that addressed in *McCoy.* Additionally, the combination "had [Abdul-Matiyn] twisted over in a bending position ... [causing him to] cry[ ]." *Id.* Crediting Abdul-Matiun's allegations, this combination of factors present a condition which a reasonable person or physician would deem worthy of treatment. Additionally, the pain appears to have been of sufficient severity. Thus, Abdul-Matiyn's chest and back pain constituted a serious medical condition.

***10** Construing the allegations in the light most favorable to Abdul-Matiyn also leads to the conclusion that the City defendants were deliberately indifferent to his need for medical treatment. Abdul-Matiyn alleges that Allen and Benbow refused to respond to his repeated requests to go to the clinic for his severe and crippling chest pains. Compl. at 7. Additionally, even though Valezquez called the clinic on Abdul-Matiyn's behalf, it is alleged that Valezquez stood idly by while Benbow told the clinic that Abdul-Matiyn was to be placed "on the burn." *Id.* at 8. Additionally, upon arrival at the clinic, Rowe refused to let Abdul-Matiyn see a physician for an extended period of time. Compl. at 9. If proven, these actions could constituted intentional delay and denial of medical services during a serious medical need.

Therefore, the City defendants' motion to dismiss on this ground should be denied.

**2. Fourteenth Amendment**

**I. Due Process**

Abdul-Matiyn contends that the State defendants violated his due process rights when he was involuntarily, civilly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

confined at CNYPC without being given any justification from the State defendants. The State defendants contend that Abdul-Matiyn's claims are conclusory.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See* *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). "Prisoners enjoy the right not to be deprived of life, liberty or property without due process of law, but their rights are to be balanced with, and often tempered by, the needs of their special institutional setting." *Malik v. Tanner,* 697 F. Supp 1294, 1301 (S.D.N.Y.1988) (citing *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974)). "Involuntary confinement, including civil commitment, constitutes a significant deprivation of liberty requiring due process." *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (*citing* *Addington v. Texas,* 441 U.S. 418, 425 (1979)). However, the Supreme Court has "permitt[ed] involuntary confinement based upon a determination that the person currently both suffers from a 'mental abnormality' or 'personality disorder' and is likely to pose a future danger to the public." *Kansas v. Hendricks,* 521 U.S. 346, 371 (1997). "In the case of civil confinement, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for ... commit[ment] ... [and is in]tolera [nt of] the involuntary confinement of a nondangerous individual." *Mental Hygiene Legal Serv. v. Spitzer,* No. 07-CV-2935 (GEL), 2007 WL 4115936, at *6 (S.D.N.Y. Nov. 16, 2007) (citations and internal quotations omitted).

In this case, viewing all facts in the light most favorable to Abdul-Matiyn, it appears that his due process rights were violated. Abdul-Matiyn continually inquired why he was being interviewed, if the results of those discussions would interfere with his release date, and, upon his arrival at CNYPC, under what authority and with what proof he was being detained. All of these unanswered inquiries directly reflect upon the due process, or lack thereof, afforded to Abdul-Matiyn.

***11** Additionally, construing the allegations in the light most favorable to Abdul-Matiyn, he was not a danger to the community as he had undergone multiple courses during his release and devoted his time and energy to his religion and assisting those less fortunate in the community. Compl. at 13-14. Moreover, Abdul-Matiyn had no suicidal ideations or mental illness but was merely a devout and spiritual Muslim. *Id.* at 16. Therefore, AbdulMatiyn has alleged adequate facts to present a basis for recovery.

Thus, the State defendants' motion to dismiss on this ground should be denied.

**ii. Equal Protection**[FN10]

FN10. Liberally construing Abdul-Matiyn's complaint, there is a second allegation of discrimination. Abdul-Matiyn claims that defendants did not target those convicted of homicide, a crime specifically mentioned in the Mental Hygiene laws, for confinement while they did target sex offenders, a crime allegedly "never considered by the framers ... as a mental illness ....“ Compl. at 25. However, Abdul-Matiyn's conclusory allegations do not compare similarly situated individuals; thus, any such contention does not implicate Fourteenth Amendment protection.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. 95-CV-1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.). "To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197 (1976).

In this case, Abdul-Matiyn alleges that male sex offenders were civilly confined in CNYPC while similarly situated female sex offenders were not. Compl. at 25. Construing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

all allegations in the light most favorable to Abdul-Matiyn, it appears that he has asserted a sex-based, discriminatory policy. The State defendants merely claim that Abdul-Matiyn has stated a conclusory allegation; however, at this stage these facts, without any proffer of substantial relation to an important government objective, are suffice to allege a potential basis for relief.

Therefore, the State defendants' motion to dismiss on this ground should be denied.

**3. First Amendment**

**I. Free Exercise of Religion**

Abdul-Matiyn alleges that his First Amendment rights were violated when the State defendants failed to provide him with his religious meals and refused to let him pray. The State defendants contend that Abdul-Matiyn's claims are conclusory.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04-CV-57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (*citing* *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (*citing* *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns ....“ *Johnson,* 2007 WL 3046703, at * 4.

**a. Failure to Provide Halal Meals**

***12** The Free Exercise Clause extends "into other aspects of prison life including, pertinently, that of an inmate's diet ....“ *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples ....“ *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden [s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

> A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under ... *Turner* ....

*Johnson,* 2007 WL 3046703 at * 4-5 (citations omitted).

In this case, Abdul-Matiyn has articulated a First Amendment violation as the State defendants did not provide him with his halal meals during his confinement in CNYPC. There is no dispute at this stage that Abdul-Matiyn held genuine religious beliefs. The State defendants at this stage assert only that Abdul-Matiyn's claim was conclusory. Therefore, the State defendants' motion must be denied because the allegations of the complaint suffice to state a claim.

Therefore, the State defendants' motion on this ground should be denied.

**b. Refusal to Allow Prayer**

"A determination of whether the refusal to permit attendance at a religious service [vioolates the First Amendment] hinges upon the balancing of an inmate's First Amendment free exercise right[ ] against institutional needs of ... operating prison facilities ....“ *Johnson,* 2007 WL 3046703, at *4. "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (citations omitted).

In this case, Abdul-Matiyn appears to have asserted a First Amendment violation when the State defendants removed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

his religious texts and refused to permit him to pray. Compl. at 19. Abdul-Matiyn specifically references defendant Capolo, alleging that "he refuse[d] to allow [Abdul-Matiyn] to go and perform his prayers ...." *Id.* at 27. The State defendants contend that Capolo's oral refusals constituted nothing more than verbal harassment, which "alone, unaccompanied by an injury no natter how inappropriate, unprofessional, or reprehensible .., does not constitute the violation of any federally protected right and therefore is not actionable under 42 U. S.C. § 1983." *Murray,* 2007 WL 956941, at *8.

However, the State defendants are incorrect in asserting that Capolo's alleged oral denials amounted only to verbal harassment and were insufficient to state a First Amendment violation. Capolo's alleged continuous refusals to provide Abdul-Matiyn with his religious texts or permit him time and space to pray were at least arguably unreasonable in light of the fact that at this stage, the State defendants have not proffered a legitimate penological interest which justified denial of the provision of a book and time for prayer. Thus, Abdul-Matiyn has alleged here a violation with a potential basis for relief.

***13** Therefore, the State defendants motion on this ground should be denied.

**ii. Access to Courts**

Abdul-Matiyn contends that while confined, he was denied access to a law library and was thus denied his First Amendment right of access to the courts. The State defendants assert that Abdul-Matiyn alleges only a conclusory claim here.

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries ...." *Bounds v. Smith,* 430 U.S. 817, 828 (1977); *see also* *Lewis v. Casey,* 518 U.S. 343, 351 (1996). This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis,* 518 U.S. at 531. "[I]n order to fulfill the actual injury requirement ... on a law library claim where there is a lack of access to the courts, the inmate must be pursuing [*inter alia* ] ... a civil rights claim pursuant to § 1983 to vindicate basic constitutional rights." *Linares v. Mahunik,* No. 05-CV-625 (GLS/RFT), 2006 WL 2595200, at *7 (N.D.N.Y. Sept. 11, 2006) (citations and internal quotations omitted). Thus, "to prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials." *Id.* (citations omitted).

In this case, Abdul-Matiyn enjoyed the right to a law library. Construing his allegations in the light most favorable to Abdul-Matiyn, this right was violated when the State defendants denied him access to one. Compl. at 20. However, Abdul-Matiyn does not allege that he suffered any injury due to this alleged deprivation. even when viewing all of Abdul-Matiyn's submissions together, he makes only that his lack of access to a law library precluded him from "drafting papers for court." Docket No. 48 at § 47. Additionally, Abdul-Matiyn claims that this preclusion from drafting papers provided defendants with their grounds for dismissal based on non-compliance with pleading requirements. *Id.*

However, this conclusory allegation is insufficient to provide a basis for relief. AbdulMatiyn alleges no case then pending which was adversely affected in any way. In this case, defendants' motions to dismiss based on the failure to comply with the pleading requirements were rejected. Moreover, Abdul-Matiyn gives no other indication of what drafts he intended to submit to the Court.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

**4. Conspiracy**

Johnson assert that Abdul-Matiyn has failed to state a cause of action against him. Abdul-Matiyn contends that Johnson participated in the conspiracy to have him civilly detained and that he has a right "to be free from conspiracies to deprive him of his constitutional rights."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

Docket No. 48 at ¶¶ 13-14.

***14** "Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Abdul-Matiyn alleges that Johnson joined with others to deprive Abdul-Matiyn of his rights. Liberally construing those allegations, the concert of actions by Johnson and others could support a claim of agreement among Johnson and other defendants and acts in furtherance of the conspiracy. This suffices to support a claim for conspiracy against Johnson and Johnson's motion on this ground should be denied.

However, liberally construing Abdul-Matiyn's claims, he has asserted an action for negligent failure to prevent the deprivation of his rights. If Johnson "ha [d] knowledge that any of the wrongs ... mentioned in section 1985 ... [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do ... [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994).

Therefore, Johnson's motion to dismiss on this ground should be granted in part and denied in part.

**F. Eleventh Amendment**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100.

"[T]he Central New York Psychiatric Center[,] ... [as an institution, is an] arm[ ] of the state for Eleventh Amendment purposes and ... therefore, [is] absolutely immune from [P]laintiff's claims for monetary damages in this lawsuit." *Murray v. Pataki,* No. 03-CV-1263 (LEK/RFT), 2007 WL 956941, at *12 (N.D.N.Y. Mar. 29, 2007) (citations omitted). Therefore, the motion of defendant CNYPC Medical Staff on this ground should be granted.

**III. Conclusion**

***15** For the reasons stated above, it is hereby **RECOMMENDED** that:

A. The motion of Walsh and Johnson to sever (Docket No. 17) be **DENIED;**

B. The motion of Walsh and Johnson to dismiss (Docket No. 17) be:

1. **GRANTED** as to Abdul-Matiyan's conspiracy claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

against defendant Johnson for failure to intervene; and

2. **DENIED** in all other respects;

C. The State defendants' motion to dismiss (Docket Nos. 44, 47) be:

1. **GRANTED** in all respects as to defendant Sawyer;

2. **GRANTED** in all respects as to Abdul-Matiyan's claim for denial of access to the courts; and

3. **DENIED** in all other respects;

D. The City defendants motion to dismiss (Docket No. 46) be **DENIED** in all respects;

E. The motion of defendant CNYPC Medical Staff to dismiss (Docket No. 55) be **GRANTED;** and

F. The complaint be **DISMISSED** without prejudice as to defendants George Pataki, Michelle Payne, and John Does I-IV.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.
Abdul-Matiyn v. Pataki
Slip Copy, 2008 WL 974409 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
MENTAL HYGIENE LEGAL SERVICE and Shawn Short, Plaintiffs,
v.
Elliot SPITZER, Andrew Cuomo, Michael Hogan, Diana Jones Ritter, and Brian Fischer, Defendants.
**No. 07 Civ. 2935(GEL).**

Nov. 16, 2007.

Sadie Zea Ishee, New York, NY, and Dennis Bruce Feld, Mineola, NY, for plaintiff Mental Hygiene Legal Service.

Hollie S. Levine, Binghamton, NY, for plaintiff Shawn Short.

Edward J. Curtis, Jr., and Bruce B. McHale, Assistant Attorneys General, New York, NY, for defendants.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

***1** On March 14, 2007, Governor Spitzer signed the Sex Offender Management and Treatment Act, which became effective on April 13, 2007, in part as Article 10 of the New York Mental Hygiene Law ("MHL"), creating a new legal regime for "Sex Offenders Requiring Civil Commitment or Supervision." As part of the Act, the New York Legislature found that "recidivistic sex offenders pose a danger to society that should be addressed through comprehensive programs of treatment and management," MHL § 10.01(a), and that some "sex offenders have mental abnormalities that predispose them to engage in repeated sex offenses," MHL § 10.01(b). The Legislature concluded that such offenders

> should receive ... treatment while they are incarcerated as a result of the criminal process, and should continue to receive treatment when that incarceration comes to an end. In extreme cases, confinement of the most dangerous offenders will need to be extended by civil process in order to provide them such treatment and to protect the public from their recidivist conduct.

*Id.*

On April 12, 2007, Plaintiff Mental Hygiene Legal Service ("MHLS") filed a declaratory judgment action attacking the constitutionality of certain provisions of the Act, and subsequently moved for preliminary injunctive relief and a temporary restraining order. Subsequently, Shawn Short, an individual subject to various provisions of the law, intervened in the matter and joined MHLS's motions. Plaintiffs do not attack the substantive constitutionality of the statutory provision for civil commitment. Rather, their motion focuses narrowly on particular procedural provisions of the Act, contending that specific aspects of the regime it creates fail to provide the requisite procedural safeguards necessary to comport with the constitutional command that persons may not be deprived of liberty without due process of law. Plaintiffs also contend that certain aspects of the statutory regime deny the individuals subject to those provisions the equal protection of laws guaranteed by the Constitution. Together, the plaintiffs challenge:

> (A) MHL § 10.06(f), which authorizes the New York Attorney General to issue a "securing petition" to detain certain individuals beyond the completion of their term of imprisonment, in advance of the probable cause hearing, without notice or opportunity for review;

> (B) MHL § 10.06(k), which mandates involuntary civil detention pending the commitment trial, based on a finding at the probable cause hearing that the individual may have a mental abnormality, without a finding of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

current dangerousness;

(C) MHL § 10.06(j)(iii), which forbids an individual indicted for a crime but found incompetent to stand trial to contest the commission of the acts that constituted the crime at the probable cause hearing;

(D) MHL § 10.07(d), which authorizes civil commitment for persons found incompetent to stand trial and never convicted of any offense based on a showing by clear and convincing evidence that they committed the sexual offense with which they were charged;

***2** (E) MHL § 10.07(c), which authorizes the factfinder at the commitment trial to make a retroactive determination by clear and convincing evidence that certain non-sex crimes were committed with a "sexual[ ] motivat [ion];"

(F) MHL § 10.05(e), which authorizes certain pre-hearing psychiatric examinations, in the absence of counsel, of individuals subject to the Act. [FN1]

FN1. At oral argument, plaintiffs withdrew their application for preliminary injunctive relief with respect to a seventh provision, MHL § 33.13(c)(9)(vii), which permits the release of confidential clinical and medical records of certain individuals subject to the act under certain specified circumstances. (Tr. 5).

Oral argument was heard on September 14, 2007.

For the reasons discussed below, plaintiffs have demonstrated irreparable injury as well as a likelihood of success in demonstrating that § 10.06(k) is unconstitutional insofar as it permits civil detention pending trial without an individualized finding of current dangerousness and that § 10.07(d) is unconstitutional insofar as it allows detention of individuals after the commitment trial absent a finding beyond a reasonable doubt that such individuals committed the acts which constituted the crime for which they had been charged. Defendants' motion to dismiss these portions of plaintiffs' complaint will therefore be denied. Plaintiffs have failed to make a showing sufficient for a preliminary injunction against the restrictions on contesting certain past events at the probable cause hearing as provided for in § 10.06(j)(iii). Defendants' motion to dismiss that portion of plaintiffs' facial attack against this provision will be granted. Both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss regarding challenges to the securing petition procedures, as provided for in § 10.06(f), the retroactive determination of the "sexual motivation" of a past crime, as provided for in § 10.07(c), and the failure to appoint counsel in advance of certain pre-hearing psychiatric exams, as provided for in § 10.05(e), will be denied.

**DISCUSSION**

I. Article Ten of the MHL

Provisions of the Act are triggered when a "person who may be a detained sex offender is nearing an anticipated release" from confinement or parole. MHL § 10.05(b).[FN2] A "[d]etained sex offender" is (for the most part) a person "in the care, custody, control, or supervision of an agency with jurisdiction," as a result of having been adjudicated to have committed certain sex offenses or certain designated felonies with a "sexual[ ] motivat[ion]." MHL § 10.03(g).[FN3] As such a person nears release, a case review team ("CRT") of three individuals, at least two of whom must be mental health professionals meeting certain statutory requirements, MHL § 10.05(a), are to determine whether the person is a "sex offender requiring civil management." MHL § 10.06(a).

FN2. "Release" is defined to include "release, conditional release or discharge from confinement, from supervision by the division of parole, or from an order of observation, commitment, recommitment or retention." MHL § 10.03(m).

FN3. The complete definition of "detained sex offender" is:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> a person who is in the care, custody, control, or supervision of an agency with jurisdiction, with respect to a sex offense or designated felony, in that the person is either: (1) A person who stands convicted of a sex offense as defined in subdivision (p) of this section, and is currently serving a sentence for, or subject to supervision by the division of parole, whether on parole or on post-release supervision, for such offense or for a related offense; (2) A person charged with a sex offense who has been determined to be an incapacitated person with respect to that offense and has been committed pursuant to article seven hundred thirty of the criminal procedure law, but did engage in the conduct constituting such offense; (3) A person charged with a sex offense who has been found not responsible by reason of mental disease or defect for the commission of that offense; (4) A person who stands convicted of a designated felony that was sexually motivated and committed prior to the effective date of this article; (5) A person convicted of a sex offense who is, or was at any time after September first, two thousand five, a patient in a hospital operated by the office of mental health, and who was admitted directly to such facility pursuant to article nine of this title or section four hundred two of the correction law upon release or conditional release from a correctional facility, provided that the provisions of this article shall not be deemed to shorten or lengthen the time for which such person may be held pursuant to such article or section respectively; or (6) A person who has been determined to be a sex offender requiring civil management pursuant to this article.
>
> MHL § 10.03(g).

As defined by the Act, a "[s]ex offender requiring civil management" is a "detained sex offender who suffers from a mental abnormality," who is either "a dangerous sex offender requiring confinement" or "a sex offender requiring strict and intensive supervision." MHL § 10.03(q). A "[d]angerous sex offender requiring confinement" is a "detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." MHL § 10 .03(e). A "[s]ex offender[ ] requiring strict and intensive supervision" is a "detained sex offender who suffers from a mental abnormality but is not a dangerous sex offender requiring confinement." MHL § 10.03(r). A mental abnormality is defined to be a "congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct." MHL § 10.03(i).

***3** If the CRT finds the offender to require civil management, then the Attorney General may file a "sex offender civil management petition" in New York State court. MHL § 10.06(a). Within 30 days after the petition is filed, the court "shall conduct a hearing to determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10 .06(g). At the conclusion of the probable cause hearing as described in § 10.06(g), the court "shall determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10.06(k). If the court so determines, it "shall order the respondent ... committed to a secure treatment facility ... [and] the respondent shall not be released pending the completion of [the] trial [contemplated in MHL § 10.07]." MHL § 10.06(k).

Under § 10.07, at the commitment trial, which is supposed to begin within 60 days of the probable cause determination, the jury (or judge if the right to a jury trial is waived) determines by clear and convincing evidence "whether the respondent is a detained sex offender who suffers from a mental abnormality." MHL §§ 10.07(a), (d). If such a determination is made, then the judge "shall consider whether the respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision." MHL § 10.07(f). If at the commitment hearing the court finds:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

by clear and convincing evidence that the respondent has a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the respondent is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility, then the court shall find the respondent to be a dangerous sex offender requiring confinement.

MHL § 10.07(f). Upon such a finding, the respondent "shall be committed to a secure treatment facility ... until such time as he or she no longer requires confinement." *Id.* Once committed, the individual shall have a yearly psychiatric exam, and a right to be examined by an independent examiner. MHL § 10.09(b). In certain circumstances, the detained individual has a right to petition the court for an evidentiary hearing, and detention will continue only if the Attorney General can demonstrate by clear and convincing evidence that the respondent is still a dangerous sex offender requiring confinement. MHL § 10.09(h). While committed, sex offenders shall be kept in "secure treatment facilit[ies]," MHL § 10.06(k)(i), segregated from those who are not "sex offenders." MHL § 10.10(e). If the court grants a subsequent hearing based on the detainee's petition and finds that the detained individual suffers from a mental abnormality, but is no longer a dangerous sex offender, then the court will discharge the individual from custody but order a regimen of strict and intensive supervision and treatment. MHL § 10.09(h).

***4** If the judge does not find that the respondent is a dangerous sex offender requiring confinement, "then the court shall make a finding of disposition that the respondent is a sex offender requiring strict and intensive supervision, and the respondent shall be subject to a regimen of strict and intensive supervision and treatment." MHL § 10.07(f).[FN4] In making such a finding, the court shall consider "the conditions that would be imposed upon the respondent if subject to a regimen of strict and intensive supervision, and all available information about the prospects for the respondent's possible reentry into the community." *Id.* An individual may petition every two years for modification or termination of the strict and intensive supervision. MHL § 10.11(f). Upon receipt of a petition for termination, the court may, in its discretion, hold a hearing where the Attorney General must show by clear and convincing evidence that the individual is still a sex offender in need of civil management. MHL § 10.11(h).

FN4. The statute allows the mental abnormality issue to be relitigated after two years of strict and intensive supervision, MHL § 10.11(f), and if a court agrees to hear a petition for discharge by an individual adjudicated to be a dangerous sex offender requiring civil confinement. MHL § 10.09(h).

II. Legal Standards

A. Preliminary Injunction

To obtain a preliminary injunction the moving party must show irreparable injury and either (i) likelihood of success on the merits or (ii) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor. *Green Party of New York State v. New York State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir.2004); *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

B. Procedural Due Process

Procedural due process claims are to be examined in "two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ... [and] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989) (citations omitted). Whether a deprivation affects a liberty or property interest can be a difficult question. In this case, however, there is no question. Persons affected by Article 10 are threatened with deprivation not merely of *a* liberty interest, but of liberty *tout court,* as the Act contemplates that those found within its scope may be confined against their will.

If a protected liberty interest is implicated by state action,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

then the Court must determine what process is due. Due process is not a fixed concept, but flexible, and depends on the particular circumstances. *Zinermon v. Burch,* 494 U.S. 113, 127 (1990). The extent of process due is analyzed under the framework established by *Mathews v. Eldridge:*

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

***5** 424 U.S. 319, 335 (1976). When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard. *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004) (plurality opinion) (The "central meaning of procedural due process" is that parties "whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.") (citations and internal quotation marks omitted); *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965); see also *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53 (1993); *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971).

Though the *Mathews v. Eldridge* analysis requires an evaluation of each challenged statutory provision or instance of government deprivation, certain general comments are appropriate. The personal interests implicated by Article 10 are fundamental human interests, including (i) liberty per se, which may be lost to involuntary commitment or strict probation-like conditions which must be complied with on pain of involuntary commitment; [FN5] (ii) involuntary psychiatric or behavior modification medication or other treatment; [FN6] and (iii) the lifelong stigma attached to the label of sex offender that may adversely affect an individual's ability to live and work. [FN7] An erroneous deprivation due to inadequate procedures in this context will likely lead to, at a minimum, substantial stigma and mandated strict supervision. The governmental interests involved are also serious. Individuals who are mentally ill and dangerous, and prone to the commission of sexual offenses, pose serious risks to our communities. New York thus has a strong interest in ensuring the safety of potential victims of such offenses.

> FN5. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987). "[A]n unchecked system of detention carries the potential to become a means for oppression and abuse." *Hamdi v. Rumsfeld,* 542 U.S. 507, 530 (2004) (plurality opinion). *See also Vitek v. Jones,* 445 U.S. 480, 492 (1980) (" '[A]mong the historic liberties' protected by the Due Process Clause is the 'right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.' "), quoting *Ingraham v. Wright,* 430 U.S. 651, 673 (1977). "[I]nvoluntary commitment to a mental hospital, like involuntary commitment of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor v. Donaldson,* 422 U.S. 563, 580 (1975) (Burger, C.J., concurring), citing *Specht v. Patterson,* 386 U.S. 605, 608 (1967), and *In re Gault,* 387 U.S. 1, 12-13 (1967). *See also Vitek,* 445 U.S. at 491 ("[F]or the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty ... [and] in consequence requires due process protection.") (citations and internal quotation marks omitted); *see also Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983).

> FN6. One has a liberty interest against "[c]ompelled treatment in the form of mandatory behavior modification programs" absent adequate justification. *Vitek,* 445 U.S. at 492. *See also Mills v. Rogers,* 457 U.S. 291, 299 n. 16 (1975) (assuming without deciding "that involuntarily committed mental patients do retain liberty interests protected directly by the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

Constitution ... and that these interests are implicated by the involuntary administration of antipsychotic drugs") (citations omitted); *Project Release v. Prevost,* 722 F.2d 960, 979 (2d Cir.1983) ("Although *Mills* did not definitively resolve the question of whether a liberty interest in refusing antipsychotic medication exists as a federal constitutional matter, the case appears to indicate that there is such an interest."); *id.* ("[I]t appears that New York State recognizes the right" to refuse antipsychotic medication).

FN7. Due process is implicated not only when an individual's physical liberty is impaired, but also "[w]here a persons's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971). Harm to "reputation alone ... is [not] 'liberty' ... by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis,* 424 U.S. 693, 701 (1976). The Second Circuit has required some additional impediment beyond harm to reputation alone to establish a constitutional deprivation. *See, e.g., Valmonte v. Bane,* 18 F.3d 992, 999 (2d Cir.1994); *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989). The liberty interests implicated by involuntary civil commitment based on mental illness include "adverse social consequences to the individual ... [and] [w]hether we label this phenomena 'stigma' or choose to call it something else ... we recognize that it can occur and that it can have a very significant impact on the individual." *Vitek,* 445 U.S. at 492, citing *Addington v. Texas,* 441 U.S. 418, 425-26 (1979); *Neal v. Shimoda,* 131 F.3d 818, 829 (9th Cir.1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender ."). *See also Doe v. Pataki,* 3 F.Supp.2d 456, 469 (S.D.N.Y.1998).

C. Involuntary Detention of Persons With Mental Illness

The Constitution does not guarantee an "absolute right in each person to be, at all times and in all circumstances, wholly free from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members." *Kansas v. Hendricks,* 521 U.S. 346, 356-57 (1997) (citations and internal quotation marks omitted). Civil commitment is appropriate in certain circumstances, but it "must be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons no longer exist." *O'Connor,* 422 U.S. at 580 (Burger, C .J., concurring), citing *McNeil v. Director, Patuxent Inst.,* 407 U.S. 245, 249-50 (1972) and *Jackson v. Indiana,* 406 U.S. 715, 738 (1972). States have, in "certain narrow circumstances," provided for "forcible civil detainment of people who ... pose a danger to the public," and the Supreme Court has

> ***6** consistently upheld ... involuntary commitment statutes when (1) the confinement takes place pursuant to proper procedures and evidentiary standards, (2) there is a finding of dangerousness either to one's self or others, and (3) proof of dangerousness is coupled ... with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'

*Kansas v. Crane,* 534 U.S. 407, 409-10 (2002), citing *Hendricks,* 521 U.S. at 357-58 (internal quotation marks omitted). "[E]ven if ... involuntary confinement [is] initially permissible [and founded upon a constitutionally adequate basis], it [can] not constitutionally continue after that basis no longer exist[s]." *O'Connor,* 422 U.S. at 575 (citation omitted); [FN8] see also *Foucha v. Louisiana,* 504 U.S. 71, 78 (1992) ("[K]eeping [someone] against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness.").

FN8. These constitutional concerns were reflected in the Kansas civil commitment statute at issue in *Hendricks* and *Crane,* where "[i]f, at any time, the confined person is adjudged 'safe at large,' he is statutorily entitled to immediate release." *Hendricks,* 521 U.S. at 364. The Kansas statute "permit[s] immediate release upon a showing that the individual is no longer dangerous or mentally impaired." *Id.* at 368-69.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The substantive standards governing involuntary civil detention are well established: "A finding of 'mental illness' alone cannot justify a State's locking up a person against his will and keeping him indefinitely in simple custodial confinement." *O'Connor,* 422 U.S. at 575. "Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty." *Id.* (citations omitted). Involuntary civil confinement "may entail indefinite confinement, [which] could be a more intrusive exercise of state power than incarceration following a criminal conviction." *Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983). Though "involuntary civil commitment constitutes a significant deprivation that requires due process protection, ... the difference between civil and criminal confinement may nonetheless be reflected in different standards and procedures applicable in the context of each of the two systems-so long as due process is satisfied." *Id.* (citations and internal quotation marks omitted). In the case of civil confinement, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson,* 406 U.S. at 738. However, "due process does not tolerate the involuntary confinement of a nondangerous individual." *Project Release,* 722 F.2d at 972 (citations and internal quotation marks omitted).

III. The Challenged Provisions

Plaintiffs do not challenge New York's authority to involuntarily commit individuals who have in the past committed sexual crimes and are at present mentally ill and dangerous. Nor can they, because the Supreme Court has held that such detention is constitutionally authorized. See *Hendricks,* 521 U.S. at 356, 369-71 (holding that confinement of sex offenders based on proof of mental abnormality and a finding of dangerousness does not violate substantive due process, and rejecting claims that sexual offender detention provisions violate the Double Jeopardy Clause or constitute impermissible ex post facto lawmaking). Plaintiffs' challenges therefore leave untouched the central provisions of the new statutory scheme, which authorize detention based on a finding that an individual who (i) has committed a sex crime (or the acts which constitute the crime) and (ii) is mentally ill and dangerous may be involuntarily committed. Plaintiffs object, however, to some provisions of the statute that they claim permit an offender to be detained on an inadequate showing of these factors. Five of their six challenges to the statute relate to this basic concern. Their sixth challenge relates to the timing of the appointment of counsel.

A. MHL § 10.06(f)

***7** Article 10 authorizes detention both after the probable cause hearing and after the commitment hearing. However, Article 10 also authorizes detention of a potential sexual offender even *before* the probable cause hearing, and in advance of any judicial hearing, solely on the basis of an executive order of detention, and plaintiffs challenge the constitutionality of these pre-hearing detention provisions.

When an individual subject to the Act may be released from incarceration or parole before the CRT is able to make a determination as to whether the individual may be a sex offender in need of civil management, the Attorney General, if she "determines that the protection of public safety so requires," may file a "securing petition." MHL § 10.06(f).[FN9] The filing of such a "securing petition" in and of itself requires that the individual shall be (or remain) detained and "there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management." *Id.*[FN10]

FN9. The statute incorporates certain time-lines anticipating that the evaluation of the individual will be completed before an individual is scheduled for release. *See, e.g.,* MHL § 10.05(b) (agencies shall give notice to the Attorney General and Commissioner of Mental Health 120 days prior to an individual's release); MHL § 10.05(g) (if the CRT determines that the individual is a sex offender requiring civil management, it shall give notice of this fact to the Attorney General and the respondent within 45 days of the Commissioner of Mental Health's receipt of the notice of the individual's release); MHL § 10.06(a) (Attorney General shall seek to file the sex offender civil management petition with the court within 30 days after receiving the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

case review team's finding). However, as certain of the provisions explicitly note, *see, e.g.,* MHL §§ 10.05(g), 10.06(a), and the statute more generally provides, these deadlines are almost always aspirational, and the failure to meet these deadlines "shall not invalidate later agency action except as explicitly provided by the provision in question." MHL § 10.08(f). Thus, Article 10 anticipates that some individuals may be scheduled for release before the CRT can complete its work and the normal judicial process is instituted.

FN10. The full text of the provision states:

> Notwithstanding any other provision of this article, if it appears that the respondent may be released prior to the time the case review team makes a determination, and the attorney general determines that the protection of public safety so requires, the attorney general may file a securing petition at any time after receipt of written notice pursuant to subdivision (b) of section 10.05 of this article. In such circumstance, there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management. If the case review team determines that the respondent is not a sex offender requiring civil management, the attorney general shall so advise the court and the securing petition shall be dismissed.

> MHL § 10.06(f).

Plaintiffs contend that these provisions violate the most basic tenets of due process: notice to the individual and an opportunity to challenge the continued detention. (MHLS Mot. 5-7.) Defendants contend that plaintiffs' concerns are overblown, and that their criticisms take the statute out of context. (D.Opp.8-10.) They insist that the securing petition provision actually "protects rather than injures the respondent" because it ensures that a judge can only determine whether an individual has a "mental abnormality" with the benefit of technical clinical evidence provided by the CRT evaluation. (*Id.* at 8.) Defendants also suggest that "the securing provisions come into play only after notice" and only in situations where "the protection of public safety so requires." (*Id.* at 10.)

On these points, defendants' arguments are unpersuasive. It is true that some form of "notice" must be given in advance of a securing petition; however, it is not notice given *to* the individual subject to the petition, and it is not notice *regarding* the potential detention by securing petition. The statute anticipates that the agency that has jurisdiction over a person who may be a detained sex offender nearing release will give notice to the Attorney General and the Commissioner of Mental Health within 120 days before such a person's release. MHL § 10.05(b). The Attorney General is authorized to issue a securing petition "at any time after receipt of written notice" pursuant to § 10.05(b), regardless of whether the Commissioner of Mental Health has received such notice. MHL § 10.06(f). Whatever notice might in due course be given to a respondent about Article 10's potential applicability to him in advance of the filing of a securing petition,[FN11] the statute unquestionably does not require that anyone give notice to the respondent, in advance of the detention, that he will be detained by a securing petition. Moreover, the statute gives an individual no opportunity to contest the petition, and thus his detention, in advance of its issuance. In addition, individuals subject to securing petitions would not necessarily have state-appointed counsel to assist them in determining how to respond to a securing petition. MHL § 10.06(c) (appointment of counsel is triggered by the filing of a sex offender civil management petition or the request by the attorney general for a court-ordered psychiatric examination, not the filing of a securing petition).

> FN11. *See, e.g.,* MHL § 10.05(e) ("If the person is referred to a case review team for evaluation, notice of referral shall be provided to the respondent.").

***8** Defendants also contend that any deprivation of liberty will be modest, because the statute requires a probable cause hearing to be held within 72 hours of the filing of the securing petition. (D. Opp. at 8). However, this is not strictly accurate. Though the probable cause hearing is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

initially scheduled to be held within 72 hours of the filing of a securing petition, the probable cause hearing may be delayed due to (i) delay caused or consented to by the individual, or (ii) a showing by the Attorney General, to the satisfaction of the court, of "good cause why the hearing could not ... commence." MHL § 10.06(h). Moreover, the statute provides that in the event of the filing of a securing petition, "there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management." MHL § 10.06(f). Thus, the confinement occasioned by the securing petition could extend well beyond 72 hours.

The Second Circuit has upheld against constitutional challenge brief detentions of less than 72 hours in certain situations involving persons who may be mentally ill and dangerous to themselves or others. Project Release, 722 F.2d at 966, upheld a statutory provision authorizing involuntary detention for 72 hours of a previously voluntary admittee to a mental hospital who gave notice of his desire to leave, so as to give the hospital administrator sufficient time to determine whether the individual should be converted from voluntary to involuntary commitment. *Charles W. v. Maul* authorized detention for less than 72 hours in a New York State psychiatric center of an individual adjudicated incompetent to stand trial on a misdemeanor charge, in order to "evaluate whether he presented a danger to himself or others warranting invocation of New York's civil commitment law." 214 F.3d 350, 353 (2d Cir.2000).

The situation surrounding the detentions authorized here appears different from those involved in Project Release or Maul. First, the nature of the dilemma faced by New York is different. Both Project Release and Maul involved situations where the release of the potentially dangerous or ill person was necessarily unpredictable. A hospital director does not know that a voluntary admittee wishes to leave until the admittee gives the director notice of those wishes. Similarly, when, or whether, a criminal defendant will be adjudicated incompetent to stand trial is also unpredictable, and the "state will not necessarily be prepared to undertake civil commitment proceedings immediately after criminal charges are dismissed." *Maul,* 214 F.3d at 359. In those situations, therefore, brief emergency detention periods are in some sense functionally necessary. Here, in contrast, the conclusion of a term of parole or imprisonment is generally a predictable event, and one for which, at least in the normal course of events, the CRT has at least 120 days in advance of the offender's release to prepare by conducting its investigation.

***9** Second, the procedures and deadlines involved in the 72-hour period of review here appear to be less rigorous than those at issue in Project Release and Maul. Under the regulatory scheme challenged in Project Release, upon written notice of the patient's desire to leave, the hospital director could continue that person's detention based on "reasonable grounds for belief that the patient may be in need of involuntary care and treatment." 722 F.2d at 966, citing MHL § 9.13(b). During that period, the director "must have two physicians examine the patient and report their findings and conclusions separately to the director, who must then either release the patient or apply for a court order authorizing involuntary retention." *Id.,* citing N.Y. Comp.Codes R. & Regs. tit. 14, § 15.7 (1980). Upon application to a court, written notice is given to the patient and the patient's nearest known relative, and to a number of other parties (including Mental Health Information Service, an organization that provides information and assistance to patients and others interested in their welfare), any of whom can demand a judicial hearing to be held within three days of the court's receipt of such a demand. *Id.* The normal procedures for court authorization of detention of an involuntary patient then apply. *Id.,* citing MHL §§ 9.13(b), 9.33. In Maul, the government policy authorizing detention required evaluation within 72 hours of a finding of incompetency to stand trial before initiating civil confinement proceedings. 214 F.3d at 356.

Here, in contrast, the judicial review at the 72-hour stage may be no more than a determination that the Attorney General has shown "good cause" for delaying the CRT evaluation. The statute does not provide *any* absolute outer limit to the time that a CRT may spend in making its determination in the wake of a filed securing petition. There are no standards in the statute for what may constitute "good cause," no requirement that this "good cause" showing be established by any sort of hearing, and no requirement that petitioner participate in such a process. Furthermore, the "good cause" finding appears to relate to the existence of an excusable failure to complete the CRT evaluations, and is not necessarily a mechanism by which the judge may review the Attorney General's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

determination that the individual is sufficiently dangerous so as to require a securing petition. Though the detention may be based on an executive branch determination that an individual is dangerous, that determination may be unreviewable by a court for a potentially indefinite period of time.

The securing petition thus may operate as a mechanism by which an executive branch official is empowered to order that an individual be held in custody beyond his sentence or judicial order of confinement on the mere say-so of the Attorney General. It may operate to authorize executive detention without notice to the individual being detained, without an opportunity to be heard, without advance judicial approval of the detention. There is no provision for immediate review by any court that the emergency action was justified and that the individual is in fact dangerous or may be dangerous, and no requirement that the court make an immediate decision as to whether an offender merits detention. Moreover, the detention could potentially last indefinitely, where "good cause" is shown why the CRT is unable to render a decision as to whether the individual may suffer a "mental abnormality" as defined by the statute.

***10** However, this is not a case in which any plaintiff is challenging his or her confinement pursuant to a securing petition. Rather, the plaintiffs here are challenging the provisions of § 10.06(f) as facially unconstitutional. Such plaintiffs bear a heavy burden. Facial invalidation of a statute is an extraordinary remedy and generally disfavored. *National Endowment for the Arts v. Finley,* 524 U.S. 569, 580 (1998) (Facial challenges to statutes are "generally disfavored," as facial invalidation is "strong medicine" that "has been employed by the Court sparingly and only as a last resort."), citing *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 223 (1990), and *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973). "A facial challenge will only succeed if there is no set of circumstances under which the challenged practices would be constitutional." *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 347 (2d Cir.1998). Therefore, a court need only determine "whether there are 'any circumstances under which the [provisions] of the Act are permissible in order to uphold the Act.' " *Velazquez v. Legal Services Corp.,* 164 F.3d 757, 763 (2d Cir.1999), quoting *Able v. United States,* 88 F.3d 1280, 1290 (2d Cir.1996). At least outside the special context of the First Amendment, plaintiffs challenging the facial constitutionality of a statute must demonstrate that the statute is invalid "in all applications." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.,* 462 F.3d 219, 228 (2d Cir.2006).

Although the analysis above suggests that under certain circumstances the broad authorization of confinement by direction of the Attorney General may operate unconstitutionally, whether by extending detention for too long a period or by permitting detention without a genuine emergency, the present record does not demonstrate that the statute cannot be administered or interpreted in a way to avoid these problems. To obtain a preliminary injunction, plaintiffs have the burden of demonstrating a likelihood of success in proving that "each time that [the] statute is enforced, it will necessarily yield an unconstitutional result." *Nat'l Abortion Fed'n v. Gonzales,* 437 F.3d 278, 293-94 (2d Cir.2006) (Walker, C.J., concurring).

There are situations, however, in which an executive official, with cause to believe that an individual is dangerous, can constitutionally detain such an individual in advance of a court hearing. See, e.g., *County of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991) (noting that probable cause hearing must follow within 48 hours of warrantless arrest); see also *Project Release,* 722 F .2d at 966; *Maul,* 214 F.3d at 353. The constitutionally of the detention depends, among other things, on (i) the reason for the detention, including existence of good or probable cause to detain the individual in the first place, and the nature of the exigency requiring action without prior notice and hearing, (ii) the nature of the detention, including the length of the detention pending the judicial hearing, and (iii) the nature and meaningfulness of the judicial review, when it actually comes. Thus, there exist situations in which an individual who may be a sexual offender may constitutionally be detained in advance of a decision by an impartial decision maker that the individual is in fact dangerous. However, detention in advance of meaningful review by a judicial officer or other impartial factfinder is usually only appropriate for a matter of days. See, e.g., *County of Riverside,* 500 U.S. at 56; *Project Release,* 722 F.2d at 966; *Maul,* 214 F.3d at 353.

***11** Thus, while plaintiffs have raised serious and legitimate concerns about the potential operation of §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

10.06(f), they have not established that they are likely to succeed in establishing the facial invalidity of this provision. It is not possible to conclude on the basis of the present record that the statute will necessarily function in an unconstitutional manner. In the first six months of the statute's operation, the parties agree, securing petitions have been used only twice.[FN12]

FN12. The first securing petition was filed on the date the Act became effective. (Letter of Edward J. Curtis, Esq., to the Court, dated September 21, 2007, at 2.) The second securing petition was filed on July 11, 2007, and withdrawn in two days. (Letter of Edward J. Curtis, Esq., to the Court, dated September 26, 2007, at 1 .)

In these cases, it appears that the periods of detention without judicial review were brief, and the record is unclear as to the reasons, if any, why the CRT was unable to complete its review before the offender's scheduled release.

It is conceivable that the statute may be susceptible to constitutional application. If there are situations in which a potentially dangerous offender who may qualify as a mentally abnormal sex offender requiring confinement is unexpectedly scheduled for imminent release, and the detention is limited to a brief period before a judicial hearing, the resulting emergency may justify a short period of detention pending such a hearing. At this early stage of the proceedings, it is unclear whether such situations exist. A factual record detailing the circumstances under which the relevant authorities become aware of the scheduled release of offenders, and how the CRTs operate, may reveal whether genuine emergency conditions warranting executive detention actually exist.

But plaintiffs have not established that it is likely that such conditions do not exist. And in any event, as a matter of equitable discretion, an injunction on these facts would be inappropriate. Since the statute was recently enacted, New York State courts have not yet had an opportunity to interpret these provisions. As a matter of equitable discretion, it is preferable to give the New York State courts the opportunity to determine the proper scope of a New York law before a federal court declares whether it offends the federal Constitution. New York courts may well interpret the securing petition as a mere emergency device, only to be utilized in compelling circumstances, and may narrowly interpret the exceptions to the provision of judicial review within 72 hours. Depending upon how New York courts interpret their own statute, there may be no need to reach any federal constitutional issue.

In short, this Court declines to issue a preliminary injunction against a provision that may rarely if ever be used, or if used, may be capable of being interpreted or applied in a manner that does not offend the due process clause. Because a fuller factual record is necessary for the Court to determine whether the statute may be capable of constitutional application, both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss will be denied as they pertain to MHL § 10.06(f).

B. MHL § 10.06(k)

Once the Attorney General, based on the report of the CRT, determines that an individual may be a sex offender in need of civil management, he may file a "sex offender civil management petition" with a New York court. MHS § 10.06(a). Within 30 days of the filing of the sex offender management petition, the court must conduct a hearing without a jury to determine if there exists "probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10.06(g). If, at the conclusion of the hearing, the court finds such probable cause, the judge is required to commit the individual to a secure treatment facility, where the individual shall be detained pending the civil commitment trial. MHL § 10.06(k). Detention may last more than 60 days.[FN13]

FN13. The statute requires a trial to begin within 60 days of the probable cause hearing. MHL § 10.07(a). However, since the statute mandates detention through the completion of the trial, MHL § 10.06(k)(iii), the statute authorizes detention beyond 60 days. In the first case that went to trial, the time of detention extended to 80 days. (Tr. 53.) In complicated trials, detention may even be longer. Both the significant period of detention authorized, as well as the purpose of the detention itself, separate this case from other

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> statutes which authorize very short periods of detention for the purpose of determining whether or not an individual is dangerous or is in need of confinement. See *Project Release,* 722 F.2d at 966 (72 hours); *Charles W. v. Maul,* 214 F.3d at 358-59 (2d Cir.2000) (less than 72 hours).

***12** Plaintiffs contend that these provisions are unconstitutional because they mandate the confinement of an individual pending the commitment trial without a finding that the individual detained is in fact dangerous, or even without probable cause to believe that the individual *might* be dangerous. An evaluation of this contention requires careful attention to the details of the regulatory scheme.

It is undisputed that when a proceeding may result in an adjudication of detention, a court may detain the defendant pending adjudication of the matter based on a finding of probable cause to believe the facts justifying ultimate detention exist, plus a finding that lesser conditions of supervision during pendency of the action will not be sufficient to guarantee the safety of the community. That is the teaching of *United States v. Salerno,* 481 U.S. 739 (1987), which upholds a statute permitting pre-trial detention of defendants in criminal cases on just such a showing. There is no reason why a similar standard should not apply in civil commitment proceedings: if there is probable cause to believe the respondent is likely to be adjudicated a dangerously mentally ill person or a sex offender requiring confinement as defined in the Act, the same need to guarantee the safety of the community that warrants detention of a criminal defendant while he is still presumed innocent warrants a similar detention pending trial of potentially dangerous persons who have not yet been found to require civil commitment.

Plaintiffs do not dispute this general principle. They argue, however, that unlike the pre-trial detention regime upheld in Salerno, the statute at issue here requires the detention pending trial of *all* respondents as to whom there is probable cause that they qualify as sex offenders requiring civil management, without an individualized judicial determination that they cannot safely be at liberty pending adjudication. They contend, in effect, that this is analogous to a statute that denied bail to *all* criminal defendants pending trial, based only on a finding of probable cause to believe they committed an offense that *might* lead to a prison sentence.

Defendants respond that the analogy fails, because a finding of dangerousness is implicit in the probable cause determination required by MHL § 10.06(k). They note that the required finding, is among other things, a finding of probable cause to believe that the respondent suffers from a mental abnormality which is defined to include only those mental abnormalities which "predispose [ ] [an individual] to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct." MHL § 10.03(i). Therefore, defendants contend, a degree of dangerousness sufficient to justify 60 days of detention pending a trial is embedded into the definition of mental abnormality itself.

But that is not quite so. What is relevant to the pre-trial release decision is not merely a generalized notion that a person presents some degree of potential danger-if that were so, any person that there is probable cause to believe committed a crime of violence could be detained without more-but also a finding that the person is sufficiently dangerous that less intrusive conditions than detention cannot guarantee the safety of the community pending trial.

***13** Article 10 itself makes clear, however, that not all persons who have a mental abnormality sufficient to meet the definition of a "sex offender requiring civil management" require actual confinement. Under the statute, "sex offender requiring civil management" is a catch-all category that includes individuals subject to the act who are *not* individuals "likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." MHL §§ 10.03(e), (q), (r). At least some individuals who fit this broader category will *not* be subject to detention, but only to parole-or probation-like conditions of supervision while at liberty in the community, even *after* a jury finding that they have been *proven,* by clear and convincing evidence, to be sex offenders in need of civil management.

The Act is not simply a mechanism to extend the confinement of individuals currently incarcerated; it can also operate to extend parole-like conditions to persons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

who are currently on parole. In certain situations, New York apparently believes that strict and intensive supervision of (and medication and therapy for) a respondent, under conditions resembling parole supervision, is adequate to protect the community. Defendants do not contest that persons across a broad spectrum of treatment needs and threat levels may be classified as "sex offenders requiring civil management." That there is probable cause to believe that an individual requires some kind of civil management, and may be dangerous *if not treated,* does not necessarily mean that such a person will be dangerous *if released,* and would therefore require detention.[FN14]

FN14. The presence of a mental abnormality combined with the commission of a past crime may be sufficient to institute proceedings against an individual, and surely the commission of past sexually violent crimes is relevant to a psychiatrist's or judge's determination of whether an individual is at present violent. *Hendricks,* 521 U.S. at 357 ("[P]revious instances of violent behavior are an important indicator of future violent tendencies.") (citations and internal quotation marks omitted). However, it is current dangerousness, not past crimes, which ultimately justifies civil detention in these situations. *See, e.g., id.* (the act held constitutional in *Hendricks* "unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement").

Nevertheless, the Act requires the detention, pending trial, on a mere finding of probable cause to believe that the respondent suffers from a "mental abnormality," of those for whom detention is not a necessary or intended remedy, even if such abnormality is proven at trial. Mandatory detention pending trial is triggered by a court finding of probable cause to believe that a person is a "sex offender requiring civil management," not by a finding of probable cause to believe that such a person is dangerous or requires secure confinement. Under the Act, then, a person may be detained for 60 days or more based on a determination that there is probable cause to believe that he may have committed a sexual felony and may have a mental abnormality.[FN15] Comparing a federal sex offender statute's definition of "sexually dangerous" demonstrates how Article 10's definition of "mentally abnormal" does not incorporate a finding of dangerousness. The comparable federal sex offender statute defines a "sexually dangerous" individual to be one who "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation *if released."* 18 U.S.C. § 4247(a)(6) (italics added). Likewise, by provision of Article 10, a "dangerous sex offender requiring confinement" is a person who suffers from a mental abnormality such that "the person is likely to be a danger to others and to commit sex offenses *if not confined to a secure treatment facility."* MHL § 10.03(e) (italics added). Both incorporate a finding that the individual would likely be sexually violent *if released.* In critical contrast, Article 10's definition of mental abnormality includes those individuals whose tendencies may be controlled by remedies that fall short of confinement, such as medicine, treatment, or some other form of supervision.

FN15. Article 730 defendants, a subset of the larger category of "detained sex offender," MHL § 10.03(g)(2), may have only been indicted for a crime before a court found them incompetent to stand trial. N.Y.Crim. Proc. Law ("CPL") § 730.50(1). Article 10 requires that only those 730 defendants that "did engage in the conduct constituting" the offense be subject to Article 10. However, such a determination is presumed at the probable cause stage, MHL § 10.06(j)(iii), and only needs to be proved by clear and convincing evidence at the trial stage, MHL § 10.07(d).

***14** The intervenor's situation illustrates the point.[FN16] He alleges that in the Article 10 proceeding against him, New York seeks only an order, in effect, of continued parole. (Intervenor Complaint ¶¶ 4, 21, 26.) Such parole-like community treatment is apparently all New York contends is required, and all the State asks the Court to impose if a jury finds that he indeed requires any treatment at all. Such treatment without detention, indeed, is all that was imposed on the intervenor before institution of proceedings under the Act.

FN16. At this stage of the proceedings, the Court makes, and can make, no findings on the facts of

the intervenor's case. Rather, the Court assumes the truth of the intervenor's allegations for the purposes of this discussion. The point is not whether these facts are indeed true as to the intervenor, but simply that what he contends are the facts of his case illustrate the conceded structure of the statute. Indeed, the Court has been advised that since the briefing in this case, the intervenor has been detained on a charge of parole violation.

Nevertheless, under § 10.06(k), upon a finding of probable cause to believe that the intervenor may have a mental abnormality as defined by the statute, a person in the intervenor's situation must be automatically detained pending trial. Such detention is potentially catastrophic. Not only will the intervenor lose his liberty, but he will likely lose his job and his house, and default on loans. (*Id.* ¶ 33.) He will thus, by mandatory operation of the statute, be deprived of more liberty *before* he is adjudicated in need of treatment, based on a mere showing of probable cause to believe treatment is required, than New York seeks to impose *after* he is shown by clear and convincing evidence to need treatment. This is perverse, and at oral argument the State was unable to give any rational explanation of how this furthers any legitimate government interest.[FN17] Nor can it-there is no convincing reason that an individual should be detained for a substantial period of time pending a trial to determine whether a person does or does not need outpatient treatment.

FN17. *See* (Tr. at 54-59); (*id.* at 59, "It is a difficult thing to justify. I have explained why I believe it's there, and that's about all I can offer.").

The Supreme Court has never held that an individual can be detained for a substantial period of time based on mental incapacity alone. See, e.g., *O'Connor,* 422 U.S. at 575 ("A finding of 'mental illness' alone cannot justify a State's locking up a person against his will and keeping him indefinitely in simple custodial confinement."). Those civil commitment statutes that the Supreme Court has upheld require a specific "finding of dangerousness either to one's self or to others" that "links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Crane,* 534 U.S. at 410, citing *Hendricks,* 521 U.S. at 357-58. Due process "does not tolerate the involuntary confinement of the nondangerous individual." Project Release, 722 F.2d at 972 (citations and internal quotation marks omitted).

In practice, the automatic detention provisions operate less as a precise tool to determine who is dangerous enough to be committed pending trial, and more as a hammer to coerce individuals to enter into plea arrangements with the State, and thereby accept both designation as a sex offender and intensive ongoing treatment in order to avoid spending what may be more than 60 days in involuntary confinement. A respondent as to whom post-trial detention is not sought will have an overwhelming incentive to agree to an adjudication that he is a sex offender in need of treatment, and to accept continuation of community supervision, rather than contest the State's case, in order to avoid a potentially lengthy period of detention pending trial, even if he believes he may avoid any adverse consequence by going to trial.

***15** Detention will of course be warranted in some cases; however, it should be triggered, as the Legislature notes, "[i]n extreme cases" and only for "the most dangerous offenders." MHL § 10.01(b).[FN18] In contrast, § 10.06(k) extends automatic detention to all individuals who may receive treatment subject to Article 10, without a judicial proceeding to determine dangerousness, and with no rational basis for determining whether the particular individual would pose a danger to the community if released. New York may not automatically detain any individual who may be subject to the statute for a significant period of time without proving that there is at least probable cause to believe that he is dangerous.[FN19]

FN18. In other portions of the brief, defendants note that the "array of protections, evaluations, judicial determinations and necessary findings which are built into the legislative scheme provide ample constitutional protections, at both the probable cause and trial stages." (D.Mot.12-13.) However, at no point previous to the mandatory detention does any person at any level make any determination that an individual is so dangerous as to necessitate detention.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN19. Defendants argue that in order to mount a successful facial challenge to a statute, plaintiffs must establish that there is no set of circumstances under which the statute would be valid. (D. Opp. 29, quoting *Salerno,* 481 U.S. at 745.) However, MHL § 10.06(k) can never be constitutional, because individuals subject to these provisions, and faced with a substantial period of detention, are entitled to an individualized determination that they are in fact dangerous. The question is not whether *detention pending trial* will ever be valid-plaintiffs concede it sometimes will be-but whether *mandatory* detention pending trial, without the showing of dangerousness necessary to justify such detention, is on its face invalid.

Plaintiffs have thus demonstrated a likelihood of success on the merits with respect to the unconstitutionality of MHL § 10.06(k). Plaintiffs have also demonstrated irreparable injury. When a complaint alleges denial of a constitutional right, irreparable harm is presumed. *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984). Unjustified confinement to a mental institution is a "massive curtailment of liberty." *Vitek,* 445 U.S. at 491. Being coerced into accepting a designation of "mentally abnormal sex offender" is also highly stigmatic. See *Vitek,* 445 U.S. at 492; *Neal v. Shimoda,* 131 F.3d 818, 829 (9th Cir.1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender ."). The harm to respondent either in being involuntarily committed without a finding of dangerousness or in being coerced to accept a designation of sex offender without an opportunity to contest the Attorney General's petition is both grave and irreparable.

This dispute must be resolved with urgency because respondents in the civil commitment proceedings are entitled to contest the State's case against them. However, if they know that they will be detained pending trial, where the pre-trial consequences are more severe than the post-trial consequences even were they to be adjudicated at the commitment trial to be a sex offender in need of civil management, then there is overwhelming and enormous pressure for an individual to accept the designation of sex offender and related treatment rather than face the 60 days of involuntary confinement. This statutory provision raises serious due process concerns with respect to all individuals who may be subject to its terms, not only because it does not require a finding of dangerousness before a period of substantial involuntary commitment, but also because it functions as a club to coerce waivers of very serious and important rights.

Plaintiffs have demonstrated a likelihood of proceeding on the merits as well as irreparable injury. Section 10.06(k) is inherently coercive, and plaintiffs' motion for a preliminary injunction will be granted insofar as the section requires detention pending trial absent a specific, individualized finding of probable cause to believe that a person is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during pendency of the proceedings.

C. MHL § 10.06(j)(iii)

***16** Plaintiffs also challenge a provision of the Act that forbids a class of individuals known as Article 730 defendants from contesting at the probable cause hearing the facts that form the basis of the criminal charges against them. Article 730 defendants are individuals who have been charged with a crime and found incompetent to stand trial pursuant to Article 730 of the New York Criminal Procedure Law, N.Y.Crim. Proc. Law ("CPL") §§ 730.10-70. [FN20] MHL § 10.03(g)(2). Although these individuals have never been found guilty of a crime, nevertheless a respondent's commission of a sex offense shall be "deemed established" and shall not be re-litigated at the probable cause hearing where it "appears that ... the respondent was indicted for such offense by a grand jury but found to be incompetent to stand trial for such offense." MHL § 10.06(j)(iii).

FN20. Article 730 authorizes criminal courts to order psychiatric investigations of criminal defendants under certain circumstances and when the court "is of the opinion that the defendant may be an incapacitated person." CPL § 730.30(1). Upon the receipt of an examination order, two qualified psychiatric examiners must examine the defendant to determine his capacity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

CPL § 730.20(1). If the examiners are not of the same opinion regarding the capacity of the defendant, a third psychiatric examiner must examine the defendant. CPL § 730.20(5). When the examiners are not unanimous in their opinion that the defendant is a dangerous incapacitated person, the court must conduct a hearing to make that determination. CPL § 730.30(4). Where the examiners are unanimous, the court may *sua sponte* conduct a capacity hearing, and must do so on motion by the defendant or the district attorney. CPL § 730.30(3). If the court concludes that the defendant is not incapacitated, the criminal action against him will proceed. CPL § 730.50(1). If the court is satisfied that the defendant lacks the capacity to assist in his defense, or if no party objects to the unanimous conclusion of the psychiatrists that the defendant is incapacitated, the court must issue either an order of observation or an order of commitment. CPL § 730.50(1). In the case of those charged with non-felony offenses, upon the order of observation or commitment the court must dismiss the criminal indictment with prejudice. CPL § 730.50(1). In the case of those charged with felony offenses, the criminal action may proceed against the defendant if the defendant regains capacity. CPL §§ 730.50(2)-(3). A defendant charged with a felony but found unable to stand trial cannot be detained in the aggregate for longer than two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment. CPL § 730.50(3).

Plaintiffs attack these procedures, pointing out that Article 730 defendants may be detained pending an Article 10 trial without any finding that they committed the underlying offense charged, while all other persons to whom the Act applies have been found to have committed all of the elements of the offense charged. (MHLS Mot. 16 .) Plaintiffs claim that this provision violates both due process and equal protection.

Plaintiffs' due process argument is founded on the concern that an individual may be detained following the probable cause hearing pending the commitment trial based on insufficient evidence that he in fact committed a crime and is in fact dangerous. Defendants argue that indictment by a grand jury demonstrates the existence of "legally sufficient evidence" to establish that a person committed such an offense. (D. Mot. 20, citing CPL §§ 190.65(1)(a)-(b) & 70.10(l)-(2)). Plaintiffs rightly point out that neither an indictment nor a finding of incompetence establishes guilt. However, detention pending criminal trial does not require a finding that the defendant in fact committed the crime charged, but only probable cause to believe that the individual committed an offense (and is dangerous or a flight risk). See, e.g., *Salerno,* 481 U.S. at 749, 755; *Bell v. Wolfish,* 441 U.S. 520, 534 (1979). In criminal cases, moreover, an indictment by a grand jury is sufficient to establish probable cause. CPL § 190.65(1); *U.S. v. Beyer,* 426 F.2d 773, 774 (2d Cir.1970). If an indictment is sufficient to conclusively establish probable cause that the person committed the offense at issue in the criminal proceeding, then surely it is sufficient to perform the same function in a civil commitment proceeding. Article 730 defendants, like other persons subject to the Act, will have the opportunity to contest the State's case against them at the commitment trial. So long as they are detained pending trial based on an individualized finding of dangerousness and mental abnormality (see discussion above regarding MHL § 10.06(k)), due process requires no more than a probable cause finding with respect to the underlying alleged offense.

***17** Plaintiffs' contention that this provision violates equal protection is also unpersuasive. Unlike others subject to the Act who have been convicted of crimes, individuals who lack capacity to assist in their own defense may not constitutionally be tried; and definitive findings about whether such a defendant in fact committed the charged crime are thus precluded. See, e.g., *Cooper v. Oklahoma,* 517 U.S. 348, 354 (1996) ("A defendant may not be put on trial unless he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.") (citations and internal quotation marks omitted). New York has not had the opportunity to try Article 730 defendants in advance of the Article 10 proceedings. Their inability to stand trial, however, should not prevent Article 730 defendants from being committed pursuant to an otherwise constitutional sexual offender commitment scheme. Persons who are unable to stand trial may still have committed violent sexual crimes, be mentally ill, and pose

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

a serious danger to the community. New York has a strong interest in detaining and treating such individuals. New York also has a strong interest in preventing the probable cause hearing, intended as an efficient screening mechanism, from turning into the first of two trials. That some persons subject to the Article 10 proceedings have been found guilty of crimes while others have not does not deny equal protection to either group.

Plaintiffs have not demonstrated a likelihood of success on the merits in their claims that MHL § 10.06(j)(iii) is facially unconstitutional, and subject to the other provisions of this opinion, plaintiffs' motion for preliminary injunction with respect to this provision is denied. Moreover, defendants' motion to dismiss the complaint will be granted as it pertains to plaintiffs' attack of MHL § 10.06(j)(iii), because as a matter of law, the probable cause established by an indictment is a sufficient showing of potential guilt to warrant pretrial detention where an individualized showing of mental abnormality and dangerousness have been made.

D. MHL § 10.07(d)

The statute predicates detention after the commitment trial on findings that an individual is (i) a sex offender who is (ii) mentally ill and (iii) dangerous. The vast majority of persons subject to the Act have been found by a jury beyond a reasonable doubt to have committed at least one crime.[FN21] For two groups, however, the Act authorizes detention following the commitment trial of individuals who have not been convicted of any crime. The first group consists of those persons who, at a criminal trial, had been found by a jury beyond a reasonable doubt to have committed the conduct constituting the offense charged, but were also found to be not guilty by virtue of some mental disease or defect. MHL § 10.03(g)(3); see also NYPL § 40.15. The second group consists of Article 730 defendants, those persons charged with sex offenses but determined by a court to have been so incapacitated as to have been unable to help prepare their own defense, and therefore unable to stand trial. MHL § 10.03(g)(2). For such defendants, the statute permits post-trial detention where the Attorney General can "prov[e] by clear and convincing evidence [at the commitment trial] that respondent did engage in the conduct constituting [the sex] offense" for which the Article 730 defendant was indicted. MHL § 10.07(d). Therefore, of all individuals subject to the Act, only the Article 730 defendants face a designation of "sex offender," and potentially involuntary detention, without having been found beyond a reasonable doubt to have committed the acts which constitute *any* crime, sexual or otherwise.

FN21. In most cases, that crime will have been determined by a jury, beyond a reasonable doubt, to have been sexual in nature. There are certain circumstances in which that is not the case, as discussed in Part III E of this Opinion, below.

***18** Plaintiffs attack the provisions relating to the post-trial detention of these Article 730 defendants, claiming that the procedures violate due process. Defendants, relying on *Addington v. Texas,* 441 U.S. 418 (1979), insist that the procedures set forth in the statute are adequate, because facts necessary to support involuntary civil commitment need only be found by clear and convincing evidence. (D.Opp.21-22.)

Defendants' argument is not without force. As a general matter, plaintiffs concede that an individual may be civilly committed based on a finding, by clear and convincing evidence, that an individual is mentally ill and dangerous. (See Tr. at 35, 36-38.) Plaintiffs concede this, as they must, because the Supreme Court's opinion in Addington supports exactly that proposition, holding that an individual can be indefinitely civilly committed upon a showing by clear and convincing evidence that an individual is mentally ill and would be a danger if released. 441 U.S. at 420, 433. See also *Hollis v. Smith,* 571 F.2d 685, 692, 695 (2d Cir.1978). Indeed, Article 730 defendants who may be detained under Article 10 may have been committed pursuant to just such a civil commitment scheme,[FN22] and presumably the legislature could, if it chose, permit lengthier commitment for such individuals than is currently permitted by Article 730.[FN23]

FN22. *See* MHL § 10.03(g)(2) (Article 730 defendants must have been charged for committing a sex offense.); MHL § 10.03(p) (All sex offenses are felonies.); CPL § 730.50(1) (If the court determines that defendant is an incapacitated person it must adjudicate defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

an incapacitated person, and "[w]hen the indictment charges a felony ... it must issue an order of commitment ... for care and treatment in an appropriate institution for a period not to exceed one year from the date of such order."); CPL § 730.50(2) (upon the conclusion of a period of confinement pursuant to Article 730, when the State believes that the defendant continues to be incapacitated, it can apply for an order of retention, and if the court adjudicates the defendant an incapacitated person, it must issue an order of retention for a period not to exceed one year); CPL § 730.60(6) (If an Article 730 defendant is about to be released and the court determines that the defendant is a danger to himself or others, then "the court shall issue an order to the commissioner authorizing retention of the committed person in the status existing at the time notice was given hereunder, for a specified period, not to exceed six months.").

FN23. *See* CPL § 730.50(3) (The civil detention for a defendant charged with a felony but found unable to stand trial "must not exceed two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment.").

But Article 10 is not a mere civil commitment statute that may apply to any citizen. Rather, it applies only to those who have committed a sexual offense (or at least, the conduct constituting such an offense). The Article 10 respondent is labeled not merely a person in need of treatment, but a "sex offender," a label premised on the conclusion that the accused committed a crime (or at least, the conduct constituting a crime). Application of the stigma associated with a finding of criminality elevates the statute beyond the ordinary civil standards of proof, and requires proof beyond a reasonable doubt, regardless of the "civil" label attached to the statute.

*In re Winship,* 397 U.S. 358 (1970), is instructive. In Winship, the Supreme Court held that when a juvenile is "charged with an act which would constitute a crime if committed by an adult," that act must be proved beyond a reasonable doubt. *Id.* at 359. New York defined juvenile delinquents as persons older than seven but younger than 16 who "do[ ] any act which, if done by an adult, would constitute a crime." *Id.* at 359, citing N.Y. Fam. Ct. Act § 712. The Court rejected the argument that a lesser standard of proof was required because "delinquency status is not made a crime [and therefore] the proceedings are not criminal," *id.* at 365, concluding that "civil labels and good intentions do not themselves obviate the need for criminal due process safeguards" and that a "proceeding where the issue is whether the child will be found to be 'delinquent' and subject to the loss of his liberty for years is comparable in seriousness to a felony prosecution." *Id.* at 365-66, citing *In re Gault,* 387 U.S. 1, 36 (1967) (internal quotation marks omitted). The Court noted that though a different label was used, the individual was still subject to the "stigma of a finding that he violated a criminal law" and the "possibility of institutional confinement on proof insufficient to convict him were he an adult." *Id.* at 367.

***19** Although Winship establishes that a civil label is not always dispositive of the requisite standard of proof, the Supreme Court has made clear that a legislature's declaration of the civil nature of confinement may be overcome only where there is "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" to deem it civil. *Hendricks,* 521 U.S. at 361, citing *United States v. Ward,* 448 U.S. 242, 248-49 (1980). Here, plaintiffs have met that high burden. The situation presented here is indistinguishable from that addressed in Winship. In neither case can the State use a particular label to obviate the need for appropriate procedural protections in determining whether an individual in fact committed acts that constitute a crime, where such a determination not only triggers the possibility of long-term detention, but also labels the person an "offender." Just as with a juvenile adjudication, the statute combines the severe deprivation of liberty attendant on detention and rehabilitative treatment with a stigmatic label. The statute subjects an Article 730 defendant found to have committed a sex offense both to the "stigma of a finding that he violated a criminal law" and to the "possibility of institutional confinement on proof insufficient to convict him were he an adult" competent to stand trial. Winship, 397 U.S. at 367. The consequences of the adjudication are significant. Article 730 defendants who are confined pursuant to the Act will be confined in secure treatment facilities, segregated alongside dangerous sexual criminals found to suffer from mental abnormalities. MHL §§

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 19

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

10.06(k), 10.07(c). And the prerequisite for that confinement is a conclusion that they too have committed sexual offenses.

Article 10 is a civil statute, and provides civil, not criminal, remedies for individuals who are mentally ill and dangerous. Those remedies, however, are predicated on criminal conduct. The statute applies only to *criminals* or to individuals who would be criminals if they had been sane when they committed the acts which constituted the crime and had been competent to stand trial. The title of Article 10 is *"Sex Offenders* Requiring Civil Commitment or Supervision." (Emphasis added.) The statute refers to those subject to its provisions as "sex offenders" and "recidivist sex offenders." See, e.g., MHL §§ 10.01(a), (g). Individuals subject to the Act are termed "sex offender[s] requiring civil management." MHL § 10.03(q). The instrument that the Attorney General must file to instigate commitment proceedings is a "sex offender civil management petition." MHL § 10.06(a). Both the terms "offender" and "recidivist" have clear criminal implications. Black's defines an "offender" as "[a] person who has committed a crime," and a "recidivist" as "one who has been convicted of multiple criminal offenses, usually similar in nature." Black's Law Dictionary (8th ed.2004). The procedures involved as well as the terminology used impart an aspect of moral condemnation, normally reserved for criminal judgments, upon those found guilty at the Article 10 trial.[FN24]

FN24. On these matters, the current statute stands in contrast to Kansas's sexual offender civil commitment statute upheld in *Hendricks*, 521 U.S. at 352. The Kansas statute applied to "sexually violent predator [s]," defined as those persons who "ha[ve] been convicted of or charged with a sexually violent offense and who suffer[ ] from a mental abnormality or personality disorder which makes [them] likely to engage in the predatory acts of sexual violance." *Id.* citing Kan. Stat. Ann. § 59-29a02(a) (1994). Though "predator" is not a gentle term, neither is it necessarily a criminal term. Furthermore, the Kansas statute applied not only to those who had been convicted of crimes, but also to those charged with committing crimes, and therefore did not purport to restrict itself to individuals who have committed criminal offenses. In any event, the Kansas statute only authorizes detention based on proof beyond a reasonable doubt that the individual was in fact a sexually violent predator. *Hendricks*, 521 U.S. at 352-53.

***20** Under the *Mathews v. Eldridge* standard, the severity of these consequences, normally resulting only from criminal conviction, argues for the imposition of the highest burden of proof. The second Eldridge factor, the risk of erroneous adjudication, points in the same direction, as the risk is particularly high in the case of Article 730 defendants. The reason these defendants have not been put on trial for the acts that form the basis of the criminal charges against them is that they were found by a court to have been incompetent to participate in their own defense. To have put them on trial on the criminal charge would have violated due process. *Cooper*, 517 U.S. at 354 ("A defendant may not be put on trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.' "), quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960). Even at a criminal trial, with a standard of proof beyond a reasonable doubt and all the other attendant protections of the criminal process, the risk of an erroneous conviction is too great when the defendant lacks the ability to assist his attorney in defending the case.

Every other category of "offender" to whom the law applies has been found guilty of conduct constituting a crime beyond a reasonable doubt, at a criminal trial at which the defendant was fully able to participate in his defense. To *reduce* the burden of proving guilt for Article 730 defendants perversely heightens the risk of erroneous conviction. The unique circumstances of these defendants, who were adjudicated to have been unable to participate in their own defense, suggest a need for stronger, not reduced, procedural protections against erroneous conviction.

The standard of proof "represents an attempt to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Winship*, 397 U.S. at 370. A weakened standard of proof

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

represents, by definition, the tolerance of a greater likelihood of error. When combined with the inherently greater risk of error implicated in trying a defendant who is unable to defend himself due to incompetence, the risk of erroneous adjudication of guilt becomes too great to permit the imposition of the stigma of the "sex offender" label and the attendant long-term deprivation of liberty.

The third Eldridge factor, the importance of the governmental interest at stake, does not suggest a more lenient standard of proof. Without question, the government interest involved here is of the highest order, involving the protection of the public safety against serious imposition. It is precisely that interest that permits the State, in effect, to put the incompetent on trial at all: given the importance of protecting potential victims against repeat sexual offenders, the difficulties that prevent a criminal trial of the incompetent cannot preclude the State from taking preventive steps to provide necessary treatment.[FN25] But the requirement of proof beyond a reasonable doubt that the respondent *is* an offender is not an obstacle to the statutory scheme. Indeed, a finding of criminal conduct beyond a reasonable doubt is prerequisite to "civil management" proceedings for every category of person subject to the scheme *other than* Article 730 defendants. There is no plausible reason to suggest that the governmental interest supporting Article 10 commitments would be undermined if the same requirement is imposed with respect to the category of defendants least able to defend themselves.

FN25. Plaintiffs do not argue, and the Court does not hold, that individuals who were found either incompetent to stand trial or not guilty by virtue of insanity may not be detained pursuant to the Act because they have not been convicted of a crime. The statute is drafted to deal with individuals who are mentally ill, and it would be strange to prevent a state from dealing with mentally ill and dangerous individuals who have been adjudicated to have committed violent sexual acts via the civil remedies that this Act imposes. Even though *Winship* required certain procedural protections in the context of juvenile adjudications, it did not completely transform all aspects of the juvenile delinquency system into a criminal system. *See, e.g., Winship,* 397 U.S. at 359 n. 1 (The opinion does not "rest[ ] ... on the assumption that all juvenile proceedings are criminal prosecutions, hence subject to constitutional limitations ... [W]e are not here concerned with ... the pre-judicial stages of the juvenile process, nor do we direct our attention to post-adjudicative or dispositional process.") (citations and internal quotation marks omitted). So too here, requiring that New York must prove beyond a reasonable doubt that the Article 730 defendant committed the acts that constitute a crime that may have been sexual does not transform all aspects of Article 10, at least with respect to Article 730 defendants, into criminal proceedings.

***21** Due process therefore requires that when an individual is subject to the stigma of being labeled a "sexual offender" and of a finding that he violated a criminal law triggering the possibility of institutional confinement, proof that he in fact committed the acts that form the basis for being labeled an "offender" must be made beyond a reasonable doubt.[FN26] Plaintiffs have demonstrated a likelihood of success in prevailing on their claim that the "clear and convincing" burden of proof does not afford the protections that due process requires in determining that Article 730 defendants are in fact "offenders" subject to the Act. Therefore, plaintiff's motion for a preliminary injunction will be granted with respect to this portion of the statute.

FN26. Plaintiffs do not argue that due process requires any other procedures to ensure that Article 730 defendants are dealt with fairly, and the Court expresses no view on any such issue.

E. MHL § 10.07(c)

The same constitutional difficulty that undermines § 10.07(d) affects § 10.07(c), albeit in a different way that presents a closer issue.

Eligibility for extended supervision under Article 10 is premised on the fact that an individual is not only an offender, but specifically a *sexual* offender. A sexual offender may be one who has committed either a crime

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

that by definition includes a sexual element (for example, rape or sexual abuse) or a crime not necessarily sexual by definition (for example, kidnapping) in a sexual manner or with a sexual motive.[FN27] The Act thus recognizes that crimes that are not sexual in their essential nature may still constitute sexual offenses. New York's criminal code did not previously recognize such a category of "as-applied" sexual crimes, and the Act amends the code to create a new crime: the commission of any one of a set of serious felonies "for the purpose, in whole or substantial part, of his or her own direct sexual gratification." NYPL § 130.91. That crime will be, by definition, a sexual offense. For those individuals subject to Article 10 by reason of a crime committed after the enactment of Article 10, that crime must be one of a defined set of sexual crimes, including a "sexually motivated felony" as defined by NYPL § 130.91. MHL § 10.03(p); NYPL §§ 130.00-130.91. In such cases, the "sexual motivation" will be an element of a crime that will have been charged, submitted to the jury, and proved beyond a reasonable doubt in the underlying criminal case, before an offender will be subject to the extended supervision provisions of the Act.

FN27. The provisions of Article 10 apply to individuals who have committed certain specialized crimes that are inherently sex-based offenses, such as rape and sexual abuse. MHL § 10.03(p); NYPL §§ 130.00-130.90. The provisions also apply to individuals who have committed certain "designated felon[ies]," MHL § 10.03(f), crimes not necessarily sexual in nature, in a way that demonstrates a "sexual [ ] motivat[ion]." MHL § 10.03(g)(4); NYPL § 130.91.

However, for those individuals sought to be detained based on a crime committed before the enactment of Article 10, that crime need not have been proven before a criminal jury to have been inherently sexual or committed with a sexual motivation. The Act authorizes the detention of such individuals if they have committed any one of a set of serious "designated felonies" with a "sexual motivation." For most of these individuals, it would have been impossible for the sexual motivation determination to have been made at the underlying trial.[FN28] Therefore, for those who have committed the crime that forms the basis of their potential detention before the enactment of Article 10, the statute allows the "sexual motivation" determination to be made not at an underlying criminal trial, but at the civil commitment trial, at which the determination is to be made on the basis of clear and convincing evidence. MHL §§ 10.03(g)(4), 10.03(p)(4), 10.07(d).

FN28. Some persons subject to Article 10 have been charged with, and convicted of, a designated felony before Article 10 was enacted or proposed. For such offenders, it would obviously have been impossible to have put the "sexual motivation" issue to the jury at the underlying criminal trial. For an offender who committed his allegedly sexual crime before the enactment of the Act, but who has been or will be charged with (and convicted of) his crime after the enactment of the Act, New York could perhaps put the issue of "sexual motivation" before the jury in the underlying criminal trial, so as to determine his eligibility for the detention provisions of Article 10. However, unlike those who committed their crimes after the Act's enactment, those who committed their crimes before its enactment cannot be found guilty of, and punished for, a crime that did not exist at the time that they committed the allegedly criminal acts. U.S. Const. art. 1, § 9. cl. 3. Moreover, such a procedure could be at best unwieldy and at worst prejudicial to defendants. In any event, New York apparently has not attempted to provide a procedure for putting the issue before the underlying criminal jury in such cases.

***22** Plaintiffs contend the "sexual motivation" determination is in fact an element of a crime, and that due process therefore requires that it be proved beyond a reasonable doubt. Defendants insist that due process requires only a "clear and convincing" standard of proof for civil commitment proceedings, relying on Addington for support. 441 U.S. at 432 (concluding that "the reasonable-doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiffs argue, however, that a retroactive determination that a pre-existing crime was committed with a sexual motive is essentially a criminal finding that necessitates a heightened standard of proof. They point out that in Addington, the Supreme Court rested its acceptance of the lesser standard of proof on the inherent uncertainties of the diagnostic and predictive findings of "mental illness" and "future dangerousness," which are not the sort of historical facts for which the standard of proof beyond a reasonable doubt was designed. The nature of a psychiatric diagnosis at issue in Addington raised a "serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous" because the "subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." 441 U.S. at 429-30 (citations omitted). See also, *Hollis v. Smith* 571 F.2d 685, 692, 695 (2d Cir.1978) (making determinations about a person's character and prospects for future conduct "beyond a reasonable doubt would either prevent the application of [commitment statutes predicated on such findings] except in the most extreme cases or invite hypocrisy on the part of judges or juries"); *Id.* (The "ultimate issue" is "not as in a criminal case whether an alleged act was committed or event occurred, but the much more subjective issue of the individual's mental and emotional character. Such a subjective judgment cannot ordinarily attain the same 'state of certitude' demanded in criminal cases."); *United States v. Comstock,* No. 5:06-HC-2195BR, --- F.Supp.2d ----, ----, 2007 WL 2588815 at *26 (E.D.N.C. Sep. 7, 2007).

In contrast, a determination of "sexual motivation," as Article 10 itself makes clear, is capable of being made by a jury beyond a reasonable doubt. "The state of a man's mind," as Lord Justice Bowen famously remarked, "is as much a fact as the state of his digestion." *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716-17 (1983), quoting *Edgington v. Fitzmaurice,* 29 Ch. Div. 459, 483 (1885). See also *Arave v. Creech,* 507 U.S. 463, 473 (1993) ("The law has long recognized that a defendant's state of mind is not a 'subjective' matter, but a fact to be inferred from the surrounding circumstances.") (citations omitted). Unlike the findings at issue in Addington that an individual is both mentally ill and dangerous, a determination that an individual committed a crime with a sexual motivation is a factual determination, normally based on inferences from the facts and circumstances, that can be made beyond a reasonable doubt, as similar findings of purpose and intent are made every day in criminal trials.

***23** Of course, the Supreme Court in Addington articulated other reasons besides the difficulty of making findings regarding mental illness and dangerousness beyond a reasonable doubt for holding the clear and convincing burden of proof standard acceptable for civil commitment proceedings. The most fundamental reason for the clear and convincing standard is that, unlike criminal commitment, "[i]n a civil commitment state power is not exercised in a punitive sense." *Addington* 441 U.S. at 428. Furthermore, the standard of proof beyond a reasonable doubt "historically has been reserved for criminal cases," and the calculation of interests relevant to civil commitment is different such that it "cannot be said ... that it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed." *Id.* at 428-29. Although Article 10, like the traditional civil commitment regime discussed in Addington, is intended to be therapeutic, protective, and regulatory rather than punitive, the sexual offender provisions of the Act differ crucially from other civil commitment regimes, in that they are reserved for persons who have already been brought into the criminal justice system, and either found guilty of sexual crimes, or determined in the commitment trial to have engaged in conduct constituting such crimes. A determination that one may need treatment is fundamentally different from a determination that one committed a crime, or that one is a sexual offender.

Applying the *Mathews v. Eldridge* standard to these offenders presents issues broadly similar to those discussed above in relation to Article 730 defendants, but with significant differences. First, with respect to the importance of the individual interests involved, the ultimate stakes remain of the highest level, since the respondent's personal liberty is at risk in these proceedings. As noted above, however, in the discussion regarding MHL § 10.07(d), the Constitution permits deprivation of liberty in the form of civil commitment on a showing of mental illness and dangerousness by clear and convincing evidence, without any finding of criminality at all. Such findings are to be made in the course of the detention hearing contemplated by Article 10 in any event. What is at stake in the determination of whether a respondent committed a crime with a sexual motivation is not whether such an offender can be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

detained, but whether the respondent can be detained pursuant to this sexual offender regime.

This, of course, is no small matter, not only because it is intertwined with the ultimate detention decision, but also because there is, as noted above, a significant stigma associated with the declaration that a person is a "sex offender." In this regard, however, individuals covered by MHL § 10.07(c) differ importantly from the Article 730 defendants covered by MHL § 10.07(d). The persons covered by § 10.07(c) have already been found, beyond a reasonable doubt, to have committed a serious felony, while the incompetent defendants covered by § 10.07(d), although accused of crimes, have never been tried or found guilty, and continue to be presumed innocent of any crime. To designate the latter "sex offenders" requires that persons who have never been convicted of a crime nevertheless be declared functionally guilty of serious felonies-which in turn will subject them to a scheme of extended detention or other supervision not imposed on any other person who has not been found beyond a reasonable doubt to have committed the conduct constituting such a felony. The defendants covered by MHL § 10.07(c), in contrast, have already been formally condemned as felons based on proof beyond a reasonable doubt. The further determination that their crimes had a sexual motivation is surely a serious matter that must be weighed carefully in the Eldridge balance. But the interest in question is not quite as strong as the interest of Article 730 defendants in avoiding a declaration of criminal guilt.

***24** The risk that an offender will erroneously be found a sexual offender if the clear and convincing standard is applied is also less great for this group of respondents. Unquestionably, the lessening of the burden of proof from "beyond a reasonable doubt" to "clear and convincing evidence" makes it easier for the finding to be made, and thus increases the chance of an erroneous finding of guilt (while, of course, reducing the risk that a respondent will erroneously be found *not* to have acted from a sexual motive). But because defendants covered by MHL § 10.07(c) are competent to assist in their defense, they are far better able to make use of the assistance of counsel and the other procedural rights accruing to respondents at trial, to defend against erroneous accusations, and to raise doubts in the mind of jurors about the accuracy of the State's charges.

Moreover, the narrowness of the issue presented reduces the chance of erroneous condemnation. Since the Article 730 defendants have never been found guilty of any crime, all of the elements of the underlying offense would be in play at an Article 10 trial. The respondent would thus have the full panoply of criminal defenses, including mistaken identity, alibi, and challenges to the witnesses' or victim's version of events available. Because of the respondent's incompetence, a lawyer representing the respondent would have little or no understanding of her client's version of the events, and thus would be enormously hampered in investigating the facts, selecting a defense, and challenging what may be a fundamentally mistaken understanding of the case. In the case of a defendant who has been found guilty of a non-sexual serious felony, however, there is no chance of error about the perpetrator's identity, or about whether the basic underlying crime was in fact committed: those facts have already been found by a jury beyond a reasonable doubt. In many cases, the sexual aspect of the case may be apparent, or, conversely, clearly absent. As compared with the cases covered by § 10.07(d), there will thus be fewer § 10.07(c) cases in which the burden of proof will likely make a difference, and in those, the respondent will be able to mount a defense. The extent to which the reduction of the burden of proof increases the risk of error is thus less in the case of § 10.07(c) than in the case of § 10.07(d).[FN29]

FN29. Plaintiffs argue that evidence that an individual has, at the present time, a sexual abnormality, another element at issue in the Article 10 trial, is "all but guaranteed" to taint the determination as to whether that individual has, in the past, committed crimes with a sexual motivation. (MHLS Mot. 9-10.) The argument has a certain air of unreality about it: it is far more likely that the evidence that the crime of conviction had a sexual aspect is what triggered the inquiry into the defendant's mental abnormality in the first place. In any event, as in all trials, the jurors will be properly instructed about the different issues they will be required to decide, the relevance or irrelevance of different pieces of evidence to each of those issues, and the need to follow any necessary limiting instructions, and it will be presumed that the jurors will follow those instructions.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Finally, as is the case with the Article 730 defendants, while the interest of the State in the Article 10 scheme as a whole is extremely strong, the State's interest in the reduced burden of proof is more attenuated. For all sexual offenders who engage in criminal activity after the effective date of the Act, the sexual nature of their offense will have to be proven beyond a reasonable doubt, because such offenders will not be eligible for extended detention or treatment under Article 10 unless they are convicted beyond a reasonable doubt either of an offense that is sexual in its nature, or of the new crime created by the Act and codified at NYPL § 130.91. This makes it difficult for defendants to argue either that the retroactive finding of sexual motivation is not a finding of the element of a criminal offense, or that requiring such a finding to be make beyond a reasonable doubt will cripple, or even hamper, accomplishment of the State's salutary purposes in enacting Article 10.

***25** Defendants argue that the State could constitutionally justify civil detention based on a finding by clear and convincing evidence, at the underlying criminal trial, that the individual committed the crime with a sexual motivation, and that the Legislature did not provide for such a lesser standard at the underlying criminal trial simply in order to avoid confusing the jury with multiple standards of proof.[FN30] That argument is unpersuasive.

FN30. Counsel for defendants contended at oral argument that the State required a heightened standard of proof for the "sexual motivation element" at the underlying criminal trial not as a constitutional necessity, but as a matter of legislative "genero[sity]." (*See* Tr. 40 ("I think what the legislature wanted to do was avoid confusing the juries or other triers of fact about what standard of proof they are supposed to employ. I mean, it was generous to those individuals who were charged after, but it makes sense in light of that.").)

First, the commission of the new crime-"sexually motivated felony"-also triggers a sentencing scheme, NYPL § 70.80, requiring certain mandatory minimum sentences that differ from the mandatory minimum sentences applicable to the commission of the underlying felonies without a sexual motivation. [FN31] It is thus not clear that New York could constitutionally reduce the burden of proving this element at the underlying criminal trial.[FN32]

FN31. Pursuant to NYPL § 70.80(4)(a), a person who has committed a felony sex offence as criminalized by NYPL § 130.91 is subject to certain mandatory minimums to which they would not otherwise be subject. *See* NYPL §§ 70.80, 130.92(3). Whereas the standard mandatory minimum for those who have committed a class B through class E felony is one year, NYPL §§ 70.00(2), 70.00(3), for those who committed a class B felony with a sexual motivation, the minimum term of imprisonment is five years, NYPL § 70.80(4)(a)(i), for those who committed a class C felony with a sexual motivation, the minimum term of imprisonment is three and a half years and the maximum term of imprisonment is 15 years, NYPL § 70.80(4)(a)(ii), for those who committed a class D felony with a sexual motivation, the minimum term of imprisonment is two years, NYPL § 70.80(4)(a) (iii), and for those who committed a class E felony with a sexual motivation, the minimum term of imprisonment is one and a half years, NYPL § 70.80(4)(a)(iv). Even higher mandatory minimums apply if the individual who committed the sexually motivated felony is a "predicate felony sex offender" as defined by NYPL § 70.80(c). *See* NYPL §§ 70.80(4), (5).

FN32. A heightened mandatory minimum sentence with no corresponding increase in the maximum sentence may not offend the Supreme Court's recent jurisprudence holding that subjecting a defendant to enhanced sentencing based on an additional offense element requires a jury finding of that element beyond a reasonable doubt. *See Harris v. United States,* 536 U.S. 545, 557 (2002) (finding that facts affecting mandatory minimums need not be proved beyond a reasonable doubt); *McMillan v. Pennsylvania,* 477 U.S. 79, 91 (1986) (same); *cf. Apprendi v. New Jersey,* 530 U.S. 466 (2000); *Blakely v. Washington,* 542 U.S. 296 (2004); *United States v. Booker,* 543 U.S. 220 (2005). It is not clear, however, that a majority of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Supreme Court continues to accept the validity of *Harris* and *McMillan*. *See, e.g., Harris,* 536 U.S. at 569 (Breyer, J., concurring in part and concurring in the judgment) ("I cannot easily distinguish *Apprendi* ... from this case in terms of logic."); *id.* at 572 (Thomas, J., joined by Stevens, Souter, and Ginsburg, JJ., dissenting) (*"McMillan* ... conflicts with the Court's later decision in *Apprendi."* ). However, NYPL § 130.91 is nonetheless a different crime from the commission of the underlying felony without a sexual motivation, and a crime for which the consequences are potentially more severe for a portion of those convicted.

Second, the prospective statutory scheme makes even clearer that the function of the "sexual motivation" element is not to decide who is in need of extended treatment, but to define a category of *convicted criminals* who are then eligible for *assessment* for such treatment. The function of the finding of sexual motivation is to define the kind of crime that the offender committed, not to determine whether he requires treatment. The clear and convincing standard of proof applies under Addington to factual assessments relating to the latter question, not the former. Thus, contrary to the State's argument, when the criminal jury under Article 10's prospective scheme is assessing the offender's motivation, it is not making an assessment of his need for extended treatment beyond expiration of his criminal sentence. That is a decision that will be made at a later date and by another jury-possibly many years later-based on a finding of mental abnormality and dangerousness as of that time. The Article 10 jury's finding about the nature of the offense is a retrospective, historical finding about the nature of the offender's conduct that triggers such an assessment, not an aspect of the assessment itself.

Finally, even accepting arguendo defendants' premise that the State could have provided prospectively for a trial finding of sexual motivation by clear and convincing evidence (for example, by foregoing any sentencing consequences other than eligibility for civil commitment under Article 10), the fact is that it did not. The issue in this case is not the constitutionality of hypothetical statutes that the Legislature might have passed affecting future sexual offenders. Rather, the inquiry under *Mathews v. Eldridge* is whether the procedural protections provided by the actual legislation with respect to past offenders are adequate, given a balancing of factors including the strength of the governmental interest in the existing scheme. Thus, regardless of the reasons why New York elected to require proof beyond a reasonable doubt of sexual motivation on a prospective basis, the fact that it did-and that it says it did so in order to simplify trial procedure by avoiding multiple standards of proof-undermines any claim that requiring proof beyond a reasonable doubt will interfere with the accomplishment of the statute's purposes.[FN33]

FN33. Alternatively, counsel argues that the reduced standard of proof was necessary because the gap in time between the crime committed with the alleged sexual motivation and the commitment hearing makes proving the "sexual motivation" element "quite a burden," and thus provides adequate justification for easing the State's burden of proof. (Tr. 40.) But the burden of defending oneself against such a charge also becomes more difficult with time. Thus, to the extent that the difficulty of accurately determining the offender's motivation retrospectively is a factor in the decision, that suggests an increased risk of error (a factor arguing for stronger procedural protections) as much as it suggests greater difficulty in accomplishing the State's purposes.

***26** The balancing standard of *Mathews v. Eldridge* necessarily involves the Court in weighing factors that the Legislature presumably considered in enacting the statute. Caution is therefore appropriate in evaluating the statutory scheme, and deference to the Legislature's conclusions is appropriate to the judicial role. Moreover, precedent is sparse and conflicting. The case of juvenile delinquency adjudications addressed in Winship appears to be the only case in which the Supreme Court has mandated proof beyond a reasonable doubt in proceedings denominated civil, and Addington's holding that those found to be dangerous and mentally ill by clear and convincing evidence may be civilly committed stands as a counter-example supporting the State's conclusion. The case of persons already found guilty beyond a reasonable doubt of a serious felony is less clearly analogous to Winship, moreover, than that of the mentally incompetent Article 730 defendants, who have never been found guilty

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of any crime and whose ability to defend themselves is by definition seriously impaired. Thus, while the prospective statutory scheme appears to demonstrate that the State could accomplish its goals with respect to past offenders even if a higher burden of proof were imposed, the other factors in the Eldridge balance do not point as strongly in favor of enhanced procedural protection.

Arguably, the case of offenders convicted of serious but non-sexual felonies gravitates closer to Addington. A state may civilly commit an individual based on clear and convincing evidence that he or she is mentally ill and dangerous. It therefore appears somewhat anomalous to hold that a state may not civilly commit or subject to an extended treatment regime an individual who has already been convicted of a serious crime based on clear and convincing evidence that he is mentally abnormal and dangerous, along with the additional finding that his previous crime was committed with a sexual motivation. Unquestionably, in the civil proceeding contemplated by Article 10, evidence that the respondent's past criminal acts were committed with a sexual motivation would be admissible in any event to prove the existence of a mental abnormality or a present danger to others such that an individual merits detention. Rather than subject all criminal defendants to screening for possible proceedings under Article 10, New York has chosen to limit eligibility for extended detention to those whose crimes involved a sexual motivation. It is hardly clear that, in the absence of explicit guidance to the contrary, this Court should prevent a state from focusing on those types of individuals who, in the State's judgment, most likely require commitment.

With respect to these defendants, therefore, the question of constitutionality is more closely balanced than with respect to the Article 730 defendants discussed above. On the current record, plaintiffs have not demonstrated a likelihood of success on the merits, and therefore their motion for a preliminary injunction will be denied. It is also not clear, however, on the face of the complaint, that Winship or Addington forecloses relief. A fuller record with respect to the types of cases that are subject to MHL § 10.07(c) may well affect the proper understanding of the Eldridge factors. At this stage of the case, the parties are unable to address how many offenders are subject to § 10.07(c), the length of time typically separating a criminal conviction from proceedings under Article 10, or the nature of the evidence that may be available to retrospectively assess the motivations of offenders, among other factors that may bear on the balancing of the Eldridge factors. Whether retrospective re-characterization of a crime in a civil proceeding requires the same procedural protections as are required for classifying an incompetent defendant as a criminal is an issue sufficiently complicated, with sufficiently broad ramifications, that the Court cannot simply find the statute constitutional on a motion to dismiss based solely on the pleadings. Accordingly, defendants' motion to dismiss that portion of the complaint that refers to MHL § 10.07(c) will also be denied.[FN34]

FN34. Plaintiffs' equal protection argument adds nothing to the analysis. Essentially, plaintiffs argue that it is irrational to distinguish the standard of proof applicable to prospective offenders from that applicable to past offenders. However, the two categories of offenders are distinct, and present distinct problems. Going forward, New York has decided that the proper way to address the problem of sexually-motivated felons is to create a new category of crime, something that the State plainly is constitutionally forbidden from doing retrospectively by the Ex Post Facto Clause of the Constitution. U.S. Const. art. 1, § 9. cl. 3. But New York does have an interest in addressing the potential present and future need for extended treatment or detention of individuals whose crimes were committed in the past. The choice to deal with future offenders primarily through the creation of a new criminal prohibition does not foreclose New York from dealing otherwise with past offenders who are presently mentally abnormal and dangerous. The question is whether the procedures adopted to deal with such past offenders are consistent with due process in their own right. Any difference between those procedures and the procedures put in place with respect to future offenders is thus a rational product of the different situations of past and future offenders, and not of any irrational bias against or greater hostility toward past as opposed to future sex offenders.

F. MHL § 10.05(e)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 27

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

***27** Article 10 provides for a right to legal counsel, with the appointment of counsel at state expense for those who cannot afford it, upon the Attorney General's initiation of a formal action against a respondent. MHL § 10.06(c). Therefore, a respondent is guaranteed state-funded counsel for all judicial hearings pursuant to the Act. Plaintiffs contend, however, that counsel is also required before the Attorney General files any formal action before a court, when an individual who is being investigated by a CRT is asked to submit to a psychiatric exam. This psychiatric exam may affect both the CRT's recommendation to the Attorney General and the Attorney General's case for confinement at the probable cause hearing and commitment trial.

Article 10 provides for three potential psychiatric examinations before the commitment trial. First, during the investigational stage, before institution of any judicial proceeding, the CRT may request that an offender submit to a psychiatric examination in connection with the CRT's investigation to determine "whether the respondent is a sex offender in need of civil management." MHL § 10.05(e). While the offender apparently may decline to participate in the interview, such a declination may be used against him. At the commitment trial, the jury "may hear evidence of the degree to which the respondent cooperated with the psychiatric examination" and, upon request and if it so finds, the court can "instruct the jury" that "respondent refused to submit to a psychiatric examination." MHL § 10.07(c). If the CRT finds that the respondent is such a sex offender, it must notify both the respondent and the Attorney General in writing. MHL § 10.05(g). This notification must include a written report from a psychiatric examiner that includes a finding as to whether the individual has a mental abnormality. *Id.* This determination necessarily occurs in advance of the filing of a civil management petition, and triggers the formal court process, including the probable cause hearing and the commitment hearing. MHL §§ 10.06(a); 10.06(g); 10.07(a). An individual is not entitled to counsel when asked by the CRT to submit to a psychiatric evaluation, MHL § 10.08(g), and the statute provides no notice to the respondent of the potential consequences of the examination.[FN35]

FN35. As was clarified at oral argument:

The Court: "Now, what kind of advice of rights, if any, does [a respondent asked to participate in a CRT-requested psychiatric examination] get ... When an individual gets told, we would like you to see Dr. So-and-so in connection with this process ... Then the doctor shows up. What is this person supposed to do? How is he supposed to make a decision as to do I go through [with] this, what does this mean, what are my rights? He is basically on his own to make that call?"

Counsel for Defendants: "I think he is pretty much on his own to make that call."

(Tr. 76-77.)

Second, upon receipt of the CRT report (but still before the filing of a sex offender civil management petition), the Attorney General may petition the court to order the respondent to submit to an evaluation by a psychiatric examiner. MHL § 10.06(d). If the court grants relief, the interview will be conducted by a psychiatric examiner of the Attorney General's choosing. *Id.* An individual is entitled to counsel upon the Attorney General's filing of such a petition. MHL § 10.06(c).

Third, after the filing of a sex offender civil management petition but prior to the commitment trial, the individual against whom the petition was filed may ask the court to order that he be evaluated by a psychiatric examiner of his own choosing. MHL § 10.06(e). If so ordered, and if the respondent cannot afford to pay a psychiatric examiner, the court "shall appoint an examiner of the respondent's choice to be paid within the limits prescribed by law." *Id.* Following the examination, the examiner shall report his findings in writing to the respondent or his counsel, the Attorney General, and the court. *Id.* If unable to afford one, a respondent is entitled to counsel upon the filing of a civil management petition, MHL § 10.06(c), and therefore will have the assistance of counsel in petitioning the court for a respondent-requested psychiatric exam.

***28** The Second Circuit has suggested that involuntary commitment proceedings trigger a right to counsel.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Project Release,* 722 F.2d at 976. However, it has also declined to extend that guarantee to pre-hearing psychiatric interviews held pursuant to the civil commitment provisions of Article 9 of New York's Mental Hygiene Law. *Id.* ("[W]e [are not] prepared to require that legal counsel be guaranteed at pre-hearing psychiatric interviews" under Article 9.); cf. *Ughetto v. Acrish,* 518 N.Y.S.2d 398, 405 (1987) (holding that the New York legislature intended that "in the absence of any showing that counsel's presence would interfere with the psychiatric examination, counsel should be permitted to observe either directly or indirectly these [Article 9] prehearing psychiatric examinations"). In evaluating Article 9 of the Mental Hygiene Law, the Second Circuit found it constitutionally sufficient that commitment procedures specifically provided a right to counsel, at state expense, in all judicial proceedings. *Project Release,* 722 F.2d at 976. Article 10, like Article 9, provides a right to counsel, at state expense, in all judicial proceedings.

Plaintiffs contend that the interests implicated here are different from those at issue in Project Release. They note that the civil commitment as a mentally abnormal sex offender under Article 10 engenders greater stigma than a psychiatric commitment under Article 9. Furthermore, individuals are presumptively committed to a "secure treatment facility" under Article 10 in contrast to a non-secure hospital under Article 9. Also, Article 10 requires a court order for release of a detained individual, and does not permit release based solely on the clinical judgment of his treating doctors. Article 9 allows release based on the clinical judgment of the treating physicians without a court order. Plaintiffs argue that these greater intrusions on the detainees' liberty warrant greater protections against the erroneous deprivation. Plaintiffs also argue that not only is the CRT-prompted psychiatric interview functionally mandatory, but operates as a critical stage of the commitment hearing,[FN36] which, especially in view of the diminished capacity of many individuals subject to the provisions, merits the appointment of counsel. Plaintiffs do not contend that counsel should be permitted to intervene in the examination. Rather, they argue only that due process requires a passive observational role for counsel in the CRT psychiatric hearing only so as to ensure that the psychiatric report and testimony based on the interview is accurate. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 4.)

FN36. *See, e.g.,* MHL § 10.08(g) (relevant written reports of psychiatric examiners are admissible in any hearing or trial pursuant to Article 10); MHL § 10.07(c) (jury may hear evidence of the "degree to which the respondent cooperated with the psychiatric examination" and if the respondent "refused to submit to a psychiatric examination").

Though there are differences between the two civil commitment provisions, it is unlikely that these differences are sufficiently significant to require a different constitutional mandate. First, and as a general proposition, the Second Circuit, like courts in other jurisdictions, has been reluctant to extend the right to counsel to psychiatric examinations. See, e.g., *Project Release,* 722 F.2d at 976; *Hollis v. Smith,* 571 F.2d 685, 692 (2d Cir.1978); *United States v. Baird,* 414 F.2d 700, 711 (2d Cir.1969); see also *Tippett v. Maryland,* 436 F.2d 1153, 1158 (4th Cir.1971); *United States ex rel. Wax v. Pate,* 409 F.2d 498 (7th Cir.1969); *United States v. Albright,* 388 F.2d 719, 726-27 (4th Cir.1968); *State v. Whitlaw,* 45 N.J. 3, 210 A.2d 763 (1965). Second, the specific statute at issue here provides that any one against whom a civil management petition has been filed has the option, with the assistance of appointed counsel if he cannot afford his own, to petition the Court for his own examiner, also paid for by the State, to examine the individual and potentially rebut any distortions or inaccuracies in the report or testimony of the CRT-prompted or Attorney General-petitioned psychiatric examiner. MHL § 10.06(e). Practically speaking, the most effective counter to an improperly-conducted psychiatric examination is not the presence of counsel, but a more professional examination by another psychiatrist. Based on both the statutory structure as well as the presence of cases from this Circuit suggesting otherwise, plaintiffs are unable to demonstrate a likelihood of success on the merits with respect to this constitutional claim. The chances of succeeding on this point appear slim, and therefore their motion for a preliminary injunction will be denied.

***29** It does not follow, however, that defendants' motion to dismiss must be granted. First, because plaintiffs seek relief different from that sought in *Project Release*[FN37] and because of the differences between the consequences of Article 9 and Article 10 proceedings set forth above, it

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

cannot be said that Project Release absolutely forecloses the position advanced by plaintiffs. Second, the evaluation of plaintiffs' arguments requires a more detailed understanding of how the psychiatric examination provisions of Article 9 and Article 10 operate. Plaintiffs argue, for example, that these proceedings function as a critical stage in the proceeding, and the strength of such an argument depends on factual allegations whose accuracy cannot be assessed on a motion to dismiss .[FN38] Plaintiffs are entitled to develop their record, and it will be more appropriate to adjudicate the merits of this argument on summary judgment or at trial. Therefore, both plaintiffs' motion for preliminary injunctive relief and defendants' motion to dismiss the complaint will be denied.

FN37. Plaintiffs here seek only an observational role for counsel, and not a participatory role. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 3 n. 2.) In *Project Release,* the plaintiffs contended that individuals had a statutory "right to have [someone] present as counsel at discussions between [themselves] and hospital staff." 722 F.2d at 969, citing *Project Release v. Prevost,* 551 F.Supp. 1298, 1303 n. 2 (S.D.N.Y.1982). The Second Circuit "found no error in this determination." 722 F.2d at 969. It is not clear from either the opinion of the district court or the Second Circuit the exact role that plaintiffs sought for the counsel at such discussions, though being present "as counsel" normally implies an active role. It is precisely because an active counsel may interfere in the course of a hospital discussion or psychiatric examination that courts are often reluctant to grant such a right to counsel. *See, e.g., Hollis,* 571 F.2d at 692 (" 'It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that.' "), quoting *Tippett,* 436 F.2d at 1158.

FN38. Plaintiff MHLS filed suit before the effective date of the Act, and "did not fully appreciate, until seeing SOMTA in operation, how critical the psychiatric exams under MHL 10.05(e) would prove" to the position of individuals subject to the Act. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 2.) Plaintiffs claim that "[i]n practice, nearly all psychiatric exams so far conducted under Article 10 have been arranged by the case review team, rather than the attorney general, and accordingly, counsel has not been involved." (*Id.*) Upon the filing of an Article 10 petition, the psychiatric examiner who conducted the CRT evaluation "is ordinarily called as the State's primary or sole witness at the probable cause hearing" and that the State "may even enter the examiner's report without calling the examiner to testify." (*Id.*) Plaintiffs also note that in addition to the fact that the individuals being interviewed may be of impaired capacity, there exists an "emotional tension" inherent in a psychiatric interview that may determine the interviewee's eligibility for post-sentence civil commitment. They liken this to the context of criminal line-ups. (*Id.* at 3 n. 2, citing *United States v. Wade,* 388 U.S. 218, 230-31 (1967) (discussing how "emotional tension" may interfere with a suspect's ability to accurately observe and report on line-up procedures).)

**CONCLUSION**

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is granted with respect to the challenged portion of MHL §§ 10.06(k) and 10.07(d), and denied in all other respects, and defendants' motion to dismiss is granted with respect to plaintiffs' challenge to MHL § 10.0(j)(iii), and denied in all other respects.

Plaintiffs are directed to submit a proposed form of order consistent with this opinion after consultation with defendants.

SO ORDERED.

S.D.N.Y.,2007.
Mental Hygiene Legal Service v. Spitzer
Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 30

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2009 WL 579445 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 2009 WL 579445 (C.A.2 (N.Y.)))

H

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,

Second Circuit.

MENTAL HYGIENE LEGAL SERVICES, Plaintiff-Appellee,

v.

David A. PATERSON [FN*], and Rew Cuomo, Diane Jones Ritter, and Brian Fischer, Defendants-Appellants.

FN* Pursuant to Federal Rule of Appellate Procedure 43(c)((2), Governor David A. Paterson is automatically substituted for former Governor Eliot Spitzer as an appellant in this case.

No. 07-5548-cv.

March 4, 2009.

Appeal from the United States District Court for the Southern District of New York (Gerard E. Lynch, Judge).

Cecelia C. Chang (Barbara D. Underwood and Benjamin N. Gutman, on the brief), for Andrew M. Cuomo, New York, N.Y.

Sadie Zea Ishee (Dennis B. Feld, on the brief), for Mental Hygiene Legal Services, New York, N.Y.

Present REENA RAGGI, RALPH K. WINTER, PETER W. HALL, Circuit Judges.

**SUMMARY ORDER**

***1** UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the order of the district court, entered on December 19, 2007, is AFFIRMED.

Defendants-appellants David A. Paterson, Andrew Cuomo, Diane Jones Ritter, and Brian Fischer appeal from an order of the United States District Court for the Southern District of New York (Lynch, *J.*), granting in part and denying in part plaintiff-appellee Mental Hygiene Legal Services's motion for a preliminary injunction. Plaintiff had filed a declaratory judgment action attacking the constitutionality of six procedural provisions of Article 10 of the New York Mental Hygiene Law (MHL), which establishes a regulatory regime for "Sex Offenders Requiring Civil Commitment or Supervision," and subsequently moved for preliminary injunctive relief. The district court granted the motion with respect to sections 10.06(k) and 10.07(d). It determined that plaintiff demonstrated a likelihood of success in challenging § 10.06(k), concluding that the provision permitted the pre-trial detention of a "sex offender requiring civil management" without an individualized finding that the person is sufficiently dangerous to warrant confinement and that lesser conditions of supervision will not suffice to protect the public. The court also enjoined defendants from committing, pursuant to section 10.07(d), any person charged with, but never convicted of, a sex offense because of his or her mental incapacity to stand trial, unless a court or jury has found that the person did commit the conduct constituting the sex offense beyond a reasonable doubt. The district court denied plaintiff's motion with respect to the four other challenged portions of Article 10.

District courts may grant preliminary injunctions when the moving party demonstrates (1) irreparable injury absent injunctive relief, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships decidedly tipped in the movant's favor. *Lusk v. Village* of Cold Spring, 475 F.3d 480, 485 (2d Cir.2007). However, when "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Beal v. Stern,* 184 F.3d 117, 122 (2d Cir.1999) (internal quotation marks omitted). A district court has wide

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Slip Copy, 2009 WL 579445 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 2009 WL 579445 (C.A.2 (N.Y.)))

discretion in determining whether to grant a preliminary injunction, and this Court reviews the district court's determination only for abuse of that discretion. *Green Party of N .Y. State v. N.Y. State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir .2004). Such abuse occurs when the court applies an incorrect legal standard or makes clearly erroneous factual findings. *See Prayze FM v. F.C.C.,* 214 F.3d 245, 249 (2d Cir.2000). We identify neither error in this case.

***2** We agree with the district court that plaintiff has shown irreparable injury and, at least, a likelihood of prevailing on its constitutional claims with respect to sections 10.06(k) and 10.07(d). Our conclusion, like any ruling on a preliminary injunction, does not preclude a different resolution of plaintiff's facial challenge on a more fully developed record. *See id.* at 253 (declining to decide facial challenge on appeal of grant of preliminary injunction).

The district court's order is accordingly AFFIRMED.

C.A.2 (N.Y.),2009.

Mental Hygiene Legal Services v. Paterson
Slip Copy, 2009 WL 579445 (C.A.2 (N.Y.))
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jesse L. STEWART, Jr., Plaintiff,
v.
Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.
No. 9:09–CV–0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

***REPORT–RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

***1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

**I. FACTUAL AND PROCEDURAL SUMMARY**

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30–4 at 14:2–11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with [Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30–11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Dkt. No. 1 at 10; Dkt. No. 30–11 at 6 ¶¶ 13–15.)

***2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8–9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14–15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30–11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9–10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

***3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46–47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

***4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23–24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

> FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16–17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

***5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards—once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29–30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

***6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

***7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30–12 at 10–11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

> FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30–4 at 9–17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14–15. Plaintiff then ended the deposition. *Id.* at 15:20–22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30–12 at 2–3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

***8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30–10 at 8–11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1–2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A) (3–4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5–8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30–11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

FN4. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

***9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8–10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23–24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9–10.) Defendants move for summary judgment of this claim. (Dkt. No. 30–12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

1. *Bedding*

***10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30–12 at 5–6.) Defendants are correct.

An individual claiming that he was deprived of an interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06–Cv–0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a

copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8–10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

***11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36–3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821–23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies *"could* cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

***12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30–12 at 11–12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* ––– F.Supp.2d ––––, No. 08–CV–116580, 2009 U.S. Dist. LEXIS 116580, at *32–39, 2009 WL 4824669, at*10–11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be ***GRANTED;*** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06–Cv–0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

***13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989));

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard
Not Reported in F.Supp.2d, 2010 WL 3907227 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD; D. Monell; N. Marsh; D. Spangenburg; D. Swarts; E. Hollenbeck; J. Edwards; and D. Russell, Defendants.

No. 9:09–CV–69 (GLS/GHL).

Sept. 30, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for the Defendants.

***MEMORANDUM–DECISION AND ORDER***

GARY L. SHARPE, District Judge.

**I. *Introduction***

***1** Plaintiff Jesse L. Stewart, an inmate at Forest State Correctional Institution, Forest County, Pennsylvania, brings this action under 42 U.S.C. § 1983, alleging that defendants Tioga County Jail employees violated his Eighth and Fourteenth Amendment rights during his incarceration at Tioga County Jail. (*See* Compl., Dkt. No. 1.) Defendants moved for summary judgment and for dismissal based on, among other things, Stewart's refusal to cooperate at his deposition. (Dkt. No. 30.) On April 26, 2010, Magistrate Judge George H. Lowe issued a Report and Recommendation Order (R & R) recommending that defendants' motion for dismissal as a discovery sanction be denied but that defendants' motion for summary judgment be granted. (Dkt. No. 38.) Pending are Stewart's objections to the R & R. (Dkt. No. 39.) For the reasons that follow, the court adopts the R & R in its entirety.

**II. *Standard of Review***

Before entering final judgment, this court routinely reviews all report-recommendations in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. *See* *Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at *6–7 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of a magistrate judge for clear error. *See id.*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing FED. R. CIV. P. 56(c)); *see also* *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). In considering a motion for summary judgment, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ...." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (citation omitted). The initial burden is on the moving party to inform the court of the basis for its motion, and identify those portions of the pleadings, affidavits, and discovery and disclosure materials on file that it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* *SEC v. Kern,* 425 F.3d 143, 147 (2d Cir.2005). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) (citation omitted). And while the court remains obliged to read a pro se movant's supporting papers liberally and "interpret them to raise the strongest arguments that they suggest," *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Moreover, pro se status "does not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

exempt a party from compliance with relevant rules of procedural and substantive law" and courts cannot read into pro se submissions inconsistent claims or claims not suggested by those submissions. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (citations and internal quotation marks omitted).

### III. *Discussion*

***2** Construed liberally, Stewart's objections specifically challenge Judge Lowe's conclusions that: (1) Stewart failed to exhaust his administrative remedies regarding his excessive force and failure to provide medical care claims; (2) Stewart's claims regarding the amount of toilet paper, conditions of showering, and removal of bedding during the day failed to make out a viable Eighth Amendment claim; (3) Stewart had no protected liberty interest entitling him to additional process prior to the imposition of disciplinary sanctions; and (4) Stewart failed to raise any triable issue of fact as to his claim for denial of access to the courts. Consequently, the court will review those conclusions de novo.

#### A. *Failure to Exhaust Administrative Remedies*

Stewart objects to Judge Lowe's conclusion that his Eighth Amendment excessive force and denial of medical care claims are barred by his failure to exhaust his administrative remedies under the Prisoner Litigation Reform Act of 1995 (PLRA). Read liberally, Stewart's argument is threefold. First, Stewart argues that the grievance process at Tioga County Jail was such that any appeal he filed would be futile and accordingly those administrative remedies were not "available" to him under the meaning of 42 U.S.C. § 1997(e). (*See* Pl. Objections at 2, Dkt. No. 39.) This argument is without merit. Even if the court were to accept the allegation that following the grievance procedures would ultimately have lead to an unfair denial of Stewart's claims at the institutional level, perceived futility of the process "does not render the grievance system 'unavailable.' " *Yeldon v. Ekpe,* 159 Fed. Appx. 314, 316 (2d Cir.2005) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Second, Stewart argues that he was not required to use the prison system to exhaust his remedies because the prison grievance system cannot award monetary damages. (*See* Pl. Objections at 3, Dkt. No. 39.) However, "[e]ven when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citing *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). Accordingly, this argument also fails.

Finally, Stewart claims that he was threatened and did not file grievances at the institutional level for fear of being retaliated against. (*See* Pl. Objections at 2, Dkt. No. 39; *see also* Compl. at 10, Dkt. No. 1; Pl. Resp. at 1, Dkt. No. 32.) The Second Circuit has held that threats by prison officials may estop those officials from raising the affirmative defense of failure to exhaust administrative remedies. *See, e.g., Macias v. Zenk,* 495 F.3d 37, 44–45 (2d Cir.2007). The estoppel argument can take two forms: either that the actions of a prison official made all administrative remedies unavailable, or that those actions made only some remedies unavailable. *See Hemphill,* 380 F.3d at 687. Stewart can only be arguing the latter. His objections state that he did complain of the use of excessive force and the failure to provide medical care in his letters to the Sheriff, Under Sheriff, and Commissioner. (*See* Pl. Objections at 2, Dkt. No. 39.) However, a review of those letters reveals that they are entirely bereft of any mention of the excessive force or failure to provide medical treatment claims, excepting two mentions—without any detail or request for action—of a civil claim for excessive force Stewart was pursuing against defendant Marsh. (*See* Compl. at 16–30, Dkt. No. 1.) As a consequence, even if the court were to presume Stewart's remedies at the prison level were unavailable, there is no question of fact as to whether Stewart failed to exhaust all his available remedies. Stewart could have raised those issues outside the local grievance process but failed to do so. Thus, defendants are entitled to judgment as a matter of law on those claims.

#### B. *Eighth Amendment Conditions of Confinement Claims*

***3** Stewart further argues that, contrary to Judge Lowe's conclusions, his conditions of confinement "shock the mind" and that he was subject to "barbaric," "draconian," and "extreme treatment" sufficient to make out cruel and unusual punishment under the Eighth Amendment. (Pl. Objections at 2–3, Dkt. No. 39.) Stewart

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

alleged in his complaint that for ten days he was denied bedding between the hours of 6:30 am and 11:00 pm, denied his personal property, allowed to shower only while in restraints, and provided only two sheets of toilet paper per defecation. (*See* Compl. at 8–9, Dkt. No. 1.) Judge Lowe was correct to find that these deprivations are not sufficiently serious to support an Eighth Amendment claim. (*See* R & R at 17–18, Dkt. No. 38.) The Supreme Court has held that

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Stewart's complaint and response fail to allege either the presence of an excessive risk to his health or safety or that any prison official was aware of such a risk. Accordingly, Judge Lowe's finding is adopted and Stewart's conditions of confinement claims are dismissed .[FN1]

> FN1. Stewart now claims via his objections that he was denied blankets at night (in contradiction of his complaint), that he had unspecified “medical life threatening ailments” which could have caused him to die in the cold without blankets, and that there was a risk he would slip and fall while wearing restraints in the shower. (*See* Pl. Objections at 4, Dkt. No. 39.) The court declines to consider these new claims at this late stage. *See* *Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1999).

**C. *Due Process***

Stewart's objections reassert the claim that his due process rights were violated due to a biased disciplinary hearing and generally flawed grievance system at Tioga County Jail. (*See* Pl. Objections at 2, Dkt. No. 39.) As the R & R observed, to establish a procedural due process claim, an inmate must show that he possessed a state granted interest in remaining free from the alleged deprivation and that the deprivation imposed “ ‘an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.’ “ (*See* R & R at 19, Dkt. No. 38 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).) Here, the conditions of Stewart's heightened confinement are not disputed by the parties and there is no evidence or allegation that the conditions of confinement were atypical in relation to other administrative confinements imposed in the ordinary course of prison administration. Thus, summary judgment is appropriate. *See* *Davis v. Barrett,* 576 F.3d 129, 134 (2d Cir.2009). In the absence of unusually harsh conditions, “restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection.” *Id.* at 133 (citation omitted). Given that Stewart's confinement was substantially shorter than 101 days, the court agrees with Judge Lowe's conclusion that Stewart possessed no protected liberty interest sufficient to support a procedural due process claim and adopts the recommendation that Stewart's due process claims be dismissed.

**D. *Access to the Courts***

***4** Lastly, Stewart argues that Judge Lowe erred in finding that Stewart failed to raise any triable issue of fact as to an injury suffered by his restricted use of the mail system. (*See* Pl. Objections at 4, Dkt. No. 39.) Stewart claims that his limited use of the mail prevented him from being heard in support of a habeas corpus petition, which resulted in an unfavorable outcome. (*See id.; see also* Pl. Resp. at 1, Dkt. No. 32.) Other than those two places, no allegation of any actual injury stemming from the mail restrictions has been made in Stewart's submissions. Judge Lowe was correct in observing that Stewart's response is unsworn and it cannot be treated as an affidavit for summary judgment purposes. (*See* R & R at 21, Dkt. No. 38.) Accordingly, the response's contents cannot constitute “evidence” sufficient to create a triable issue of fact. (*See* Pl. Resp. at 1, Dkt. No. 32.) The court is mindful of Stewart's pro se status and observes that even if his response could be construed as an affidavit, the statement therein is too conclusory to create a triable issue of fact regardless of his non-compliance with 28 U.S.C. § 1746. Stewart references no specific facts regarding the case he allegedly lost as a consequence of the denial of sufficient postage. Mere assertions unsupported by any specifics,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

even when contained in an affidavit, are insufficient to create the material dispute necessary to defeat a motion for summary judgment. *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008). Therefore, the court adopts Judge Lowe's recommendation that Stewart's denial of access to the courts claim be dismissed.[FN2]

> FN2. The court observes in passing that even if it were willing to consider new evidence in Stewart's sworn objections, Stewart's statement therein regarding his lost legal case is no more helpful in identifying what case he lost or providing substantiation to the claim that he lost the case as a consequence of limited postage. (*See* Pl. Objections at 4, Dkt. No. 39.)

**E. *Remaining Recommendations***

Because Stewart has not objected to the remaining recommendations, the court has reviewed those recommendations for clear error and finds none. Accordingly, the remainder of the R & R is adopted.

**IV. *Conclusion***

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge George H. Lowe's April 26, 2010 Report and Recommendation Order (Dkt. No. 38) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion to dismiss based on Stewart's refusal to cooperate with his deposition (Dkt. No. 30) is **DENIED;** and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED** and Stewart's claims are **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Stewart v. Howard
Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary **Civil Rights 78 1358**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310 203**

310 Prisons

310II Prisoners and Inmates

310II(D) Health and Medical Care

310k203 k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1546 k. Medical care and treatment. Most Cited Cases

A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

***1** Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

**II. BACKGROUND**[FN2]

FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2008 WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"* ). Some of the facts recounted here are drawn from the prior opinion.

**A. Facts**

**1. Parties**

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

FN4. *See id.* ¶ 2.

FN5. *See id.* ¶ 3.

FN6. *See id.*

**2. Bellamy's Surgery**

In August 2004, while in DOCS custody at Sing Sing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

FN7. *See Bellamy I,* 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. *See* Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

FN8. *See* 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

FN9. See *Bellamy I,* 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. *See id.* While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. *See* 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

FN10. *See, e.g.,* Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

FN11. *See* 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. *See* Moorjani Aff. ¶¶ 4-5.

FN12. *See* Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). *See also* Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

FN13. *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

FN14. *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

FN15. *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

FN16. *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses. [FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate. [FN20] The concerns are then investigated and addressed by the regional staff.[FN21]

FN17. *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

FN18. *See id.*

FN19. *See id.* ¶ 13.

FN20. *See id.* ¶ 14.

FN21. *See id.*

***2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

FN22. *See id.* ¶ 15.

FN23. *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff." [FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution." [FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See* *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See* *Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FN35 An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " FN36 A fact is material when it " 'might affect the outcome of the suit under the governing law.' " FN37 "It is the movant's burden to show that no genuine factual dispute exists." FN38

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.FN39 "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

party's case, and on which that party will bear the burden of proof at trial.' " FN40 To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " FN41 and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " FN42 However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " FN43

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord* *In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

***3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.FN44 However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " FN45 Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." FN46

FN44. *See* *Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord* *Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," FN47 and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." FN48 However, a pro se plaintiff must still meet the usual requirements of summary judgment .FN49 Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." FN50

FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord* *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

FN48. *Burgos,* 14 F.3d at 790.

FN49. *See* *Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions.FN51 Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to court at all." FN52 Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." FN53 Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules-in order to suffice.FN54 The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." FN55

FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also* *Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 732, 739 (2001).

FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

FN53. *Id.*

FN54. *See* *Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. FN56

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." FN57 "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " FN58

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

***4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." FN59 "A state's Eleventh Amendment protection from suit extends to its agencies and departments." FN60 "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." FN61 To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." FN62 State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment. FN63

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." FN64 In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.FN65 "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." FN66 Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." FN67

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " FN68 Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." FN69 In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.FN70 However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." FN71 The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." FN72 Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." FN73 For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." FN74

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. *See* *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). *See also* *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

***5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord* *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. *See* *Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord* *Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See* *Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord* *Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See* *Winter,* 129 S.Ct. at 381.

**IV. DISCUSSION**

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

**A. Exhaustion of Administrative Remedies**

***6** This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." FN88 Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5 (citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

**B. Eleventh Amendment Immunity**

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

**C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity**

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

FN90. *See* *Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved with the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

***7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis. [FN91]

FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See* *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."). *See also* *Kshel Realty Corp. v. City of New York,* No. 01 Civ. 9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.
Netter THOMAS, Plaintiff,
v.
David SAGATIES, et al., Defendants.
No. 09 Civ. 5116(JGK).

Nov. 23, 2011.

***MEMORANDUM OPINION AND ORDER***

JOHN G. KOELTL, District Judge.

***1** The plaintiff, Netter Thomas, brought this action pursuant to 42 U.S.C. § 1983 against David Sagaties, Dr. Kamlesh Verma, Christine Madingo, and Dr. Donald Sawyer, who were employed by the New York State Office of Mental Health ("OMH") at all relevant times, and against Bryan Hilton and Patrick Griffin, who were employed by the New York State Department of Corrections ("DOCS") at all relevant times (collectively "the defendants"). She alleges that the defendants terminated her employment in retaliation for the exercise of her right to free speech protected under the First and Fourteenth Amendments of the United States Constitution. The defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**I.**

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v.Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* *White v. Dep't of Corr. Services,* No. 08 Civ. 0993, 2011 WL 4527320, at *1 (S.D.N.Y. Sept. 30, 2011).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also* *Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See* *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible...." *Ying Jing Gan v. City of N.Y.,* 996 F.2d 522, 532 (2d Cir.1993); *see also* *Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir.1998) (collecting cases); *White,* 2011 WL 4527320, at *1.

**II.**

***2** The following facts are undisputed except where otherwise noted. In March 2008, the plaintiff began her provisional employment as a Licensed Master Social Worker ("LMSW") with the Behavioral Health Unit ("BHU") at Sullivan Correctional Facility ("Sullivan"). (Defendants' 56.1 Statement ("Defs' 56.1") ¶ 1; Plaintiff's 56.1 Response ("Pl.'s 56.1") ¶ 1). During the course of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff's employment, defendant Hilton served as Assistant Deputy Superintendant at Sullivan, defendant Verma served as one of the plaintiff's supervisors, defendant Griffin served as Deputy for Security at Sullivan, defendant Mandigo served as Associate Personnel Administrator for the New York State Office of Mental Health ("OMH"), and defendant Sawyer was Executive Director of OMH. (Compl.¶¶ 3–6). Defendant Sagaties was Unit Chief for BHU from June 2008 until March 2011. (Knudsen Decl. Ex. D ("Sagaties Aff.") ¶ 1). The BHU is a jointly-operated program of OMH and the Department of Correctional Services ("DOCS"), and is designed "to provide treatment services to inmate-patients with serious mental illnesses who are actively serving sanctions in a Special Housing Unit ("SHU")." (Defs' 56.1 ¶ 2; Pl.'s 56.1 ¶ 2). BHU employees, including the plaintiff during her employment, meet as a treatment team to discuss inmate-patient progress. (Defs.' 56.1 ¶ 2; Pl.'s 56.1 ¶ 2). As an LMSW, the plaintiff was primarily responsible for providing counseling services to BHU's inmate-patients. (Compl. ¶ 9; Answer ¶ 6).

The defendants claim that beginning in April 2008, Verma began receiving complaints about the plaintiff, and met regularly with the plaintiff to discuss her behavior and job performance. (Defs' 56.1 ¶ 4). In support of this assertion, the defendants cite memoranda and e-mails that recount alleged incidents of insubordination, disrespect toward co-workers and DOCS staff, and failure to abide by established BHU and DOCS security and conduct policies. (Knudsen Decl. Ex B). On June 4, 2008, Verma issued a formal counseling to the plaintiff. (Verma Aff. ¶ 9). A memorandum regarding the counseling, issued to the plaintiff, summarized the plaintiff's alleged behavior issues and various informal counseling meetings. (Knudsen Decl. Ex B at 52–53). The plaintiff was instructed to abide by her performance standards, which included sustaining appropriate relationships with co-workers and inmate-patients, and was warned that further inappropriate behavior would not be tolerated. *Id.* On June 26, 2008, the plaintiff received a second formal counseling, the memorandum of which summarized an instance in which the plaintiff had allegedly left her group of inmate-patients unattended and a second incident where the plaintiff allegedly failed to arrive for her group session. *Id.* at 48–49. The plaintiff was advised that she needed to show "immediate improvement" in the area of respecting others. *Id.* The plaintiff's probation period report, presented to her on July 25, 2008, reiterated the need for the plaintiff to improve in the areas of "relationship with people," "reaction to supervisor[s]" and "analytical and problem solving abilities." *Id.* at 2. On October 4, 2008, Sagaties forwarded to Mandigo a report from Hilton of an incident of the plaintiff's alleged insubordination, and added that with the plaintiff's previous behavior issues and unsuccessful counseling, he believed termination was the appropriate course of action. *Id.* at 29. In response, Mandigo sent Sawyer a summary of the plaintiff's alleged misconduct and history of formal counseling, and requested permission to proceed with the termination. *Id.* at 19. On October 8, 2008, Sawyer approved the plaintiff's termination. *Id.* On October 10, 2008, the plaintiff was informed of her termination, which was to take effect eight days later. (Defs' 56.1 Stmt. ¶ 22; Pl.'s 56.1 Stmt. ¶ 22).

***3** While the plaintiff does not dispute the timeline set forth by the defendants, she alleges a very different version of events. The plaintiff alleges that she "repeatedly observed and complained to her supervisors and [DOCS staff] about inappropriate, punitive treatment" of inmate-patients, and that she continually notified her supervisors of this ongoing abuse. (Pl.'s 56.1 Stmt. ¶¶ 10, 13). Specifically, the plaintiff alleges that on May 8, 2008, the plaintiff reported to a Unit Chief at BHU that an African–American inmate-patient was being treated unfairly because of his race. (Knudsen Decl. Ex A ("Thomas Dep.") at 104–08). The plaintiff also raised concerns about officers at Sullivan being racist against AfricanAmericans inmate-patients and staff, including the plaintiff, although the plaintiff later sent an e-mail to a Unit Chief at BHU, stating that the plaintiff "had no issues with the correction officers ... [nor] with the way in which they have treated [her] ." (Knudsen Decl. Ex G ("Stapholz Aff.") at 57). Additionally, during a September 4, 2008, meeting of the treatment team, the plaintiff raised concerns about the disparate, racially-motivated treatment and punishment of inmate-patients, as well as what the plaintiff perceived to be Griffin's unilateral decision making. (Pl .'s 56.1 ¶ 17; Defs' 56.1 ¶ 17). When asked by Sagaties for specific instances of unilateral decision making, the plaintiff did not name any specific incidents, (Knudsen Decl. Ex B at 33–34), although she now contends this was because Sagaties already knew the incidents to which she

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

was referring and also because she feared naming inmate-patients could jeopardize her safety. (Pl.'s 56.1 ¶ 17).

With respect to her alleged behavioral issues, the plaintiff disputes that her meetings with Verma were convened to correct the plaintiff's behavioral issues. *Id.* ¶¶ 4–8. Instead, the plaintiff asserts that the meetings focused on the curbing the plaintiff's desire to advocate for the allegedly abused inmate-patients. *Id.* The plaintiff alleges that the various memoranda and e-mails circulated regarding the plaintiff's alleged inappropriate behavior, in addition to the plaintiff's probation period report, were filled with misinformation and "code words" designed to alert Sagaties, Sawyer and others that the plaintiff was attempting to stop inmate-patient abuse. (Pl.'s 56.1 Stmt ¶¶ 19, 28–33).

The plaintiff claims that Hilton and Griffin pressured the plaintiff's supervisors to recommend her for termination, and that Hilton was "trying to cast [the] plaintiff in a negative light." *Id.* ¶¶ 14, 26c. The plaintiff alleges that Mandigo's October 8, 2008, e-mail deliberately misrepresented events that occurred during the plaintiff's employment in an attempt to "railroad" her. *Id.* ¶ 26; (Thomas Dep. at 121). The plaintiff claims that all of the defendants "feared her whistleblowing activity," such that they felt compelled to "suppress that [activity] and rid the facility of her," by feeding Sawyer false information in order to cause her termination. (Pl.'s 56.1 Stmt ¶ 22).

**III.**

***4** The plaintiff claims that she was discharged in retaliation for her complaints about the disparate, racially motivated treatment of inmate-patients at Sullivan in violation of the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

It is well-established that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In defining the protection afforded public employee speech, the Supreme Court has been sensitive to the "public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti v. Ceballos,* 547 U.S. 410, 419, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). Yet "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.' " *Garcetti,* 547 U.S. at 420 (quoting *Connick,* 461 U.S. at 154). "Government employers, like private employers, need a significant degree of control over their employees' words and actions" in order to provide services to the public efficiently. *Id.* at 1958.

Therefore, in order for a public employee to state a claim for First Amendment retaliation, the plaintiff initially must show by a preponderance of the evidence that: (1) the plaintiff spoke "as a citizen upon matters of public concern," *Connick,* 461 U.S. at 147, rather than as an employee on matters of personal interest, (2) the plaintiff suffered an adverse employment action, and (3) the speech at issue was a substantial or motivating factor in the adverse employment action. *See Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003); *Sheppard v. Beerman,* 317 F.3d 351, 355 (2d Cir.2003).

If the public employee successfully states a prima facie case of First Amendment retaliation, the government employer may still prevail by showing by a preponderance of the evidence that it would have taken the same action regardless of the employee's speech. *See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pappas v. Giuliani,* 118 F.Supp.2d 433, 443 (S.D.N.Y.2000), *aff'd,* 290 F.3d 143 (2d Cir.2002); *see also Benvenisti v. City of New York,* No. 04 Civ. 3166, 2006 WL 2777274, at *7 (S.D.N.Y. Sept. 23, 2006).

The defendants argue that the plaintiff has failed to establish a prima facie case of First Amendment retaliation because her complaints were made pursuant to her official job duties and not on a matter of public concern. The defendants further argue under *Mt. Healthy* that BHU had independent, fullyjustified reasons for terminating the plaintiff. For these reasons, the defendants claim they are entitled to summary judgment on the plaintiff's First Amendment retaliation claim.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**A.**

In evaluating a claim of First Amendment retaliation, the threshold question is whether the plaintiff was "speaking as a citizen upon matters of public concern." *Connick,* 461 U.S. at 147. In *Garcetti,* the Supreme Court clarified that this question involves two distinct inquiries. First, the Court must determine whether the plaintiff was speaking as a "citizen" for First Amendment purposes. *See Garcetti,* 547 U.S. at 417. Employees do not speak "as citizens for First Amendment purposes" when they "make statements pursuant to their official duties." *Id.* at 421. Whether a statement is pursuant to official duties should be determined through an "objective" and "practical" inquiry, because the scope of the employee's duties is not determined by a formal job description. *Weintraub v. Bd. of Educ.,* 593 F.3d 196, 202 (2d Cir.2010) (quoting *Garcetti,* 547 U.S. at 424). Speech need not be "required by, or included in, the employee's job description, or in response to a request by the employer," so long as it is "a means to fulfill, and undertaken in the course of performing," one of the employee's "primary employment responsibilit [ies]." *Id.* at 203 (internal quotation marks and citations omitted); *see also Flyr v. City Univ. of New York,* No. 09 Civ. 9159, 2011 WL 1675997, at *3 (S.D.N.Y. Apr. 25, 2011). After that, the Court must turn to the traditional *Connick* analysis and ask whether, viewing the record as a whole and based on the content, context, and form of a given statement, the plaintiff's speech was made as a citizen upon "matters of public concern." *Connick,* 461 U.S. at 147–48. "The inquiry into the protected status of speech is one of law, not fact." *Id* . at 148 n. 7; *see also Benvenisti,* 2006 WL 2777274 at *7.

***5** The plaintiff's speech can be grouped into two categories: (1) complaints regarding the treatment of inmate-prisoners by DOCS staff and (2) complaints about the decision making process at BHU.

**1.**

The defendants claim that the plaintiff's complaints of disparate, racially motivated treatment of inmate-patients were made pursuant to her official job duties and are therefore unprotected. This assertion, however, is in direct conflict with the evidence offered by the defendants themselves. In an e-mail to several BHU employees, Verma stated that the plaintiff would need time to "undo" the training from her former work, where she "advocated, advocated, advocated." (Knudsen Decl. Ex B at 347). When the plaintiff expressed frustration with her inability to advocate for inmate-patients, Verma advised the plaintiff that her goals were unrealistic given the nature of the inmate-patient population at BHU. (Defs' 56.1 ¶ 10). Verma also wrote in an e-mail to OMH staff that BHU might not be a "proper environment" for the plaintiff, and that he had suggested to the plaintiff that she change some of her advocacy goals and make them more realistic to BHU and the forensic environment. (Knudsen Decl. Ex B at 360). At the very least, this raises issues of material fact as to whether complaints regarding racially motivated disparity in inmate-patient treatment were "[meant] to fulfill, and [were] undertaken in the course of performing" one of the plaintiff's primary employment responsibilities. *Weintraub* 593 F.3d at 203. While the ultimate determination under *Garcetti* is a question of law for the Court, such a factual issue precludes a legal determination at the summary judgment stage. *See, e.g., Caruso v. Massapequa Union Free Sch. Dist.,* 478 F.Supp.2d 377, 384 (E.D.N.Y.2007) (issues of fact regarding an employee's job responsibilities preclude *Garcetti* analysis.)

**2.**

The plaintiff also complained about what she perceived to be Griffin's unilateral decision making during treatment meetings. This speech, unlike the plaintiff's allegations of racially-motivated treatment disparity, was unquestionably made as an employee and not a citizen. The plaintiff was addressing a concern that Griffin was ignoring her professional opinion, as well as those of her colleagues, to the detriment of inmatepatient treatment. This speech was clearly in furtherance of the plaintiff's professional responsibilities and "undertaken in the course of performing" her duties as an LMSW. *Weintraub,* 593 F.3d at 203. Accordingly, the defendants' motion is granted as to comments regarding BHU's decision making process.

**B.**

The defendants also claim that the plaintiff has failed to show that her speech was on a matter of public concern. An issue is one of "public concern" when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

146. A wide range of issues have been found to constitute matters of public concern. *See* *Benvenisti,* 2006 WL 2777274, at * 10 (collecting cases). Essential to this evaluation is "whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose." *Ruotolo v. City of New York,* 514 F.3d 184, 189 (2d Cir.2008) (internal quotation marks and citation omitted). "[S]peech on a purely private matter ... falls outside the realm of constitutional protection." *Schlesinger v. N.Y.C. Transit Auth.,* No. 00 Civ. 4759, 2001 WL 62868, at *5 (S.D.N.Y. Jan.24, 2001) (internal quotation marks and citation omitted); *see also* Benvenisti 2006 WL 2777274, at *10.

***6** Because the plaintiff was not speaking as a citizen when complaining about BHU's decision making, it is unnecessary to determine whether these statements were on a matter of public concern. With respect to the statements regarding raciallymotivated treatment of inmate-patients, the defendants do not assert that the plaintiff was attempting to redress personal grievances, but instead characterize the plaintiff's speech as largely consisting of complaints about taking away privileges and therefore not of public concern. This characterization, however, is misleading. While it is true that the plaintiff complained about certain inmate-patients having privileges revoked, her primary concern was her perception that racial bias motivated those and many other decisions regarding the treatment of inmate-patients at Sullivan. *See* (Knudsen Decl. Ex B at 61). The plaintiff also complained about racism by DOCS personnel against African American individuals, including inmates and the staff. *See* (Stapholz Aff. at 61). While she initially included herself as adversely affected by this alleged discrimination, she made clear subsequently that her allegations of racial discrimination were not based on any mistreatment she personally experienced. *Id.* at 57. Moreover, the Supreme Court has found complaints of racial discrimination not tied to a personal employment grievance to be "a matter inherently of public concern," even when such complaints are made privately to a supervisor. *See* *Connick v. Myers,* 461 U.S. 138, 146, 148 n. 8, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing *Givhan v. W. Line Consol. Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)). Accordingly, the plaintiff's speech regarding disparate, racially motivated treatment of inmatepatients at Sullivan was speech on a matter of public concern.

**C.**

The defendants claim that the plaintiff has failed to show a causal connection between her speech and her termination, and that even if she could show such a connection, her termination was justified on the independent grounds that she was insubordinate and disrespectful.

A plaintiff can establish proof of causation either directly or indirectly. *See* *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000). Causation may be proved indirectly "by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence." *Id.; see also* *Benvenisti,* 2006 WL 2777274, at * 12. If a plaintiff establishes causation, a public employer and its agents may avoid liability by proving by a preponderance of the evidence that they would have made the adverse employment decision even in the absence of the protected conduct. *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *see also* *Scheiner v. New York City Health & Hospitals,* 152 F.Supp.2d 487, 495 (S.D.N.Y.2001).

The plaintiff alleges that she was terminated because of her constant advocacy on behalf of the inmate-patients at Sullivan. In support of this contention, the plaintiff points to the e-mail in which Verma states that Sullivan may not be the right environment for the plaintiff in the context of a memo in which Verma recounts a conversation with the plaintiff about changing her advocacy goals. (Knudsen Decl. Ex B at 360). In response, the defendants allege that the evidence adduces only two instances in which the plaintiff made specific complaints of abuse, first that an African–American inmate-patient was unfairly punished after an altercation, and second that decisions by the treatment team were racially motivated. The defendants claim that two complaints could hardly be characterized as constant advocacy. However, in her deposition, the plaintiff highlights several specific incidents of alleged inmate-patient abuse, and recounts her alleged efforts to bring these incidents to the attention of her supervisors. (Thomas Dep. at 63–69).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

***7** The plaintiff also asserts that absent her speech, the defendants lacked sufficient justification for her termination. To support this, the plaintiff points to her probation evaluation report, which found the plaintiff to be satisfactory in five of eight performance areas, including "quality of work," "work habits, work interest" "resourcefulness," and "written and oral presentation." (Knudsen Decl. Ex B at 1–2).

While the probation report refers to the plaintiff's two formal counselings, both of which highlight the plaintiff's need to improve her relationship with staff and supervisors, the plaintiff claims that the substance of the allegations made in those counselings is false. She asserts that the incidents of her alleged insubordination and unprofessional conduct were fabricated and misrepresented in order to create a pretext for her termination. As to several of the instances of the plaintiff's alleged misconduct, the plaintiff offers versions of events that are sufficiently plausible and materially different than those offered by the defendants. For example, the defendants claim that during a group therapy session, the plaintiff's actions caused five inmate-patients to request to return to their cells. The plaintiff alleges, however, that only three inmate-patients were present at the therapy session, casting doubt on the defendants' allegations. (Thomas Dep. at 109–10). Because the parties offer several competing versions of events, bolstered only by after the fact accounts, there are issues of fact as to what actually occurred in the incidents and whether they were pretexts for termination. In addition, because there are issues of fact as to the nature and severity of the incidents on which the defendants allegedly relied to terminate the plaintiff, the defendants have failed adequately to show that the plaintiff would have been terminated in the absence of her speech.

**D.**

Because material facts exist as to both the plaintiff's statements regarding the disparate, racially motivated treatment of inmate-patients, and the causal connection between those statements and her termination, and because the statements of racially motivated treatment were on a matter of public concern, the defendants' motion for summary judgment is denied as to those statements.

**IV.**

The defendants argue that the plaintiff has failed to allege personal involvement on the part of defendants Hilton and Griffin. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrel v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted). Where the defendant is a supervisor, at a minimum, "liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2008); *Solar v. Annetts,* 707 F.Supp.2d 437, 441 (S.D.N.Y.2010). Beyond direct action by the state official, there is considerable disagreement in the Second Circuit as to how a plaintiff may sufficiently demonstrate personal involvement of a supervisor. *See Morrissette v. Cripps,* No. 10 Civ. 8795, 2011 WL 4089960, at * 2 (S.D.N.Y. Sept.14, 2011) (collecting cases). However, for the purposes of this motion, it is unnecessary to explore the outer reaches of supervisory liability. *See Schoon v. Berlin,* No. 07 Civ. 2900, 2011 WL 1085274, at *4 (S.D.N.Y. Mar.23, 2011) The plaintiff has pleaded facts sufficient to allege Hilton's personal involvment in the plaintiff's termination and has failed adequately to plead facts alleging Griffin's involvement in or knowledge of the plaintiff's termination or discipline.

***8** In her complaint, the plaintiff alleges that, in order to affect the plaintiff's termination, Hilton falsely accused the plaintiff of repeatedly using profanity while criticizing a supervisor. (Complaint ¶¶ 15–17). Hilton's e-mail to Sagaties recounts an alleged conversation between the plaintiff and "a number of OMH and DOCS staff." During the discussion, the plaintiff allegedly engaged in a profanity-laden tirade, disparaging Sagaties's actions regarding a decision about an inmate-patient's treatment, and making a vow to "do something about it." In the e-mail, Hilton does not provide the names of any staff member present for the conversation, nor was Hilton present for the conversation himself. The record reflects that Hilton's e-mail to Sagaties regarding the plaintiff's alleged criticism of Sagaties was the direct cause of Sagaties's recommendation to Mandigo that the plaintiff be terminated. (Knudsen Decl. Ex B at 28–29). In fact,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

within one day of receiving Hilton's forwarded e-mail, Mandigo requested permission to terminate the plaintiff and received authorization the next day. Therefore, a reasonable jury could find that Hilton had personal involvement in the plaintiff's termination. Accordingly, the motion for summary judgment is denied as to Hilton.

**C.**

The plaintiff alleges that Griffin supported Hilton's efforts and induced the plaintiff's supervisors to terminate her. The plaintiff does not allege any specific acts by Griffin in her complaint, and the record is devoid of any evidence which shows a connection between Griffin and the plaintiff's termination or disciplinary actions. Griffin is not alleged to be the source of any false reports of the plaintiff's misconduct, nor did he take part in any communication regarding the plaintiff's disciplinary actions. Moreover, the record does not reflect that Griffin was even aware of the plaintiff's disciplinary problems or that the other defendants sought permission to terminate her. At the argument of the current motion, the plaintiff was unable to proffer any evidence of defendant Griffin's personal involvement in the plaintiff's termination. Therefore, the plaintiff has failed adequately to show any involvement by Griffin. Accordingly, the defendants' motion for summary judgment is granted as to defendant Griffin.

**CONCLUSION**

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The motion for summary judgment is **granted** as to the plaintiff's statements regarding decision making at BHU and as to defendant Griffin. As to all other claims, the motion for summary judgment is **denied.** The Clerk is directed to close **Docket No. 23.**

**SO ORDERED.**

S.D.N.Y.,2011.

Thomas v. Sagaties
Slip Copy, 2011 WL 5877767 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Joseph BLOOMFIELD, Plaintiff,

v.

Bezalel WURZBERGER,[FN1] MD; Jose Gonzalez, MD; Sara Nelson, M.D.; Donald Sawyer, Ph.D., Acting Executive Director; Shakunthala Mudigonda, Social Worker; Jeffrey Nowicki, Treatment Team Leader; Nikhill Nihalani, Psychiatrist; Robert Woods, Superintendent, Defendants.

FN1. In the Caption and throughout the body of the Amended Complaint, Plaintiff spells this Defendant's name as "Wurzberger," however, in the "Parties" section of that pleading, he refers to this same individual as "Wursenberger. *See generally* Dkt. No. 10. Garnering its information from the Parties section, the Clerk has listed this Defendant on the Docket Report as "Wursenberger." In correspondence to the Court and in their Motion, Defendants utilize the former spelling, which we presume to be correct. Dkt. No. 26 & 28. The Court will utilize the spelling as agreed upon by the parties, "Wurzberger," and will direct the Clerk to correct the spelling in the Docket Report.

Civil Action No. 9:08–cv–619 (GLS/RFT).

Oct. 15, 2009.

Joseph Bloomfield, Jamaica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Charles J. Quackenbush Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

***ORDER***

GARY L. SHARPE, District Judge.

***1** The above-captioned matter comes to this court following a Report–Recommendation by Magistrate Judge Randolph F. Treece, duly filed September 18, 2009. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections [FN2] having been filed, and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

FN2. The court notes that the plaintiff submitted a letter to the court advising that he does not object to the Report–Recommendation and Order (Dkt. No. 33).

ORDERED, that the Report–Recommendation of Magistrate Judge Randolph F. Treece filed September 18, 2009 is ACCEPTED in its entirety for the reasons state therein, and it is further

ORDERED, that Defendants' Motion to Dismiss (Dkt. No. 28) is granted in part and denied in part, and it is further

ORDERED, that Defendants Shakunthala Mudigonda, Jeffrey Nowicki and Nikhill Nihalani are dismissed from this action, and it is further

ORDERED, that the Clerk of the court serve a copy of this order upon the parties in accordance with this court's local rules.

IT IS SO ORDERED.

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Joseph Bloomfield brings this civil rights action, pursuant to 42 U.S.C. § 1983, asserting Defendants violated his civil rights when they involuntarily confined him in a mental institution upon the cessation of his state incarceration sentence. Dkt. No. 10,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Am. Compl. Currently pending before this Court is Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 28. Despite being granted multiple extensions of time, Plaintiff has failed to oppose the Motion. *See* Text Notice, dated Mar. 23, 2009; Dkt. No. 31, Order, dated May 14, 2009. For the reasons that follow, it is recommended that Defendants' Motion be **granted in part and denied in part.**

## I. BACKGROUND

### A. Procedural History

Plaintiff initiated this action, *pro se,* on June 12, 2008, with the filing of a civil rights Complaint; the sole Defendant named in that pleading was former-Governor George E. Pataki. Dkt. No. 1, Compl. In accordance with 28 U.S.C. § 1915A,[FN2] this Court performed an initial review of the Complaint and found it to be inadequate due to Bloomfield's failure to allege any personal involvement on behalf of former-Governor Pataki, thus, dismissal of the action was warranted. Dkt. No. 5. In a Report–Recommendation and Order, this Court recommended that in light of Plaintiff's *pro se* status, prior to dismissing the action outright, Bloomfield should be given an opportunity to amend his Complaint. *Id.* That recommendation was adopted by the Honorable Gary L. Sharpe, United States District Judge, and Plaintiff was given an opportunity to amend his pleading. Dkt. No. 9. Thereafter, on October 28, 2008, Plaintiff filed his Amended Complaint, dropping Pataki from the action and naming eight other Defendants in his stead. Dkt. No. 10, Am. Compl. After reviewing the amended pleading, this Court directed that Summonses be issued and, because of his *in forma pauperis* status, the Marshals were to effect service on Plaintiff's behalf. Dkt. No. 12.

> FN2. At that time, Plaintiff was incarcerated at the Wende Correctional Facility, and so, pursuant to 28 U.S.C. § 1915A, the Court was required to perform an initial review of his pleading to determine its sufficiency.

***2** On February 27, 2009, after all Defendants had been served with process, Defendants filed a Motion to Dismiss in lieu of an answer. Dkt. No. 28. In accordance with this District's Local Rules of Practice, a response to that Motion was due by March 16, 2009. On March 4, 2009, the Court received a Notice from Plaintiff indicating a change in his address. Dkt. No. 29. In light of this updated address, the Court *sua sponte* rescheduled Plaintiff's response deadline to April 13, 2009, and Defendants re-served their Motion to Dismiss on Plaintiff at his new civilian address. Dkt. No. 30. By May 14, 2009, the Court still had not received a response from Plaintiff. Once again, we *sua sponte* reset Plaintiff's response deadline, this time to June 15, 2009. Dkt. No. 31. To date, the Court has not received any opposition from Plaintiff; in fact, Plaintiff has not communicated with the Court since March 4, 2009, when he filed his Notice of Change of Address.[FN3] Dkt. No. 29.

> FN3. By this Court's May 14, 2009 Order, Plaintiff was specifically warned of the consequences that could ensue should he fail to respond to Defendants' Motion, including dismissal of his action for the reasons stated by the Defendants and/or due to Plaintiff's failure to prosecute this matter. Dkt. No. 31. Given the amount of time that has passed without any communication from Plaintiff, the Court could recommend an exercise of its authority to dismiss this entire action based on Plaintiff's failure to prosecute this matter. *See* FED. R. CIV. P. 41(b); N.D.N.Y.L.R. 41.2(a). However, in light of his *pro se* status and the important constitutional issues raised herein, we will assess the viability of his pleading against Defendants' Motion, but without the benefit of Plaintiff's input. Should, however, Plaintiff continue this apathetic litigation approach, the Court's patience and leniency will surely expire and dismissal for failure to prosecute will be within the realm of probability.

### B. Allegations in the Amended Complaint

In accordance with the standard of review utilized in assessing a motion to dismiss, the following facts asserted in the Amended Complaint are accepted as true. *See infra* Part II.A.

The events giving rise to this civil action occurred at Upstate Correctional Facility ("Upstate") and Central New York Psychiatric Center ("Central"). Am. Compl. at ¶ 2. At all times relevant to this case, Bloomfield was an inmate in the custody of the New York State Department of Correctional Services ("DOCS") and then an inpatient

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

in the custody of the New York State Office of Mental Health ("OMH"). *Id.* at ¶ 3. According to the DOCS website, Bloomfield was, at the time period relevant in the Amended Complaint, serving an indeterminate sentence of incarceration for convictions of Sodomy in the First Degree and Attempted Robbery in the Second Degree. *See* N.Y. DOCS Inmate Locator Website, *available at* http://nysdocslookup.docs.state.ny.us (information for Inmate Joseph Bloomfield, DIN 99–A–4562) (last visited Sept. 15, 2009).[FN4]

FN4. The Court takes judicial notice of the information contained on the DOCS website as such public information is "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." FED.R.EVID. 201(b)(2); *Marcus v. AT & T Corp.,* 938 F.Supp. 1158, 1164–65 (S.D.N.Y.1996) (noting that a court may take judicial notice of public documents, even if not included in or attached to a complaint).

On July 28, 2006, less than a week before Plaintiff's scheduled release from Upstate, Bloomfield met with Defendants Bezalel Wurzberger, M.D., and Jose Gonzalez, M.D., via video conference. Am. Compl. at ¶ 14. Both of these Defendants were, at that time, psychiatrists employed by OMH and were assigned to conduct examinations at Upstate. *Id.* at ¶¶ 4–5. The meeting was brief, lasting for only a "few moments." *Id.* at ¶ 14. During the meeting, Bloomfield was advised that he fit the criteria for civil commitment under "Sex Offender Mental Hygien[e] Law ["MHL"] Section 9.27" and was to be involuntarily committed on August 3, 2006, the date on which he was set to be released from DOCS custody. *Id.* at ¶ 15. Also on July 28, 2006, the two doctors each completed a "Certificate of Examining Physician" justifying the involuntary commitment.[FN5] According to Plaintiff, Defendant Wurzberger's Certificate of Examining Physician states that it would be "prudent to admit [Bloomfield] to inpatient treatment in order to prevent harm to others, before his return to the community," while Defendant Gonzalez's Certificate of Examining Physician states that Bloomfield "is considered a danger to others based on his repeated sexual offenses ... indicating high likelihood to re-offend." *Id.* at ¶¶ 16–18.

FN5. Neither of these documents were attached to the Complaint nor Amended Complaint, though Plaintiff quotes from the documents in his Amended Complaint. Am. Compl. at ¶¶ 17–18.

***3** On August 3, 2006, pursuant to MHL § 9.27, Defendant Robert Woods, Superintendent of Upstate, facilitated Bloomfield's transfer to Central. *Id.* at ¶ 19. Upon arrival at Central, Defendant Sara Nelson, M.D., a staff psychiatrist employed by OMH and assigned to Central, confirmed that Plaintiff was admitted to Central as an "involuntary-status" patient pursuant to MHL § 9.27. *Id.* at ¶¶ 6 & 21. Then, in accordance with a policy sanctioned by Defendant Donald Sawyer, Ph.D., Acting Executive Director of Central, Plaintiff was subjected to a "strip-frisk search" of his clothes and body cavities.[FN6] *Id.* at ¶¶ 7 & 20. During his stay at Central, Plaintiff was thrice more subjected to this type of search following visits from relatives on August 12, September 9, and October 15, 2006. *Id.* at ¶¶ 23–25.

FN6. Plaintiff does not identify who performed these strip-frisk searches.

While at Central, Plaintiff was also subjected to various threats. First, on August 3, 2006, Defendant Jeffrey Nowicki, Treatment Team Leader employed by OMH and assigned to Central, approached Plaintiff and stated, "I don't care if you stay here forever[,] I am team leader and I will do whatever it takes to keep people like you off the streets." *Id.* at ¶¶ 9 & 22. Then, on November 16, 2006, Defendant Nikhill Nihalani, a psychiatrist employed by OMH and assigned to Central, threatened to persuade Plaintiff's parole officer to violate him if he did not consent to a urine test. *Id.* at ¶¶ 10 & 26. Defendant Nihalani then ordered Bloomfield to submit a urine sample while in Nihalani's presence. *Id.* Also, Defendant Shakunthala Mudigonda, a social worker employed by OMH and assigned to Central, falsified statements in Bloomfield's "Core History" and "Treatment Plan." *Id.* at ¶¶ 8 & 27.

Thereafter, on September 28, 2006, Defendant Sawyer applied to the Supreme Court, Oneida County, for a "Court Authorization to Retain a Patient." *Id.* at ¶ 28.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2009 WL 3335892 (N.D.N.Y.)

(Cite as: 2009 WL 3335892 (N.D.N.Y.))

## II. DISCUSSION

### A. Motion to Dismiss Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See* *Cruz v. Beto,* 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N .D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (emphasis added).

***4** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See* *Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6 (1963); *see also* *Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007); *Ashcroft v. Iqbal,* ––– U.S. –––– 129 S.Ct. at 1950 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* ––– U . S. –––– 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* ––– U.S. –––– 129 S.Ct. at 1950–51.

With this standard in tow, we consider the plausibility of Plaintiff's Amended Complaint.

### B. Bloomfield's Claims

In liberally construing the Amended Complaint, we conclude that Bloomfield attempts to raise the following claims against the following Defendants: 1) claims of threats and/or falsification of records against Defendants Nowicki, Nihalani, and Mudigonda; and 2) Due Process violations, stemming from his involuntary commitment to Central pursuant to Article 9 of the Mental Hygiene Law, against Defendants Wurzberger, Gonzalez, Wood, Nelson, and Sawyer. Am. Compl. at ¶¶ 29–36.[FN7]

> FN7. Bloomfield seeks compensatory damages for pain and mental anguish he suffered in an amount no less than $300,000. No injunctive relief is sought.

#### *1. Threats and Falsification of Records*

Bloomfield asserts that during his stay at Central, Defendants Nowicki and Nihalani threatened him, with the latter compelling him to submit to a urine test, and Defendant Mudigonda falsified records. Am. Compl. at ¶¶

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

22, 26, & 27. Assuming the veracity of these facts, none of these claims rise to the level of a constitutional violation.

***5** A claim brought under § 1983 is "not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996)); *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (noting that, ordinarily, a claim for verbal harassment is not actionable under § 1983). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474 (cited in *Garrett v. Reynolds,* 2003 WL 22299359, at * 4 (N.D.N.Y. Oct. 7, 2003) & *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000)). Therefore, Plaintiff has failed to state a claim for relief against Defendants Nowicki and Nihalani as their purported threats do not rise to the level of a constitutional violation.

As for the falsification of records claim, it is unclear in what manner these records were falsified and how such falsity harmed Plaintiff. The filing of a false entry in medical records, without more, does not constitute a constitutional violation. *Benitez v. Locastro,* 2008 WL 4767439, at * 11 (N.D.N.Y. Oct. 29, 2008) (allegation that defendants falsified plaintiff's medical records did not state a valid § 1983 claim); *Diaz v. Goord,* 2006 U.S. Dist. LEXIS 14309, at *20 (W.D.N.Y. Mar. 20, 2006) (allegation of false medical entries did not state a valid claim). Thus, Plaintiff's sole claim against Defendant Mudigonda for falsifying his records at Central also does not rise to the level of a constitutional violation.

Accordingly, Plaintiff's Amended Complaint fails to state a plausible cause of action against Defendants Nowicki, Nihalani, and Mudigonda, and the Defendants' Motion to Dismiss should be **granted** as to these Defendants.

*2. Due Process*

Next, we address Plaintiff's claims of violations of his due process in connection with his involuntary admission into psychiatric treatment at Central. To put this issue into perspective, some background information is necessary with regard to New York's Mental Hygiene Law.

Article 9 of the New York Mental Hygiene Law provides for the involuntary psychiatric commitment of "any person alleged to be mentally ill and in need of involuntary care and treatment." N.Y. MENTAL HYG. LAW § 9.27. Such admission may only be accomplished "upon the certificates of two examining physicians, accompanied by an application for the admission of such person." *Id.* at § 9.27(a). The application for admission must be made by someone with personal knowledge of the individual, and shall "contain a statement of the facts upon which the allegation of mental illness and need for care and treatment are based." *Id.* at § 9.27(b) & (c). Upon arrival to the facility, a doctor must complete a confirmatory examination of the patient prior to his or her admission. *Id.* at § 9.27(e). Then, after hospitalization, the patient may request a judicial hearing to address the need for hospitalization. *Id.* at § 9.31.

***6** Upon information and belief, in the Fall of 2005, "professionals from the [New York State] Office of Mental Health (OMH) began to evaluate certain felony sex offenders nearing the completion of state prison sentences to assess whether they posed a danger to themselves or others and suffered from mental conditions that warranted commitment in a psychiatric hospital." *State ex. rel. Harkavy v. Consilvio,* 870 N.E.2d 128, 129 (N.Y.2007) (*Harkavy II* ). Such evaluations were accomplished via Article 9. At that time, there was no specific state statutory authority governing the release of felony offenders from prison into psychiatric hospitals upon completion of their prison sentences. At issue in the *Harkavy* case was whether the individuals to be committed were "prisoners" and thus entitled to the procedures set forth in Correction Law § 402, which governs the involuntary admission of mentally ill inmates *during* their prison sentence, instead of Article 9. *State ex. rel. Harkavy v. Consilvio,* 859 N.E.2d 508 (N.Y.2006) (*Harkavy I* ). Notably, Correction Law § 402 calls for pre-commitment notice and hearing, while Article 9 does not. The New York State Court of Appeals noted that neither Article 9 nor § 402 were specifically designed to address the class of mentally ill patients set to be released into the community, but "in the absence of a clear legislative directive in regard to inmates

Page 6

Not Reported in F.Supp.2d, 2009 WL 3335892 (N.D.N.Y.)

(Cite as: 2009 WL 3335892 (N.D.N.Y.))

nearing their release from incarceration," and in light of the fact that the evaluations were completed during the prison sentence, in non-emergency situations, § 402 was the more appropriate mechanism for evaluating an inmate for "postrelease involuntary commitment to a mental facility." *Id.* at 512. The court further noted, however, that "[o]nce the sentence expire[d], ... any further proceedings concerning the continued need for hospitalization are governed by the Mental Hygiene Law." *Id.*

Following the 2006 *Harkavy I* decision, the state legislature bridged the gap in the law by "enacting a legislative scheme designed to address the civil confinement of certain classes of inmates completing their terms of imprisonment." *Harkavy II,* 870 N.E.2d at 131. This act, entitled the "Sex Offender Management and Treatment Act," created Article 10 of the Mental Hygiene Law, which provides the procedures to be followed for the transfer of certain convicted offenders to psychiatric hospitals after release from prison. *Id.*

As set forth in the Amended Complaint, Bloomfield's involuntary commitment to a psychiatric hospital was accomplished in August 2006, prior to the New York State Court of Appeals' decision in *Harkavy I* and the 2007 legislative enactment of Article 10. This backdrop of information is relevant because the Defendants' Motion to Dismiss is primarily based upon the later enactment of Article 10, which they assert provides Plaintiff's exclusive remedy. They further assert that just as the New York State Court of Appeals ruled in *Harkavy II,* Bloomfield's "complaints against the 2006 procedures under which he was retained ... have been rendered academic by the 2007 enactment of Article 10." Dkt. No. 28–2, Defs.' Mem. of Law, at p. 4. In the alternative, Defendants assert they are entitled to qualified immunity for following the only statutory scheme in place at that time for such involuntary commitments. At this stage of the litigation, we disagree on both fronts.

***7** The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz,* 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz,* 533 U.S. 194, 201–02 (2001). Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan,* ––– U.S. ––––, 129 S.Ct. 808 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

Qualified immunity is an affirmative defense that must be pled by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. at 815). The only pleadings filed in the present case thus far are the Original and Amended Complaints. Defendants have not raised this affirmative defense in a responsive pleading, as set forth in Federal Rule of Civil Procedure 8(c), but rather in their Memorandum of Law in support of the Motion to Dismiss. Generally, however, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004) (quoting *Green* ). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019); *see also McKenna v. Wright,* 386 F.3d at 435.

By alerting the Court to the state court decisions in *Harkavy* and the subsequent legislative enactment of Article 10, it appears that Defendants may have inadvertently conceded that Bloomfield did not receive the full panoply of due process protections prior to his involuntary admission. Nevertheless, they argue that they are entitled to qualified immunity because they "provided [Bloomfield] with process which was due under the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

then-existent state of the law." Defs.' Mem. of Law at p. 6. But this argument is neither an accurate description of the status of the law at the time of Plaintiff's involuntary admission, nor of Plaintiff's claims themselves.

***8** First we address Defendants' rendition of the protections due under the law in place at the time in question. Defendants seem to suggest that, at the time of Bloomfield's involuntary admission, the only statutory scheme in place was Article 9, therefore, they are immune from suit having relied on a presumptively valid statute. However, the Defendants overlook the fact that Corrections Law § 402 was also in place at the time in question, yet they opted to not follow that equally presumptively valid statute. Just because Article 10 was later enacted to cover a perceived gap in New York State law does not mean that Plaintiff had no entitlement to due process. Whether Defendants are entitled to qualified immunity for relying on one law over another depends, in our view, on whether the rights Plaintiff asserts he was entitled to were clearly established as of his involuntary admission. We find that they were. Indeed, as early as 1980, the Supreme Court ruled that the involuntary transfer of a prisoner to a mental hospital implicates a liberty interest protected by the Fourteenth Amendment's Due Process Clause. *Vitek v. Jones,* 445 U.S. 480 (1980).[FN8] In so holding, the Court emphasized that certain procedural protections *must* be provided *before* the transfer of a prisoner to a mental hospital. *Id.* at 493 (noting that, just as with private citizens, a convicted felon "is entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital"). Heavily swaying the Court's decision was the fact that not only are these individuals stigmatized by virtue of being labeled mentally ill, but their involuntary psychiatric commitment further subjected the individuals to "mandatory behavior modification as a treatment for mental illness." *Id.* at 494. Among the procedures sanctioned as those that should precede such commitment include:

FN8. In *Vitek,* the Court also engaged in an analysis of the challenged Nebraska state statute to determine if a liberty interest was created therein. This analysis obviously pre-dates the Court's decision in *Sandin v. Conner,* 515 U.S. 472, 484 (1995), which called into question the continued validity of the process described in *Hewitt v. Helms,* 459 U.S. 460 (1983), wherein courts were directed to scrutinize state statutes for mandatory language in determining whether the state created a liberty interest, which, without due process, could not be denied. Because the Supreme Court in *Vitek* found that a prisoner's liberty interest in remaining free from involuntary commitment to a psychiatric hospital also arises under the Due Process Clause of the Fourteenth Amendment, we need not address the pre-*Sandin* analysis of the Nebraska state statute, nor do we need to engage in an analysis of whether New York similarly created a liberty interest.

A. Written notice to the prisoner that a transfer to a mental hospital is being considered;

B. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given;

C. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;

D. An independent decisionmaker;

E. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;

F. Availability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own; [FN9] and

FN9. Only three other Justices joined this aspect of the opinion, that is, whether due process requires appointment of counsel for indigent

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2009 WL 3335892 (N.D.N.Y.)

(Cite as: 2009 WL 3335892 (N.D.N.Y.))

prisoners thought to be suffering from a mental disease or defect. *Vitek v. Jones,* 445 U.S. at 496.

G. Effective and timely notice of all the foregoing rights.

*Id.* at 494–95 (internal quotation marks and citations omitted).

***9** New York State Corrections Law appears to satisfy the clearly established procedures set forth in *Vitek,* while Article 9 does not. In this regard, we find that at this stage, Defendants' reliance on Article 9 as the only protections available to be misplaced. At the very least, it is questionable at this stage whether their reliance on Article 9 as the sole avenue was reasonable.

Next we address Defendants' possible misreading of Plaintiff's claims. In liberally construing Plaintiff's Amended Complaint, it appears to this Court that his due process complaints are two-fold. On the one hand, he seemingly takes umbrage with the constitutionality, or rather, inadequate due process protections, of Article 9 itself, while, at the same time, he appears to state that he was not even afforded the minimal protections set forth in Article 9. For example, Bloomfield states that he met with the two doctors via video conference for a single examination that lasted only a few moments. While the categorization of the exact length of time could be viewed as conclusory, it is clear that Bloomfield is asserting, as fact, that a short, brief meeting ensued wherein he was determined to be mentally ill. It is difficult to assess at this juncture whether a full picture of Bloomfield's mental state could be developed in such a short "examination," of which neither doctor was in Bloomfield's physical presence. Other alleged violations of Article 9 include the way in which the certifications of mental infirmity were drafted. As the content of the examination and certifications are not fully developed, we are not in a position to adduce whether full compliance with Article 9, or other due process protections, was adhered to in this case. For example, MHL § 9.27(c) mandates that the application for admission must contain a "statement of the facts upon which the allegation of mental illness and need for care and treatment are based," yet, it is not clear whether this process was adhered to. N.Y. MENT. HYG. LAWW 9.27(c). Also, the examining physicians are directed to consider, prior to completing a certificate of examination, alternate forms of treatment. *Id.* at § 9.27(d). We must accept for purposes of this Motion that the procedures set forth in Article 9 were not fully followed.

We find that Plaintiff has adequately pled that his involuntary commitment is both inconsistent with the procedures set forth in Article 9 and with the well-established Supreme Court decision in *Vitek,* in that, for example, there was no requirement for pre-commitment notice to the patient, no mandate that a court-appointed independent physician conduct a psychiatric examination, nor was he afforded the possibility for a pre-commitment judicial hearing. It is also not clear what post-confinement process was provided to Bloomfield. In this regard, we cannot find, at this stage of the litigation, that the process afforded to Plaintiff was constitutionally adequate, nor can we find under the facts alleged that any reasonable person would plausibly believe that the cursory evaluation Plaintiff alleges he received was adequate to provide him with a meaningful assessment of his mental health.

***10** For all of the above reasons, we find that the qualified immunity defense is not readily apparent at this stage. *Taylor v. Vermont Dep't of Educ.,* 313 F.3d 768, 793 (2d Cir.2002) (noting that a determination of qualified immunity "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings"); *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y.2004) ("Resolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation."). Further debilitating to the imposition of qualified immunity at this juncture is the fact that, on the record before us, "even a lower ranking subordinate could not have reasonably believed that the perfunctory procedures here provided (as alleged by plaintiff[ ] ) remotely comported with elementary fairness and due process." *Bailey v. Pataki,* 636 F.Supp.2d 288, 2009 WL 2001178, at *4 (S.D.N.Y. July 10, 2009).

Lastly, Defendants urge the Court to dismiss this action because it is now governed by the procedures set forth in Article 10. In support of this argument, Defendants cite to the *Harkavy II* decision wherein the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

patients' challenge to their continued confinement against their will in a psychiatric hospital was rendered "academic" by virtue of the Article 10 procedure, which then encompassed those patients. First, it is unclear whether Bloomfield ever received the Article 10 procedures, though given the timing of his involuntary commitment, he was probably entitled to such process. Second, and most importantly, the patients at issue in the *Harkavy* decisions proceeded under *habeas* petitions. Thus, it is clear why their *habeas* challenge to their continued confinement in a psychiatric hospital pursuant to Article 9 would be rendered academic by the enactment and application of Article 10. Indeed, at the time of *Harkavy II,* each of those patients was being provided the additional procedural protections of Article 10. The proceeding before us, however, is not one for immediate release; instead, Bloomfield seeks monetary damages for alleged constitutional violations. Such relief is neither available in *habeas* proceedings nor in an Article 10 proceeding. Thus, nothing about whether Bloomfield later received due process under Article 10 precludes his ability to seek monetary damages for violations of his due process rights in accordance with his Article 9 involuntary admission. *See* *Bailey v. Pataki,* 636 F.Supp.2d 288, 2009 WL 2001178, at *6 (noting that despite the fact that the plaintiffs were receiving Article 10 proceedings, their due process claims stemming from their Article 9 involuntary admission are not barred by the abstention doctrine set forth in *Younger v. Harris,* 401 U.S. 37 (1971), since the Article 10 proceedings do not afford an "adequate opportunity for judicial review of their federal constitutional claims arising out of their commitment pursuant to Article 9").

***11** At this early stage of the litigation, Plaintiff has alleged enough facts to survive a Motion to Dismiss by stating that his due process rights were violated during his Article 9 involuntary commitment to a psychiatric hospital. By this decision, we do not foreclose Defendants' ability to present the affirmative defense of qualified immunity to the Court at a later time when the factual record is more fully developed.

### III. CONCLUSION

For the reasons stated herein, it is

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 28) be **granted in part and denied in part** consistent with this opinion; and it is further

**RECOMMENDED,** that Defendants Shakunthala Mudigonda, Jeffrey Nowicki, and Nikhill Nihalani be dismissed from this action for the reasons stated above; and it is further

**ORDERED,** that the Clerk of the Court correct the Docket Report to reflect the correct spelling of Defendant Wurzberger's name; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.

Bloomfield v. Wurzberger
Not Reported in F.Supp.2d, 2009 WL 3335892 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

D. Connecticut.
Paul HOLMES, Plaintiff,
v.
The TOWN OF EAST LYME, Paul Formica, and Richard Crooks, Defendants.
Civil No. 3:09cv2088 (JBA).

March 30, 2012.

**Background:** Part-time town police officer, who was terminated and then reinstated, brought action against town, first selectman, and resident state trooper, alleging violations of his due process rights under § 1983, as well as claims for violation of Connecticut Whistleblower statute, common law defamation, and false light invasion of privacy. Officer moved for partial summary judgment, and defendants cross-moved for summary judgment.

**Holdings:** The District Court, Janet Bond Arterton, J., held that:

(1) officer had property interest protected by procedural due process in his continued employment;
(2) town violated officer's procedural due process rights in connection with his termination;
(3) first selectman's statements were sufficiently stigmatizing to support stigma-plus claim;
(4) selectman was not entitled to qualified immunity from due process claims;
(5) officer's speech was not protected by Whistleblower statute; but
(6) fact issue precluded summary judgment as to defamation claim against selectman.

Motions granted in part and denied in part.

West Headnotes

**[1] Constitutional Law 92 0**

92 Constitutional Law

Procedural due process analysis addresses two questions: (1) whether there existed property interest that was interfered with by state, and (2) whether procedures provided prior to denial of property interest were constitutionally sufficient. U.S.C.A. Const.Amend. 14.

**[2] Constitutional Law 92 0**

92 Constitutional Law

Determination of whether a plaintiff possessed property interest protected by procedural due process in continued employment is made by reference to rights that are created by state law. U.S.C.A. Const.Amend. 14.

**[3] Constitutional Law 92 0**

92 Constitutional Law

Public employee who has right not to be fired without "just cause" has property interest protected by procedural due process in his employment. U.S.C.A. Const.Amend. 14.

**[4] Constitutional Law 92 0**

92 Constitutional Law

Part-time town police officer had property interest protected by procedural due process in his continued employment; officer was union member subject to "just cause" standard of removal. U.S.C.A. Const.Amend. 14.

**[5] Constitutional Law 92 0**

92 Constitutional Law

Whether public employee received process to which he was entitled to safeguard his property interest in his job invokes interest-balancing test from *Mathews v. Eldridge*:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1) nature of private interest that will be affected by governmental action, (2) government's interest, including function involved and fiscal and administrative burdens that additional or substitute procedural requirement would entail, and (3) risk of erroneous deprivation of such interest through procedures used, and probable value, if any, of additional or substitute procedural safeguards. U.S.C.A. Const.Amend. 14.

**[6] Constitutional Law 92 0**

92 Constitutional Law

In context of procedural due process claim brought by employee who is union member, purpose of *Loudermill* hearing is as an initial check against mistaken decisions, essentially, determination of whether there are reasonable grounds to believe that charges against employee are true and support proposed action. U.S.C.A. Const.Amend. 14.

**[7] Constitutional Law 92 0**

92 Constitutional Law

While pre-termination process need not be elaborate or approach a full adversary hearing, due process does require that before being terminated public employee be given oral or written notice of charges against her, an explanation of employer's evidence, and opportunity to present her side of story. U.S.C.A. Const.Amend. 14.

**[8] Constitutional Law 92 0**

92 Constitutional Law

Even if grievance and arbitration proceedings provided part-time town police officer remedy for his improper termination, town defendants did not afford employee procedural due process he was due as public employee prior to his termination; defendants did not provide officer notice of all charges against him, explanation of evidence against him, or opportunity to present his side of story, either on his own behalf, or through counsel or union representation. U.S.C.A. Const.Amend. 14.

**[9] Constitutional Law 92 0**

92 Constitutional Law

In action based on termination from government employment, a plaintiff must satisfy three elements in order to demonstrate deprivation of stigma component of stigma-plus due process claim; first, plaintiff must show that government made stigmatizing statements about her, statements that call into question plaintiff's good name, reputation, honor, or integrity, or statements that denigrate plaintiff's competence as professional and impugn plaintiff's professional reputation in such a fashion as to effectively put significant roadblock in plaintiff's continued ability to practice his or her profession, second, plaintiff must prove these stigmatizing statements were made public, and third, plaintiff must show that stigmatizing statements were made concurrently with, or in close temporal relationship to, plaintiff's dismissal from government employment. U.S.C.A. Const.Amend. 14.

**[10] Constitutional Law 92 0**

92 Constitutional Law

A plaintiff seeking to establish stigma-plus due process claim generally is required only to raise falsity of stigmatizing statements as an issue, not prove they are false. U.S.C.A. Const.Amend. 14.

**[11] Civil Rights 78 0**

78 Civil Rights

First selectman's statements at town's board of selectmen meeting that he thought part-time police officer, who was suspected of falsifying time cards, violated town's trust, and that “everything that I looked at was reviewed and showed a pattern of inconsistencies,” were not just statements of opinion, but rather, they were accusations of theft of services, and thus statements were sufficiently stigmatizing to support officer's § 1983 stigma-plus due process claim. U.S.C.A. Const.Amend. 14.

**[12] Civil Rights 78 0**

78 Civil Rights

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

--- F.Supp.2d ----, 2012 WL 1108557 (D.Conn.)

(Cite as: 2012 WL 1108557 (D.Conn.))

Post-deprivation hearings are sufficient to satisfy procedural due process where deprivation at hands of government actor is random and unauthorized, hence rendering it impossible for government to provide pre-deprivation hearing; however, this "random and unauthorized" exception does not apply where government actor in question is high-ranking official with final authority over significant matters. U.S.C.A. Const.Amend. 14.

**[13] Constitutional Law 92 0**

92 Constitutional Law

Town's first selectman, who made stigmatizing statements about part-time town police officer at board of selectmen meeting, leading to officer's termination, was "high-ranking official," precluding application of "random and unauthorized" exception to pre-deprivation procedural due process, and thus officer was entitled to hearing prior to being terminated. U.S.C.A. Const.Amend. 14.

**[14] Federal Civil Procedure 170A 0**

170A Federal Civil Procedure

A defendant will be entitled to summary judgment on qualified immunity grounds in § 1983 action when no reasonable jury, looking at evidence in the light most favorable to, and drawing all inferences most favorable to, plaintiffs, could conclude that it was objectively unreasonable for defendant to believe that he was acting in fashion that did not clearly violate established federally protected right. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[15] Civil Rights 78 0**

78 Civil Rights

Question of whether right is clearly established for qualified immunity purposes in § 1983 action is determined by reference to case law extant at time of violation. 42 U.S.C.A. § 1983.

**[16] Constitutional Law 92 0**

92 Constitutional Law

Where person's good name, reputation, honor or integrity is at stake because of what government is doing to him, notice and an opportunity to be heard are essential under Due Process Clause. U.S.C.A. Const.Amend. 14.

**[17] Federal Civil Procedure 170A 0**

170A Federal Civil Procedure

Genuine issues of material fact existed as to whether it was objectively unreasonable that part-time town police officer was not presented with notice of full set of charges against him prior to his termination, and that officer was prevented from presenting his side of events in question, and as to whether first selectman should have known that officer, as union employee, was entitled to dismissal only for "just cause," precluding summary judgment as to selectman's claim that he was entitled to qualified immunity from officer's § 1983 procedural due process claims arising from his termination. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[18] Labor and Employment 231H 0**

231H Labor and Employment

Whether subject matter addressed by particular statement is of public concern, as required for statement to be protected by Connecticut's Whistleblower statute, involves question of law for court. C.G.S.A. § 31–51q.

**[19] Labor and Employment 231H 0**

231H Labor and Employment

Whether particular statement addresses matter of public concern, as required for statement to fall under protection of Connecticut's Whistleblower Statute, depends on its content, its form, and context in which it is made; latter inquiry necessarily involves question of fact. C.G.S.A. § 31–51q.

**[20] Labor and Employment 231H 0**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

231H Labor and Employment

In determining whether speech addresses matter of public concern, as required for speech to fall under protection of Connecticut's Whistleblower statute, court should focus on the motive of speaker and attempt to determine whether speech was calculated to redress personal grievances or whether it has broader public purpose. C.G.S.A. § 31–51q.

**[21] Labor and Employment 231H 0**

231H Labor and Employment

For purposes of claim under Connecticut's Whistleblower statute, protected speech in question must touch on matter of public concern, and if it does, then the plaintiff's motivation for speech becomes question for the jury. C.G.S.A. § 31–51q.

**[22] Labor and Employment 231H 0**

231H Labor and Employment

Part-time town police officer was not speaking on issue of public concern when he submitted memorandum to town's first selectwoman complaining about sergeants' conduct, as substance of memorandum addressed tense relationship between officer and sergeants, and thus speech was not protected by Connecticut's Whistleblower statute. C.G.S.A. § 31–51q.

**[23] Libel and Slander 237 0**

237 Libel and Slander

"Defamation," the tort that encompasses libel and slander, is established under Connecticut law by demonstrating that (1) the defendant published defamatory statement, (2) defamatory statement identified plaintiff to third person, (3) defamatory statement was published to third person, and (4) plaintiff's reputation suffered injury as result of statement.

**[24] Libel and Slander 237 0**

237 Libel and Slander

"Actual malice," as element of defamation claim brought by public figure under Connecticut law, can be demonstrated by showing the defendant made statement with knowledge the statement was false or with reckless disregard for whether it was false or not.

**[25] Libel and Slander 237 0**

237 Libel and Slander

Whether defendant had knowledge of falsity of defamatory statement, as would establish malice element of defamation claim brought by public figure under Connecticut law, is question for trier of fact.

**[26] Federal Civil Procedure 170A 0**

170A Federal Civil Procedure

Genuine issue of material fact existed as to whether town's first selectman acted with actual malice when he made statements at board of selectmen meeting that he thought part-time police officer, who was suspected of falsifying time cards, violated town's trust, and that "everything that I looked at was reviewed and showed a pattern of inconsistencies," precluding summary judgment as to officer's defamation claim against selectman under Connecticut law.

**[27] Torts 379 0**

379 Torts

In order to establish invasion of privacy by false light under Connecticut law, a plaintiff must show (1) false light in which the other was placed would be highly offensive to reasonable person, and (2) actor had knowledge of or acted in reckless disregard as to falsity of publicized matter and false light in which the other would be placed.

**[28] Torts 379 0**

379 Torts

"Publicity" associated with invasion of privacy, for purposes of false light invasion of privacy under

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Connecticut law, means that the matter is made public, by communicating it to public at large, or to so many persons that matter must be regarded as substantially certain to become one of public knowledge.

**[29] Torts 379 0**

379 Torts

In employment context, when information is conveyed only to employees with duty, responsibility, and need for such information, there is not sufficient publicity to support action for false light invasion of privacy under Connecticut law.

**[30] Torts 379 0**

379 Torts

If employer communicates false information concerning former employee to so many persons that matter must be regarded as substantially certain to become one of public knowledge, false light claim may lie under Connecticut law.

**[31] Federal Civil Procedure 170A 0**

170A Federal Civil Procedure

Genuine issue of material fact existed as to whether statements made by town's first selectman at board of selectmen meeting that he thought part-time police officer, who was suspected of falsifying time cards, violated town's trust, and that "everything that I looked at was reviewed and showed a pattern of inconsistencies," would be highly offensive to reasonable person, precluding summary judgment as to officer's false light invasion of privacy claim against selectman under Connecticut law.

**[32] Torts 379 0**

379 Torts

In context of cause of action for invasion of privacy under Connecticut law, term "publicity" means that matter is made public, by communicating it to public at large, or to so many persons that matter must be regarded as substantially certain to become one of public knowledge.

**[33] Torts 379 0**

379 Torts

It is not invasion of privacy, for purposes of false light invasion of privacy claim under Connecticut law, to communicate fact concerning plaintiff's private life to single person or even to small group of persons; publicity is communication that reaches, or is sure to reach, public at large.

**[34] Officers and Public Employees 283 0**

283 Officers and Public Employees

Governmental immunity under Connecticut law was not complete defense to discharged part-time town police officer's defamation and false light invasion of privacy claims against town's first selectman brought against selectman in his individual capacity. C.G.S.A. § 52–557n.

**[35] Labor and Employment 231H 0**

231H Labor and Employment

In action under Connecticut's Whistleblower statute, plaintiff has initial burden to prove by preponderance of evidence prima facie case of retaliatory discharge: (1) that plaintiff engaged in protected activity, (2) that plaintiff was subsequently discharged from his employment, and (3) that there was causal connection between his participation in protected activity and his discharge. C.G.S.A. § 31–51m.

**[36] Labor and Employment 231H 0**

231H Labor and Employment

A plaintiff's burden of establishing prima facie case of retaliation under Connecticut's Whistleblower statute by presenting evidence which allows rational trier of fact to raise inference of retaliatory discharge is de minim is. C.G.S.A. § 31–51m.

**[37] Federal Civil Procedure 170A 0**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

170A Federal Civil Procedure

Genuine issue of material fact existed as to whether discharged part-time town police officer met his de minims burden of establishing prima facie case of retaliatory discharge, precluding summary judgment as to officer's retaliation claim against town and town selectman under Connecticut's Whistleblower statute. C.G.S.A. § 31–51m.

**[38] Federal Civil Procedure 170A 0**

170A Federal Civil Procedure

Genuine issue of material fact existed as to whether resident state trooper sergeant acted with malice when he made statements regarding part-time town police officer, who was suspected of falsifying time cards, at town's board of selectmen meeting, precluding summary judgment as to officer's defamation claim against sergeant under Connecticut law.

**[39] Federal Civil Procedure 170A 0**

170A Federal Civil Procedure

Genuine issue of material fact existed as to whether resident state trooper sergeant's statements regarding part-time town police officer, who was suspected of falsifying time cards, at town's board of selectmen meeting, including statement in which sergeant likened officer's over-billing particular instance to officer's billing practices in other instances, were “highly offensive,” precluding summary judgment as to officer's false light invasion of privacy claim against sergeant under Connecticut law.

**[40] Damages 115 0**

115 Damages

In order to prevail on claim for intentional infliction of emotional distress (IIED) in Connecticut, a plaintiff has burden of establishing four elements: (1) that actor intended to inflict emotional distress, or that he knew or should have known that emotional distress was likely result of his conduct, (2) that conduct was extreme and outrageous, (3) that conduct was cause of plaintiff's distress and (4) that emotional distress sustained by plaintiff was severe.

**[41] Damages 115 0**

115 Damages

Liability for intentional infliction of emotional distress (IIED) under Connecticut law requires conduct exceeding all bounds usually tolerated by decent society, of nature which is especially calculated to cause, and does cause, mental distress of very serious kind.

**[42] Damages 115 0**

115 Damages

Conduct on part of defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form basis for action under Connecticut law based upon intentional infliction of emotional distress (IIED).

**[43] Damages 115 0**

115 Damages

Under Connecticut law, conduct rises to level of “extreme and outrageous,” as would support intentional infliction of emotional distress (IIED) claim, when recitation of facts to average member of community would arouse his resentment against actor, and lead him to exclaim, “Outrageous!”.

**[44] Damages 115 0**

115 Damages

Bar for conduct that is found to be “extreme and outrageous,” as would support intentional infliction of emotional distress (IIED) under Connecticut law, is set very high.

**[45] Damages 115 0**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

--- F.Supp.2d ----, 2012 WL 1108557 (D.Conn.)

(Cite as: 2012 WL 1108557 (D.Conn.))

115 Damages

Supervisor's actions in connection with investigating allegations that part-time town police officer falsely reported time cards, including reporting at town's board of selectmen meeting that other officers told sergeant that officer billed town for four hours on particular assignment, even though he showed up two hours late, and going to officer's full-time employer, in uniform, in order to check his whereabouts on dates at issue, did not rise to level of "extreme and outrageous," as would support officer's intentional infliction of emotional distress (IIED) claim against supervisor under Connecticut law.

Jacques J. Parenteau, Madsen, Prestley & Parenteau, LLC–NL, New London, CT, Magdalena B. Wiktor, Madsen, Prestley & Parenteau, LLC–HTFD, Hartford, CT, for Plaintiff.

Joseph W. McQuade, Kainen, Escalera & McHale, PC, Joseph A. Jordano, Josephine S. Graff, Margaret Q. Chapple, Attorney General's Office, Hartford, CT, for Defendants.

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

JANET BOND ARTERTON, District Judge.

***1** Plaintiff Paul Holmes filed suit against Defendants the town of East Lyme, First Selectman Paul Formica, and Resident State Trooper Sergeant Richard Crooks. Plaintiff claims violations of the state whistleblower law, Conn. Gen.Stat. § 31–51m (Count One), unlawful retaliatory termination in violation under Conn. Gen.Stat. § 31–51q (Count Two), violations of due process property and liberty interests under 42 U.S.C. § 1983 (Counts Three and Four), common law defamation and false light invasion of privacy against the Town, Defendant Formica and Defendant Sergeant Richard Crooks (Counts Five and Six), and, against Defendant Sergeant Richard Crooks only, intentional infliction of emotional distress (Count Seven).

Plaintiff moves for partial summary judgment against the Town of East Lyme and Paul Formica [Doc. # 60] on Counts Three and Four (Plaintiff's due process claims), and also moves separately for summary judgment on Counts Five and Six (Defamation and False Light Invasion of Privacy claims) against Sergeant Crooks [Doc. # 64]. Defendants Town of East Lyme and Paul Formica cross-move for summary judgment [Doc. # 66] on all counts against them, as does Defendant Richard Crooks [Doc. # 63].

For the reasons discussed below, Plaintiff's motion for summary judgment against the Town and Formica will be granted in part and denied in part, and his motion for summary judgment against Crooks will be denied in its entirety. All Defendants' motions for summary judgment will be granted in part and denied in part.

**I. Factual Background**

Paul Holmes began working as a part-time police officer for the Town of East Lyme in 1985. In East Lyme, a part-time police officer is known as a "special constable." Since 1987, Plaintiff has been employed by the Connecticut Department of Transportation, and he continues to work there. For a number of years, Plaintiff was reappointed as a part-time police officer every six months (Holmes Dep., Ex. A to Town's Loc.'s R. 56(a)1 Stmt [Doc. # 66–4] at 34), and this was considered "a long-standing practice" in the Town that has continued even after part-time officers were added to the collective bargaining unit in 1990 (Award of Arbitrator in the Matter of the Arbitration between AFSCME Council 15 Local 2852 and The Town of East Lyme, August 28, 2009, Ex. 3 to Pl.'s Loc. R. 56(a)1 Stmt. at 2; Arb. 6/17/08 F. Kent. Sistare's Testimony, Ex. 25, at 64:25–65:3).

Defendant Formica is the First Selectman of the Town of East Lyme, and was designated to act as Chief of Police. Defendant Richard Crooks is employed by the Connecticut State Police, and held the position of Resident State Trooper for the Town of East Lyme from January 2007 to April 2008. The Resident State Trooper is the highest certified police officer in the Police Department, and provides services to the Town through a contract with the Connecticut Department of Public Safety.

In 2005, the Town of East Lyme and East Lyme Police Local 2852 Council 15, AFSCME entered into a collective bargaining agreement that was in effect from July 1, 2005 to June 30, 2009. Since 1987, Plaintiff was a member of the Union. Sergeant Paul Renshaw is employed as an East Lyme Police Officer, and also serves as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

President of the Union.

***2** Town police officers fill out weekly time cards that record the number of hours that they worked, along with notes about each set of hours. At his deposition, Plaintiff testified that he learned how to fill out his time card by talking to other officers in the police department. (Holmes Dep. at 24:2–4.) Plaintiff also testified that the number of hours worked, and the rates at which a part-time officer was paid, depended on the type of work that the officer was doing: "that's what we always did .... if [you're not already scheduled to work and] you go to court, you get a four-hour block of time at time-and-a-half." (*Id.* at 26:11–13.)

In December 2006, then-East Lyme Administrative Sergeant Terry Saffioti noted errors in Plaintiff's time card, and wrote a memo to Plaintiff asking for clarification and for the hours that Plaintiff actually worked. (Dec. 4, 2006 Memorandum from Sgt. Saffioti to Holmes, Ex. 24 to Crooks' Loc. R. 56(a)1 Stmt.) In June 2007, due to budgetary concerns, Sergeant Crooks issued a directive consistent with Section 5.5.2 of the union contract that no overtime was to be issued without his approval. (Crooks Aff. ¶ 9.) The directive was copied to the First Selectman at that time, Beth Hogan. (*Id.*) Administrative Sergeant Saffioti was tasked with reviewing the time cards, and if there were discrepancies between the work schedule and submissions for overtime, Sergeant Saffioti would make a note on the time card. (Crooks Aff. ¶ 11; Pl.'s Dep. at 53:15–54:7.) Sergeant Saffioti noted several issues with Plaintiff's time cards in 2007, and Sergeant Saffioti and Plaintiff had a "verbal altercation about Holmes working a shift for which he was not initially scheduled." (Crooks Aff. ¶ 13.)

Prior to December 2007, Plaintiff made several complaints regarding the conduct of East Lyme Police Sergeant Paul Saffioti and Defendant Crooks. On October 1, 2007, Plaintiff wrote a memo to Defendant Crooks, stating, "Sergeant Saffioti is blatantly disregarding the advice of other Sergeants to correct the way he charges time and willfully continues to make the same mistakes." (October 1, 2007 Memorandum from Paul Holmes to Sgt. Crooks, Ex. 4 to Pl.'s 56(a)1 Stmt.) Plaintiff also stated: "Recently, Sergeant Saffioti berated me in the presence of another East Lyme officer making inappropriate comments and threatening to file insubordination charges against me ... I feel Sergeant Saffioti continues to harass me and this needs to stop immediately." (*Id.*) On November 29, 2007, Plaintiff wrote a memo to Beth Hogan, the First Selectman, alluding to a meeting he had recently had with her, and stating that "since the meeting, tensions between Sergeant Saffioti and myself have escalated. I am always on guard for my safety when around Sergeant Saffioti." (November 29, 2007 Memorandum from Paul Holmes to Beth Hogan, Ex. 5 to Pl.'s 56(a)1 Stmt.) In his memo to Hogan, Plaintiff also wrote, "Sergeant Crooks and yourself have acknowledged there is a problem between Sergeant Saffioti, others, and myself.... Please advise me of what actions or investigations you have undertaken to resolve the hostile work environment Sergeant Saffioti has created at the East Lyme Police Department and that Sergeant Crooks has condoned." (*Id.*) Plaintiff was not the only officer to complain of Sergeant Saffioti's behavior, as Lieutenant Fusaro, the Captain of the Connecticut State Police and Commanding Officer, received correspondence from another officer, Joseph Dunn, also complaining about the hostile work environment created by Sergeant Saffioti. (Fusaro Aff., Ex. 4 to Crooks' 56(a)1 Stmt. ¶ 6.)

***3** On November 29, 2007, First Selectman Beth Hogan wrote a letter to Sergeant Saffioti thanking him for his service, and assigning Sergeant San Juan to be the new Administrative Sergeant, effective December 3, 2007. On December 3, 2007, Defendant Paul Formica began serving as the Town's First Selectman in place of Ms. Hogan. Plaintiff did not follow up with Mr. Formica about his November 29, 2007 memo to Ms. Hogan.

In October and November 2007, a criminal investigation that Plaintiff was involved in required his testimony in court as a witness on November 1 and November 16, 2007. Plaintiff mistakenly listed November 6, 2007 instead of November 1, 2007 as the date he appeared in court on his time card. In December 2007, Defendant Crooks alleged that Plaintiff had not appeared in court on November 6 or November 16, 2007 but that Plaintiff had submitted time cards requesting payment for appearing in court on those dates. Sergeant Crooks did not notice the discrepancy at first, writing, "On 11/11/07, OFC Paul Holmes submitted his weekly time card requesting

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

payment for four (04) hours of overtime for an 11/06/07 court appointment.... I did not question this overtime request and authorized payment." (December 20, 2007 Memorandum from Richard Crooks to Lt. Louis Fusaro, Commanding Officer, Ex. 36 to Pl.'s 56(a)1 Stmt. at 1.) However, Crooks did notice that there was an issue with the November 16 court date, writing, "On 11/ 18/07, OFC Paul Homes submitted his weekly time card requesting payment for four (04) hours of overtime for an 11/16/07 court appearance.... I was aware that Holmes, Sergeant San Juan, and Detective Marr had been subpoenaed for Stanford's trial on 11/16/07, but that the case had been adjudicated." (*Id.*) Crooks stated further,

> I asked OFC Holmes about this overtime and ... [he] stated that he was never informed that he was not required to appear in court. OFC Holmes stated that he left work on Friday, 1//16/07, that he drove to GA–10 [the courthouse] in New London, and that upon his arrival, was informed that his appearance in court was no longer required. OFC Holmes stated that he requested four hours of overtime because he left work and actually went to court.

(*Id.*) Plaintiff denies that Sergeant Crooks ever followed up with him, and states that "Crooks did not question me about my having appeared at court on any date in November, 2007." (Pl.'s Aff. ¶ 10.)

Sergeant Crooks began an investigation into Plaintiff's time cards. The Town hired Attorney Michael E. Satti to investigate the allegations with regard to time card submissions against Plaintiff. (DVD, Ex. 34 to Pl.'s 56(a)1 Stmt, at 16:57–1:14:30.) Given that this investigation was being conducted, Mr. Formica recommended that Plaintiff's reappointment by the Board of Selectmen be deferred, rather than having the Board consider Plaintiff's reappointment on December 19, 2007. (Formica Dep. at 39.) Defendant Formica announced his decision to defer Plaintiff's reappointment at the December 19, 2007 Board of Selectmen meeting. (6/ 17/08 Arb. Formica Testimony, Ex. 23 to Pl.'s Loc. R. 56(a)1 Stmt. at 90.) Plaintiff was not present at that meeting and learned that his reappointment was to be deferred from Sergeant Renshaw.

***4** Plaintiff's appointment as a part-time police officer expired on December 31, 2007. Though Defendant Formica offered to meet with Plaintiff on December 29, 30, and 31 to discuss the deferral of his reappointment as a part-time officer, Plaintiff did not respond, and on December 31, 2007, Formica sent a letter to Plaintiff, writing, "Please be advised that in the absence of your meeting with me to discuss this matter, I will make recommendations to the Board of Selectmen regarding reappointment without the benefit of your input." (Dec. 31, 2007 Ltr from Formica to Holmes, Ex. H to Town's 56(a)1 Stmt.)

On January 9, 2008, Defendant Formica sent Plaintiff a memo regarding a meeting he had scheduled that same day to discuss Plaintiff's reappointment. (Jan. 9, 2008 Memorandum from Formica to Holmes, Ex. I to Def.'s Loc. R. 56(a)1 Stmt.) The memo reads:

> I am meeting with you today to discuss with you some, but not all, of my concerns regarding your recent actions while purportedly acting as a paid employee of the Town.... You recently submitted time cards requesting pay for court appearances.... These alleged appearances, according to your time card, were on November 6 and November 16, 2007. There has been no substantiation that you ever appeared on either of these dates, and your action in requesting pay for time not worked is a serious matter, which I, on behalf of this Town, take seriously.

(*Id.*) At his deposition, Mr. Formica testified that he did not consider the meeting with Plaintiff to be "potentially disciplinary ." Neither Plaintiff nor Sergeant Renshaw were informed prior to January 9, 2008 what the issues or allegations surrounding Plaintiff's deferred reappointment were. At the meeting, Mr. Formica and Selectwoman Rose Ann Hardy met with Plaintiff and Sergeant Renshaw, where Mr. Formica informed Plaintiff that Plaintiff was not entitled to Union representation but the Town would allow Sergeant Renshaw to be present in the capacity of a private citizen. (Consent of Paul T. Holmes, Ex. 14 to Pl.'s 56(a)1 Stmt.) Defendant Formica refused to continue the meeting if Plaintiff did not agree, in writing, to forgo Union Representation. (Renshaw Testimony at 9:11–16.) Though Plaintiff gave his consent, he inserted "I am not in agreement with this document" at the bottom of the page, signing and dating it. (Consent of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Paul T. Holmes.) The issues of the November court dates and time card discrepancies were the only issues discussed at this meeting. (Renshaw Testimony 13:20–24.) Renshaw testified that "[w]e left [the meeting] feeling that if we could resolve these two dates, these two issues; that the issue of [Plaintiff's] reappointment would be rectified." (*Id.* 13:15–17 .)

By January 25, 2008, the fact that Plaintiff had sought four-hour overtime payments in connection with court appearances had become part of the investigation. (Crooks Dep. at 199:17–21.) That same day, Plaintiff provided documentation to the Town and to Mr. Formica showing that he had been in court and testified on the days for which he was accused of not being present. (Jan. 25, 2008 Memorandum from Holmes to Formica, Ex. 8 to Pl.'s 56(a)1 Stmt.) On January 31, 2008, Mr. Formica hand-delivered a memo to Plaintiff, informing him that

> ***5** on Wednesday, February 6, 2008, there will be a Board of Selectmen meeting at 7:30 at the East Lyme Town Hall, at which there will be a discussion concerning your conduct as a part time constable for the Town of East Lyme, as well as to consider whether or not you will be reappointed to that part time position. As this is a "personnel matter", it is exempt from public disclosure .... [though] you have the right to waive your right to keep this information confidential, including the right to request the executive session be open to the public.
>
> Among topics to be discussed at next Wednesday's meeting are (1) your time card submittals and documentation of time worked regarding 11/6/07, 11/16/07 (for which you recently submitted a written explanation), 12/17/07, 12/ 18/07, 12/ 19/07, 12/20/07, 12/22/07, 2007, and 1/09/08; (2) your conduct and demeanor in addressing Sergeant Richard Crooks on December 14, 2007 and December 28, 2007; (3) your failure to complete MRT training recertification in a timely fashion; and (4) your disregard for my direct order that you not be present at the East Lyme Police Department.

(Jan. 31, 2008 Memorandum from Formica to Holmes, Ex. 9 to Pl.'s Loc. R. 56(a)1 Stmt.)

Sergeant San Juan, Plaintiff's Administrative Sergeant, testified that he had spoken with Sergeant Crooks about whether Plaintiff was entitled to four hour minimums at overtime rates, and that Crooks "inquired about whether Holmes was entitled to the four hours pay. I said it was my understanding that he was. As Crooks stood there, I went to the contract [Collective Bargaining Agreement] and showed him what I believed to be the proper area, which is ... the off-duty court appearance, 5.17. And he agreed." (10/09/08 Arb. San Juan Testimony, Ex. 22 to Pl.'s Loc. R. 56(a)1 Stmt. at 166:3–8.) Sergeant Crooks did not inform Mr. Formica of his conversation with Sergeant San Juan regarding this past practice of four hour minimum time cards. Defendant Formica testified that he was aware that the Plaintiff believed he was entitled to four hour minimum time cards prior to the February 6, 2008 Board of Selectmen meeting. (8/19/08 Arb. Formica Testimony, Ex. 16 to Pl.'s 56(a)1 Stmt. at 89:16–24.)

The evening before the February 6, 2008 Board meeting, Plaintiff requested that the discussion pertaining to his employment be postponed, as he had previously scheduled plans to be out of state. (Feb. 5, 2008 Ltr from Holmes to Formica, Ex. 11 to Pl.'s 56(a)1 Stmt; DVD.) Plaintiff asked that the Town hold its discussion on his personnel matters in open session and that he have Union representation at the meeting and representation through counsel. (*Id.*) Both Plaintiff's request for representation and for postponement were denied and Plaintiff was unable to attend the meeting.

Other than Mr. Formica, who had already decided that Plaintiff should not be reappointed prior to the February 6 meeting (8/19/08 Arb. Formica Testimony at 49:17–18), the remaining members of the Board of Selectmen knew nothing about the investigation until meeting, when they received the binder of exhibits and had a chance to review it at the meeting. Robert Wilson, one of the Selectmen, testified that he "was made aware" of the issue prior to the meeting by Mr. Formica, who had told him "that he had reservations about reappointing Mr. Holmes." (10/09/08 Arb. Wilson Testimony, Ex. 20 to Pl.'s 56(a)1 Stmt. at 29:2–12.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

***6** The Charter of the Town of East Lyme provides that "The First Selectman shall ... establish and be responsible for the administrative and personnel policies for town offices and employees, with the approval of the Board of Selectmen, and shall execute or cause to be executed the town ordinances, regulations, resolutions and policies voted by the Board of Selectmen." The Board of Selectman provides for the appointment of Constables and Special Constables, and an appointed officer may be removed only for cause by the Board of Selectmen:

> No such removal for cause shall be effected unless the officer or member has received a statement in writing of the reasons why he should be removed. This statement shall be prepared by the Board of Selectmen. Not less than fifteen days after the delivery of the statement of reasons, an opportunity for a public hearing before the Board of Selectmen must be provided at which time the appointed officer or member may appear with counsel.

(Charter at 4.6.1, 4.7.1–4.7.2.)

During the open session meeting, the Board of Selectmen heard from Attorney Satti, who had conducted an investigation into Plaintiff's time card issue. He reported that Plaintiff's time cards to the Town "indicated according to Officer Crooks' report that he was seeking again a multitude of a number of hours for that day there was no court. (DVD at 58:20–32.) Satti further stated that Plaintiff "submitted overtime hours on certain occasions where there's no evidence that there was a court proceeding or there's no evidence that he was actually performing those services." Satti accused Plaintiff of insubordination, stating, "It shows me that there is an attitude that is insubordinate to say the least and that there are serious serious questions about the time that the Town has already paid that it didn't even know that it paid and not in error." (*Id.* at 1:12:36–1:12:52.) Sergeant Crooks also spoke before the Board, stating that he was unfamiliar with the time card policies for part-time officers, "this is really the only instance in my tenure in Town and I've been here fourteen months." (*Id.* at 1:18:26–1:18:38.) Crooks also stated that Plaintiff showed up two hours late for an assignment to McCook Park (the "McCook Park incident") and that "other officers told me that ... [he] still billed the Town for four hours." (*Id.* at 1:27:12–1:27:29.) FN1

Defendant Formica also spoke at the meeting, stating that Plaintiff "violated the trust" of the Town and that "we do an injustice to the rest of the people who diligently work in that department everyday if we let this sit another day by not making it clear that we are not reappointing this gentleman based on the pattern and history of the activity that you have in front of you with all these pages of documents," and called for an immediate vote confirming the non-reappointment of Plaintiff. Selectman Wilson stated that they had not been made aware that they would need to vote that night. (*Id.* at 1:33:35–45:33.) The Board of Selectmen voted 4–2, with Selectwoman Hardy and Selectman Wilson voting against, to confirm Plaintiff's non-reappointment. (Formica's Testimony at 45; DVD at 1:45:38–1:45:45)

***7** On February 22, 2008, an article about Plaintiff's termination was printed in the New London Day newspaper with the headlines "Officer accused of overbilling East Lyme" and "Part-time East Lyme Officer allegedly doctored time cards." New London Day article, Feb. 22.2008, Ex. 12 to Pl.'s 56(a)1 Stmt.) A recording of the February 6, 2008 Board of Selectmen meeting was broadcast more than once over the public access channel in East Lyme. (Pl.'s Aff. ¶ 13.) The Town's practice is to broadcast these meetings three times each day until a recording from the next Board of Selectmen meeting is aired. (Jan. 31, 2011 Morris Deposition, Ex. 39 to Pl.'s 56(a)1 Stmt. at 9–10.)

After Plaintiff's termination, Plaintiff's daughter was taunted at school and her classmates told her that "your dad steals," and called her father a "crook" and a "thief." (Pl.'s Aff. ¶ 19.) Plaintiff has sought medical and psychiatric treatment after the meeting, and Plaintiff was diagnosed with Post Traumatic Stress Disorder after his termination. (Pl.'s Dep. at 188:23–193:25.)

On February 20, 2008, the Union filed a grievance on Plaintiff's behalf contesting his termination. (Award at 19.) The parties appeared before Arbitrator J. Larry Foy, Esq. for ten arbitration hearings. On August 28, 2009, Arbitrator Foy found that Plaintiff was covered by the Collective Bargaining Agreement, and determined that Plaintiff could not be terminated from his employment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

except for just cause. (*Id.* at 38–39.) Foy also found that Plaintiff was entitled to a post-deprivation hearing, finding that the proceedings leading to Plaintiff's termination were "wholly lacking in due process." (*Id.* at 46.) Plaintiff was granted reinstatement and back pay in the arbitration award. (Pl.'s Dep. at 207.)

**II. Discussion**FN2

**A. Counts Three and Four: Due Process Claims against the Town of East Lyme and Paul Formica**

Defendants Town of East Lyme and Formica argue that summary judgment is appropriate on both the property and liberty due process claims, claiming that Plaintiff's remedies lie in the grievance and arbitration process, and through litigation of his state tort causes of action. Plaintiff argues that he has a constitutionally—protected property interest in his employment as a Special Constable, and that he was denied the process that he was due when Defendants failed to provide him with notice of all charges against him, an explanation of the evidence against him, and an opportunity to present his side of the story. Plaintiff also contends that the statements made against him by Mr. Formica were injurious to his reputation, and entitle him to summary judgment on his due process "stigma—plus" claim.

*1. Count Three: Due Process Deprivation of a Property Interest*

[1] A procedural due process analysis addresses two questions: (1) whether there existed a property interest that was interfered with by the state; and (2) whether the procedures provided prior to the denial of the property interest were constitutionally sufficient. *Shakur v. Selsky,* 391 F.3d 106, 118 (2d Cir.2004).

***8** [2][3] Determination of whether Plaintiff possessed a property interest in continued employment is made by reference to rights that are created by state law. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules"). A public employee who has a right not to be fired without "just cause" has a property interest in his employment. *Otero v. Bridgport Housing Authority,* 297 F.3d 142, 151 (2d Cir.2002); *see also Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d. Cir.1991) ("The collective bargaining agreement between the Town and the police union to which Moffitt belonged guaranteed that he could not be fired without just cause. Accordingly, Moffitt had a property interest in his employment that qualified for the protections of procedural due process.")

[4] The parties do not dispute that police officers in East Lyme, both full-and part-time, are subject to a "for cause" standard for removal. The Collective Bargaining Agreement at Section 8.1 states, "No permanent officer shall be discharged, demoted, suspended or disciplined except for 'just cause.' " The Town Charter provides that Special Constables, i.e., part-time police officers like the Plaintiff, are also subject to a "for cause" standard of removal: "An appointed officer or a member of an appointive board may be removed only for cause by the Board of Selectmen." (Charter, Ex. 37 to Pl.'s 56(a)1 Stmt. at 4.7.1.) Thus, Plaintiff had a protected property interest in his part-time employment with the Town of East Lyme.

[5][6] Defendants nonetheless maintain that the Plaintiff received all of the process that he was due under the Fourteenth Amendment. Whether the Plaintiff received the process to which he was entitled to safeguard his property interest in his job invokes the interest—balancing test from *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> (1) the nature of the private interest that will be affected by the governmental action; (2) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (3) the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.

*Segal v. City of New York, Dept. Of Ed.,* 459 F.3d 207, 215 (2d Cir.2006). Plaintiff argues that as a union member entitled to "just cause" to support disciplinary action, he was owed a *Loudermill* hearing, which includes, (1) oral or written notice of the charges against him, (2) an explanation of the employer's evidence, and (3) an

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

opportunity to present his side of the story, before termination of employment. *Cleveland Bd. Of Ed. v. Loudermill,* 470 U.S. 532, 543, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The purpose of a *Loudermill* hearing is as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46.

***9** Defendants argue that the private interest at stake is not as important as it has been in other governmental employment cases, because Plaintiff is a part-time police officer. (Town's Mem. Supp. at 10.) While it is undisputed that Plaintiff's primary source of income is his full-time job with the state Department of Transportation, he has held his part-time Special Constable position for over 20 years. Defendants argue that the loss of a secondary part-time position did not deprive him of his livelihood (*id.*),[FN3] and thus is a weak "private interest" under *Mathews,* when contrasted with the Town's interest in the free exercise of its responsibilities under the Town Charter to appoint, reappoint or decline to appoint part-time officers. (*Id.* at 11.)

As to the third *Mathews* factor, Defendants argue that the risk of an erroneous deprivation is mitigated by the "prompt post-deprivation procedures of the grievance and arbitration provisions of the Collective Bargaining Agreement" (*id.*),[FN4] which provided adequate post-deprivation process. The Second Circuit has held that "there is no due process violation where pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." *Adams v. Suozzi,* 517 F.3d 124, 128 (2d Cir.2008); *see Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 213 (2d Cir.2003); *Narumanchi v. Bd. of Trustees of Conn. State Univ.,* 850 F.2d 70, 72 (2d Cir.1988) (finding due process was satisfied "by the pre-deprivation notice and hearing rights provided in the grievance procedures under the [collective bargaining agreement]"). Plaintiff, on the other hand, argues that the existence of a grievance and arbitration proceeding in a collective bargaining agreement does not eliminate or reduce the need to provide adequate pre-deprivation notice. *See, e.g ., Ciambrello v. County of Nassau,* 292 F.3d 307, 321 (2d Cir.2002) (a state worker was entitled to notice and opportunity to be heard before being demoted, regardless of the existence of a grievance procedure to contest the adverse action) (citing *Chaney v. Suburban Bus Division of the Regional Transportation Authority,* 52 F.3d 623, 629 (7th Cir.1995) ("due process requires pre-termination notice and an opportunity to respond even where a CBA provides for post-termination procedures that fully compensate terminated employees.")). *But see Wojcik v. Mass. State Lottery Comm'n,* 300 F.3d 92, 102 (1st Cir.2002) (pre-deprivation notice and "the full arbitration afforded by the collective-bargaining agreement w[ere] more than sufficient to satisfy" due process requirements).

[7] While pre-termination process "need not be elaborate or approach ... a full adversary hearing, ... due process does require that before being terminated such an employee be given oral or written notice of the charges against her, an explanation of the employer's evidence, and an opportunity to present her side of the story." *Otero v. Bridgeport Housing Auth.,* 297 F.3d 142, 151 (2d Cir.2002) (union employee accused of stealing from her employer who was told only that there was "substantial evidence" against her was denied due process). In *Otero,* the Second Circuit held that "merely presenting 'some semblance' of the evidence ... does not necessarily afford the accused an adequate opportunity to present her side of the story," and that "mere notice of the charge, ... is not an explanation of the evidence and does not necessarily suffice to provide due process." *Id.* at 151–52. *See also Clayton v. City of Middletown,* 564 F.Supp.2d 105, 116 (D.Conn.2008) ("In dismissal-for-cause cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect, because permitting the employee to give his version of the events will provide a meaningful hedge against erroneous action.") (citing *Loudermill,* 470 U.S. at 543 n. 8).

***10** [8] Even if the grievance and arbitration proceedings provided Plaintiff a remedy for his improper termination, the undisputed characteristics of the pre-termination process do not suffice to meet the requirements of *Loudermill.* It is undisputed that Defendants did not provide Plaintiff with (1) notice of all

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the charges against him, (2) an explanation of all the employer's evidence against him, or (3) an opportunity to present his side of the story, either on his own behalf, or through counsel or union representation. Defendants knew that Plaintiff was unable to make the February 6 Board of Selectmen meeting (*see* February 5 Ltr. From Holmes to Formica, Ex. 11 to Pl.'s 56(a)1 Stmt.; DVD, Ex. 34); Defendant Formica did not reschedule the meeting, allow a Union representative present on Plaintiff's behalf at the meeting to speak for him, or permit Plaintiff to be represented by an attorney. (*See* DVD; February 4, 2008 Email from Eileen Duggan to Ken DeLorenzo, Ex. 15 to Pl.'s 56(a)1 Stmt.[FN5]) Given the structure of the meeting, and the absence of notice of all charges, Plaintiff had no opportunity to present his side of the story about the practice of submitting four-hour minimums beyond the documentation of time cards surrounding the November 6 and November 16, 2007 court dates, or regarding the McCook Park Incident. (*See* January 31, 2008 Memorandum from Formica to Holmes, Ex. 9 to Pl.'s Loc. R. 56(a)1 Stmt.)

Mr. Formica's attempts to meet with Plaintiff in late December notwithstanding (*see* Jan. 9, 2008 Memorandum from Formica to Holmes), Plaintiff was never made aware of all of the evidence against him, and Plaintiff thus provided documentation responsive only to the evidence that Formica did notify him about (*See* Jan. 25, 2008 Memorandum from Holmes to Formica). The most serious charge against Plaintiff, that is, his practice of submitting time cards listing a four-hour minimum at overtime rates, did not even arise until the presentation by Attorneys Satti and Duggan at the February 6, 2008 Board of Selectmen meeting. (*See* DVD.) Even Selectpersons Hardy and Wilson observed this procedural deficiency, stating that they “had only heard one side.” (*Id.*) *See* *McDaniel v. Princeton City School District Bd. of Ed.,* 72 F.Supp.2d 874, 881 (S.D.Ohio 1999), *aff'd* 45 F. App'x 354 (6th Cir.2002) (summary judgment entered for plaintiff where defendant did not provide notice or opportunity to respond to three of the five reasons noted for her termination in the letter following her *Loudermill* hearing).

Viewing the evidence of record in the light most favorable to the Defendants, no reasonable factfinder could find that the Defendants afforded Plaintiff the process that he was due as a public employee prior to his termination. The Town Charter provides that appointed officers are removable only for cause, and “no such removal for cause shall be effected unless the officer ... has received a statement in writing of the reasons why he should be removed.” (Charter § 4.7.1., Ex. 37 to Pl.'s 56(a)1 Stmt.) Plaintiff was not provided with a complete list of the charges against him prior to the January 9 meeting, and the Town's January 31 notice failed to list the important issue of four hour minimum payments for off-duty days and scheduled the hearing for Plaintiff less than a week later, contrary to the Charter provisions:

> ***11** The statement [in writing of the reasons why he should be removed] shall be prepared by the Board of Selectmen. Not less than fifteen days after the delivery of the statement of reasons, an opportunity for a public hearing before the Board of Selectmen must be provided at which time the appointed officer or member may appear with counsel.

(Charter § 4.7.1–4.7.2.) Accordingly, Defendants' motion is denied, and Plaintiff's motion is granted.

*2. Count Four: Due Process Deprivation of a Liberty Interest*

Plaintiff and Defendants Town of East Lyme both move for summary judgment on Plaintiff's due process deprivation of liberty claim.

[9] In an action based on a termination from government employment, a plaintiff must satisfy three elements in order to demonstrate a deprivation of the stigma component of a stigma-plus claim.” [FN6] *Segal v. City of New York,* 459 F.3d 207, 212 (2d Cir.2006):

> First, the plaintiff must ... show that the government made stigmatizing statements about [her]—statements that call into question [the] plaintiff's good name, reputation, honor, or integrity. We have also said that statements that denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession will satisfy the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

stigma requirement. Second, a plaintiff must prove these stigmatizing statements were made public. Third, the plaintiff must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment.

*Id.,* 459 F.3d at 212–13 (internal citations omitted). While the Second Circuit has noted that a typical "stigma-plus" case occurs when the state actor makes the stigmatizing statement at the time of termination, "perfect parity in the origin of the stigma and the plus is not required." *Velez v. Levy,* 401 F.3d 75, 89 (2d Cir.2005).

[10] Defendants argue that the stigmatizing statements made must be defamatory, and that therefore the Plaintiff must prove that the statements complained of were false. *See Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). However, "a plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not *prove* they are false." *Patterson v. City of Utica,* 370 F.3d 322, 330 (2d Cir.2004) (emphasis added). *Abramson* describes "situations where the reasons for termination or resignation were given a public airing which impaired the prospects of the employee for other employment" as a possible circumstance giving rise to a claim of denial of a liberty interest. *Abramson,* 278 F.3d at 101.

Defendants also maintain that a defamatory statement must convey an objective fact, "since expressions of mere opinion are generally not actionable." (Town's Mem. at 14.) As illustration, Defendants cite to *Wiese v. Kelley,* No. 08–CV–6348, 2009 WL 2902513, 2009 U.S. Dist. LEXIS 82307, *19–20 (S.D.N.Y. Sept.10, 2009), in which the Southern District of New York found the New York Attorney General's description of the conduct "resulting in the loss of data as 'extremely troubling' to be a statement of opinion, rather than fact, and as such is not actionable as a stigmatizing remark." *Id.* (citing *Blackburn v. City of Marshall,* 42 F.3d 925, 936 (5th Cir.1995) (statement of opinion does not suffice to support stigma-plus claim because it does not contain "false factual representations, concrete or otherwise"); *see also Strasburger v. Bd. of Educ.,* 143 F.3d 351, 356 (7th Cir.1998) ("True but stigmatizing statements that preclude further government employment do not support this type of claim. Nor do statements of opinion, even stigmatizing ones, if they do not imply false facts. We also require the statements to come from the mouth of a public official.").

***12** [11] It is undisputed that at the Board of Selectmen meeting, Defendant Formica stated that "I think that he violated the trust," that "everything that I looked at was reviewed and showed a pattern of inconsistencies with this," and that:

> [W]e do an injustice to the rest of the [police officers **]** who diligently work in that department every day if we let this sit another day by not making it clear that we are not reappointing this gentleman based on the pattern and the history that you have in front of you with all these pages of documents, a lot of which are signed in his hands.

(DVD.) In making these statements, Defendant Formica relied on Attorney Satti's presentation, which referred to the report from Sergeant Crooks to his commanding officer, stating that the investigatory report on Holmes "raised questions about the legitimacy about the request for payments that have been made." (*Id.* at Ch. 5.)

Unlike the statement of opinion that a plaintiff's behavior was "extremely troubling" in *Wiese,* the statements made at the Board of Selectmen meeting are not just statements of opinion, but are accusations of theft of services which a reasonable juror could find sufficient for proof of a stigma-plus violation. The record does not require a conclusion that they are "true but stigmatizing," *Strasburger v. Bd. of Educ.,* 143 F.3d at 356, nor mere assertions of Defendant Formica's opinion. Rather, these were statements made by a public official that implied false facts about a scheme Plaintiff had for getting paid improperly. *Strasburger,* 143 F.3d at 356.[FN7] Since these statements directly addressed Plaintiff's reputation for honesty and morality, Plaintiff was subjected to disciplinary action as a result of them, and they were found to be false at the post-deprivation arbitration (*see* Arbitration Award, Ex. 3 to Pl.'s 56(a)1 Stmt. at 64–69), they were unquestionably stigmatizing. Thus, the question that remains is whether Plaintiff received all of the process that he was due as a result of this deprivation of liberty.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

--- F.Supp.2d ----, 2012 WL 1108557 (D.Conn.)

(Cite as: 2012 WL 1108557 (D.Conn.))

[12] Generally, as discussed above, due process requires that a state afford persons "some kind of hearing" *prior* to depriving them of a liberty or property interest. *See DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003) (internal citations omitted). Defendants argue that Plaintiff received all the process to which he was due in the "post-deprivation name-name clearing hearing" that he received in the form of his Arbitration Award. (Def.'s Mem. Supp. at 17–19.) However, in the Second Circuit, post-deprivation hearings are sufficient *only* "[w]here a deprivation at the hands of a government actor is 'random and unauthorized,' hence rendering it impossible for the government to provide a pre-deprivation hearing." *DiBlasio,* 344 F.3d at 302. This "random and unauthorized" exception does not apply where "the government actor in question is a high-ranking official with final authority over significant matters." *Id.* (citing *Burtnieks v. City of New York,* 716 F.2d 982, 988 (2d Cir.1983)) ("In our view, however, decisions made by officials with final authority over significant matters, which contravene the requirements of a written municipal code, can constitute established state procedure."); *see also Dwyer v. Regan,* 777 F.2d 825, 832 (2d Cir.1985) ("In contrast, where the depriving actions were taken by a high-ranking official having final authority over the decision-making process, this Court has found that they were not random or unauthorized.").

***13** [13] Defendant Formica is a "high-ranking official," and accordingly, the "random and unauthorized" exception to pre-deprivation process does not apply here. As the First Selectmen, he serves as the Chief of Police for the Town of East Lyme, and the Board of Selectmen are charged with the appointment of constables and special constables (*see* Ex. 37 to Pl.'s 56(a)1 Stmt. at 4.6.1), as well as with dismissing employees of the town (*see id.* at 3.2.3). Thus, Mr. Holmes was entitled to "some kind of hearing" prior to being terminated, and he received only inadequate notice of the charges against him and a post-deprivation hearing. Accordingly, the Court denies Defendants motion for summary judgment on this count, and grants Plaintiff's motion for summary judgment.

*3. Qualified Immunity as to Counts Three and Four*

Defendants maintain that Defendant Formica is entitled to qualified immunity in his individual capacity on each of the due process claims. In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims:

> First, a court must decide whether the facts that a plaintiff has alleged (see, Fed.R.Civ.P. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

*Pearson v. Callahan,* 555 U.S. 223, 128 S.Ct. 808, 815–16 (2009). In *Pearson,* the Court held that the Saucier protocol should not be regarded as "mandatory, but that the two-step process is often beneficial." 128 S.Ct. at 818. Here, because summary judgment is being entered for Plaintiff on both due process claims, the Court must consider whether Plaintiff's rights were "clearly established" at the time Defendant Formica acted.

[14] A defendant will be entitled to summary judgment on qualified immunity grounds when "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999). Defendants rely on the fact that Formica was acting on the advice of counsel when he acted, however the Second Circuit has held that "reliance on the advice of counsel ... cannot be used to support the defense of qualified immunity." *In re County of Erie,* 546 F.3d 222, 229 (2d Cir.2008).

[15][16] "The question of whether a right is 'clearly established' is determined by reference to the case law extant at the time of the violation." *In re County of Erie,* 546 F.3d 222, 229 (2d Cir.2008). The case law describing the constitutional protections where liberty or property interests are at stake is longstanding and well established.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In *Roth,* the Supreme Court held that the dismissal of a government employee accompanied by a "charge against him that might seriously damage his standing and associations in his community" would qualify as something "the government is doing to him," so as to trigger the due process right to a hearing. *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548. Thus, the Court concludes that at the time of Plaintiff's dismissal, his rights were clearly established.

***14** [17] Viewed in the light most favorable to Plaintiff, a reasonable jury could find that it was objectively unreasonable that Plaintiff was not presented with notice of the full set of charges against him, that Plaintiff was prevented from presenting his side of the events in question, and that Mr. Formica should have known that Plaintiff, as a union employee, was entitled to dismissal only for "just cause." Further, the digital recording of the Board of Selectmen meeting reveals that Mr. Formica was focusing intently on the "interpretation of the contract" when he asked the member of the Board to vote on Mr. Holmes's non-reappointment and noted that Plaintiff, if he chose to, could always bring a grievance through his union. (*See* DVD, Ex. 34 to Pl.'s 56(a)1 Stmt, at 1:36:00.) Factual issues remain for jury determination, such as how to interpret the language of the Collective Bargaining Agreement, or how a reasonable First Selectman would have addressed the lack of clarity between the Collective Bargaining Agreement and the language in the Town Charter. Thus, this inquiry into reasonableness is not appropriately decided on summary judgment, and accordingly, Defendants' motion for summary judgment on qualified immunity grounds will be denied.

**B. Counts One, Two, Five, and Six: Connecticut State Law Claims Against the Town and Formica**

*1. Count Two: Protected Speech under Conn. Gen.Stat. § 31–51 q*

Defendants move for summary judgment as to Count Two, Connecticut's Whistle blower statute, asserting that (1) Plaintiff's alleged speech did not address a matter of public concern, and (2) Plaintiff failed to plead that the exercise of his rights substantially or materially interfered with his working relationship with the Town. (Town's Mem. at 27.)

Conn. Gen.Stat. § 31–51q states:

> Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer.

Defendants argue that summary judgment is proper on this count because the speech protected by the statute can only be speech regarding issue of public concern, and Plaintiff's speech only concerned his own private interests.

[18][19][20] "Whether the subject matter addressed by a particular statement is of public concern involves a question of law for the court." *Daley v. Aetna Life & Casualty Co.,* 249 Conn. 766, 734 A.2d 112 (1999). "Whether a particular statement addresses such a matter depends on its content, its form, and the context in which it is made. This latter inquiry necessarily involves a question of fact." *Id.* "The court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it has a broader public purpose." *Lewis v. Cowen,* 165 F.3d 154, 163–64 (2d Cir.1999).

***15** [21] The protected speech in question must touch

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

--- F.Supp.2d ----, 2012 WL 1108557 (D.Conn.)

(Cite as: 2012 WL 1108557 (D.Conn.))

on a matter of public concern, and if it does, then the plaintiff's motivation for the speech becomes a question for the jury. For example, in *Campbell v. Windham Community Memorial Hospital, Inc.,* 389 F.Supp.2d 370 (D.Conn.2005), Judge Hall found that "it could not be said that [the plaintiff's] speech concerned only the scope of the terms and conditions of [plaintiff's] employment, and concluded that speech that addressed plaintiff's "employer's potentially illegal practices with respect to private third parties" was a matter of public concern, and denied the employer's motion for summary judgment. 389 F.Supp.2d at 381. However, *Campell* is distinguishable from the speech at issue here: there, the plaintiff's speech "did not relate to the terms of her employment or her own pay and salary. Instead it addressed in part her employer's potentially illegal practices." 389 F.Supp.2d at 381. Here, the record shows that in his November 29, 2007 Memorandum to First Selectman Hogan, Plaintiff listed some of the issues he had broached with Hogan, including, "pay issues, part time hours and how time was being incorrectly charged to this account causing the 'over the budget condition,' " and "the continued harassment both verbal, written and the hostile work environment that has been created by Sergeant Saffioti." (November 29, 2007 Memorandum, Ex. 5 to Pl.'s 56(a)1 Stmt.)

[22] While it is the case that speech that concerns the management of government funds constitutes protected speech, *see Vasbinder v. Scott,* 976 F.2d 118, 119–20 (2d Cir.1992), speech that relates to a public employee's personal "pay issues" does not automatically render it an issue of public concern. Viewing the record in the light most favorable to Plaintiff, the court concludes that no reasonable juror could find that Plaintiff was motivated by matters of public concern when he submitted his memo to First Selectwoman Hogan. The substance of the memorandum addressed the tense relationship between him and Sergeants Crooks and Saffioti, and case law does not support a finding that this could be a matter of public concern. *See, e.g., Gorman–Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 545, 553 n. 4 (2d Cir.2001) ("Plaintiffs' claims related to the administration of the Cooperative and the allocation of funds were based on alleged mismanagement of government funds and violations of its by-laws, which are clearly matters of public concern.... Plaintiffs' other speech focused on the safety of young children at horse shows involving 4–H, a matter of public concern."); *Johnson v. Multnomah County, Oregon,* 48 F.3d 420, 425 (9th Cir.), *cert. denied,* 515 U.S. 1161, 115 S.Ct. 2616, 132 L.Ed.2d 858 (1995) ("[W]e have stated that misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern ."). Thus, summary judgment will be granted for Defendants Town of East Lyme and Paul Formica on Count Two.

*2. Count Five: Defamation as to Defendant Formica*

***16** [23] Defendant Formica has also moved for summary judgment as to Count Five, and Plaintiff has moved for summary judgment under Rule 56(f) (summary judgment "independent of the motion"). Defamation, the tort that encompasses libel and slander, is established by demonstrating that (1) the defendant published a defamatory statement; (2) the defamatory statement identified plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. *Cweklinsky v. Mobil Chemical Co.,* 267 Conn. 210, 217, 837 A.2d 759 (2004). In *Lizotte v. Welker,* 45 Conn.Supp. 217, 709 A.2d 50 (1996), the court defined defamation as "that which tends to injure reputation in the popular sense, to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." 45 Conn.Supp. at 220, 709 A.2d 50.

[24][25] Plaintiff, as a police officer, concedes that he is a public figure for defamation purposes. Therefore, he must show that Formica acted with actual malice in defaming him. *Miles v. Perry,* 11 Conn.App. 584, 588–89, 529 A.2d 199. Actual malice can be demonstrated by showing the defendant made the statement with knowledge the statement was false or with reckless disregard for whether it was false or not. *Holbrook v. Casazza,* 204 Conn. 336, 342, 528 A.2d 774 (1987). Whether a defendant had knowledge of the falsity of a defamatory statement is a question for a trier of fact. *Bleich v. Ortiz,* 196 Conn. 498, 501, 493 A.2d 236 (1985).

[26] Defendants argues that Formica's statements are either true, or statements of opinion, and thus cannot form

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the basis of a claim of defamation. *See Johnson v. Chesebrough -Pond's USA Co.,* 918 F.Supp. 543, 551–52 (D.Conn.1996), *aff'd,* 104 F.3d 355 (2d Cir.1996) (statements about job performance, such as plaintiff "didn't fit in" and "could not be recommended" were opinions, and therefore not defamatory). Plaintiff counters that Formica's statements were made with reckless disregard as to their truth or falsity, as Formica failed to conduct an adequate investigation into the charges against Plaintiff. At the Board meeting, both Attorney Satti and Selectmen Wilson noted that the four hour time card issue "came up a lot" with other officers, but Formica focused only on the Plaintiff as someone with a problematic "pattern of behavior over a period of time." (DVD.) Reckless disregard for the truth of a statement may be found when an individual publishes defamatory statements with a "high degree of awareness of ... probable falsity ... or entertained serious doubts as to the truth of [the] publication." *Woodcock v. Journal Publishing Co.,* 230 Conn. 525, 646 A.2d 92 (1994) (citing *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). The "publication" element is also satisfied here, as all that is required is the communication of statements to a third party, and not, as Defendant argues, the publication of the statement to the public. *See Miles v. Perry,* 11 Conn.App. 584, 529 A.2d 199 (1987).

***17** There are sufficient facts in the record that, viewed in the light most favorable to Plaintiff, would allow a reasonable juror to find that Defendant Formica acted with actual malice when he made the statements in question at the Board meeting. The record shows that Formica consciously disregarded evidence that the four-hour minimum overtime issue was not unique to Plaintiff, and that in spite of evidence showing that this appeared to be a practice in the department, Formica made his statements about "violating the trust," and about the Board "doing an injustice" if they let the issue of Mr. Holmes's appointment sit another day." (DVD at 1:33:35–1:45:33.) FN8 The Court concludes that both parties' motions must be denied, and the question of actual malice must be submitted to a jury.

*3. Count Six: False Light Invasion of Privacy as to Defendant Formica*

[27][28] Defendant Formica moves for summary judgment as to Count Six, false light invasion of privacy. "In order to establish invasion of privacy by false light, the plaintiff must show "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Jonap v. Silver,* 1 Conn.App. 550, 557–558, 474 A.2d 800 (1984) (quoting 3 Restatement (Second), Torts § 652E; *Honan v. Dimyan,* 52 Conn.App. 132–133 (1999)). The 'publicity' associated with invasion of privacy "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Orsini v. Zimmer,* No. CV075013711S, 2009 WL 5698148, at *7 (Conn.Super.2009) (quoting 3 Restatement (Second), Torts § 652D, cmt.a).

[29][30] In the employment context, when information is conveyed only to employees with a duty, responsibility, and need for such information, there is not sufficient publicity to support an action for invasion of privacy. *See, e.g., Grossman v. Computer Curriculum Corp.,* 131 F.Supp.2d 299, 311–12 (D.Conn.2000) (citing *Pace v. Bristol Hosp.,* 964 F.Supp. 628, 631–32 (D.Conn.1997)) (concluding that former employer's dissemination of information regarding circumstances of former employee's discharge to management personnel, interested co-workers and independent contractor with whom plaintiff worked did not constitute "publicity" necessary to state a false light claim). If an employer communicates false information concerning a former employee to so many persons that the matter must be regarded as substantially certain to become one of public knowledge, a false light claim may lie. *See Grossman,* 131 F.Supp.2d at 312.

[31][32][33] Here, Defendants' main contention is that Plaintiff chose to have the meeting held in open session. (Town's Mem. at 40.) FN9 "In the context of a cause of action for invasion of privacy, the term publicity means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Sidiropoulos v. Bridgeport*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Hosp.,* No. CV030401830S, 2004 WL 202256, at *2 (Conn.Super.Jan.9, 2004) (internal quotations omitted). "[I]t is not an invasion of privacy to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. Publicity is a communication that reaches, or is sure to reach, the public at large ." *Id.* (citing *Cyr v. Mountain Grove Cemetery Assoc.,* No. CV030401575, 2003 WL 21805496 (Conn.Super. July 18, 2003)). Here, the Board of Selectmen meeting at which Formica's statements were made was aired multiple times on public access television (*see* Pl.'s Aff. ¶ 13; Morris Dep., Ex. 39 to Pl.'s 56(a)1 Stmt at 9–10), and thus, the matter "must be regarded as substantially certain to become one of public knowledge." *Grossman,* 131 F.Supp.2d at 312.

***18** The record here supports Plaintiff's contention that Formica's communication reached the public at large, and what Formica said about Plaintiff could be found highly offensive by a reasonable juror. Accordingly, Defendant's motion for summary judgment is denied as to Count Six.

*4. Governmental Immunity*

Defendants argue that regardless of the merits of Counts Five and Six, Mr. Formica is entitled to summary judgment on Plaintiff's defamation and false light invasion of privacy claims, because governmental immunity bars both claims. (Town's Mem. at 37.) Under Conn. Gen.Stat. § 52–557n, the state legislature imposed liability on a municipality for the "negligent acts or omissions of ... any employees" but it has not waived the municipality's immunity from liability for the intentional torts of its employees and officials.

The Connecticut Supreme Court has also held that, while municipal employees are immune from liability for their negligent acts, they are not immune from liability for acts that "involve malice, wantonness or intent to injure, rather than negligence." *Evon v. Andrews,* 211 Conn. 501, 505, 559 A.2d 1131 (1989). Plaintiff argues that the special defense of governmental immunity has been found not to apply to the claim of willful and intentional wrongdoing, including defamation, alleged by a plaintiff against a municipal employee. *Hamden Salvage Inc. v. Kops,* 1999 WL 1241904 (Conn.Super.1999).

[34] In *Sam martino v. Turn,* No. CV99070151, 2003 Conn.Super. LEXIS 564, at *3–5 (Feb. 28, 2003), relied on by Defendant, the court found that governmental immunity was a complete defense to an intentional tort claim against the "First Selectman of the Town of Andover," sued only in his official capacity. However, Plaintiff has sued Formica in his individual capacity (*see* Compl. Counts Three, Four, Five, Six, all against Formica in his official and individual capacities), therefore Mr. Formica's defense of governmental immunity will not apply here.

*5. Count One: Retaliation under Conn. Gen.Stat. § 31–51m*

Defendants argue that Plaintiff has "failed to state a claim" under Conn. Gen.Stat. § 31–51m, which states, in relevant part:

> No municipal employer shall discharge, discipline or otherwise penalize any employee because the employee, or a person acting on behalf of the employee, reports, verbally or in writing, to a public body concerning the unethical practices, mismanagement or abuse of authority by such employer.

Conn. Gen.Stat. § 31–51m(b). "Public Body" is defined as "(A) any public agency, ... or any employee, member or officer thereof, or (B) any federal agency or any employee, member or officer thereof." *Id.*

[35][36] In an action under the state whistleblower statute, the plaintiff has the initial burden to prove by a preponderance of the evidence a *prima facie* case of retaliatory discharge: (1) that the plaintiff engaged in a protected activity as defined by § 31–51m(b); (2) that the plaintiff was subsequently discharged from his employment; and (3) that there was a causal connection between his participation in the protected activity and his discharge. *See Arnone v. Town of Enfield,* 79 Conn.App. 501, 507, 831 A.2d 260, 266 (2003). A plaintiff's burden of establishing a *prima facie* case by presenting evidence which allows a rational trier of fact to raise an inference of retaliatory discharge is *de minim is. LaFond v. General Physics Services Corp.,* 50 F.3d 165, 173 (2d Cir.1995).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

***19** [37] Defendants have not provided any legal arguments or citations to the record in support of their motion on this count, and a reasonable jury could find that Plaintiff has met his *de m inim us* burden of establishing a *prima facie* case of retaliatory discharge: Mr. Holmes's memorandum was a written report to the First Selectwoman, the Chief of Police, concerning "unethical practices, mismanagement or abuse of authority by such employer" as contemplated under the statute (Ex. 5 to Pl.'s 56(a)1 Stmt), and upon complaining to First Selectwoman Hogan about how Sgts. Crooks and Saffioti treated him, Sergeant Crooks and Defendant Formica launched an investigation into his timecard submissions, culminating in the decision to not reappoint Mr. Holmes to his 23–year position as a special constable. Drawing all inferences in Mr. Holmes's favor, summary judgment is denied as to Plaintiff's § 31–51m claim.

**C. Counts: Fix, Six, and Seven: Claims Against Defendant Richard Crooks**

Plaintiff moves for summary judgment against Defendant Sergeant Crooks on Counts Five and Six of the Amended Complaint. Sergeant Crooks cross-moves for summary judgment on those counts as well as on Count Seven (Intentional Infliction of Emotional Distress).

*1. Count Five: Defamation*

Sergeant Crooks argues that summary judgment should enter in his favor as to Count Five because he was only expressing statements of opinion, which are not actionable, he made no false statements of fact, and the truth is a complete defense to a claim of defamation. *See Holbrook v. Casazza,* 204 Conn. 336, 361, 528 A.2d 774 (1987).

[38] As evidence of his defamation claim, Plaintiff points specifically to Sergeant Crooks' retelling of the "McCook Park incident" at the Board meeting. Sergeant Crooks spoke of this incident without revealing the full back story; as discussed *supra,* Plaintiff was in fact called into work at the last moment to replace an injured officer. Sergeant Crooks also likened Plaintiff's over-billing in that particular instance to Plaintiff's billing practices in other instances, stating: "One or two mistakes you can explain but there's a certain pattern of behavior over a period of time." (DVD.)

Here, the record shows that Crooks discussed the allegations constituting the McCook Park incident with the Board, but had never spoken with Plaintiff or with Sergeant Renshaw about the allegations, which ultimately were found to be false. The record also shows that Sergeant Crooks made these statements as part of the Board's investigation into Plaintiff's reappointment. While Sergeant Crooks may not have knowingly made any false statements of fact, the record is sufficient to convince a reasonable juror that Crooks acted in reckless disregard of the truth when he made these statements. For that reason, Sergeant Crooks' motion for summary judgment is denied. As for plaintiff's motion, a reasonable juror could similarly find that Sergeant Crooks did not act with actual malice when he made these statements—he interviewed other officers about the McCook Park incident as part of his investigation into Plaintiff's time card issue, and he recounted what they had told him at the Board meeting. Accordingly, summary judgment is also denied as to Plaintiff's motion on Count Five.

*2. Count Six: False Light Invasion of Privacy*

***20** As discussed above, the type of false light claim alleged by Plaintiff protects a person's interest in not being placed before the public in an objectionable position that is false and is "a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in his position." *Jonap v. Silver,* 1 Conn.App. 550, 558, 474 A.2d 800 (1984). Not every unwelcome public comment satisfies the legal necessity that the statement be "highly offensive." Isolated negative statements, even if false, do not meet the requirement for highly offensive behavior. *Cavallero v. Rosado,* No. CV 05–4009939, 2006 Conn.Super. LEXIS 2919, at *17 (Conn.Super.Oct.5, 2006).

[39] Sergeant Crooks argues that his statements were neither knowingly false nor highly offensive. (Crooks' Mem. Supp. at 11.) However, as discussed above with respect to the claim against Defendant Formica, mere reckless disregard for the truth is all that is required for actual malice. Viewed in the light most favorable to Plaintiff, Crooks' statements speak directly to the Plaintiff's character for honesty and suggest that the Plaintiff was cheating. A reasonable juror could conclude

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

that such statements were "highly offensive." On the other hand, and viewing the record most favorably to Sergeant Crooks, a reasonable juror could also find that Sergeant Crooks' statements did not rise to that level of offensiveness, nor that they were made with actual malice. Accordingly, summary judgment is denied as to all motions on Count Five against Sergeant Crooks.

*3. Count Seven: Intentional Infliction of Emotional Distress*

[40][41][42] Sergeant Crooks also moves for summary judgment on Plaintiff's claim of intentional infliction of emotional distress (Count Seven). In order to prevail on a claim for the intentional infliction of emotional distress in Connecticut, a plaintiff has the burden of establishing four elements:

> It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (2006). "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Ancona v. Manafort Bros. ., Inc.,* 56 Conn.App. 701, 712, 746 A.2d 184 (2000). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Carrol v, Allstate Insurance Co.,* 262 Conn. 433, 443, 815 A.2d 119 (2003).

***21** [43] Under Connecticut law, conduct rises to the level of "extreme and outrageous" when a "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Appleton v. Board of Educ. of Town of Stonington,* 254 Conn. 205, 211, 757 A.2d 1059(2000). Defendant Crooks argues that Plaintiff's allegations, and the record, do not support the argument that his behavior rose to the level of "extreme and outrageous conduct."

[44] Indeed, the bar for conduct that is found to be "extreme and outrageous" is set very high. For instance, in *DeLeon v. Little,* a district court considered a situation where the defendant's alleged conduct towards the plaintiff included:

> orders to purchase illegal drugs, orders to stand guard while [d]efendant ingested illegal drugs, orders to perform personal errands, orders to perform tasks for a private employer, repeated telephone calls to plaintiff at her home, threats to terminate plaintiff's employment and replace her with an individual of another race, implementation of discriminatory sick time policies, monitoring of attendance at work, and repeated degrading and humiliating criticism of Plaintiff in the presence of others.

981 F.Supp. 728, 738 n. 8 (D.Conn.1997). The court held that the defendant's action did "not rise to the level of extreme and outrageous behavior. There is no evidence that Defendant's requests were accompanied by any threat of force or physical violence." *Id.* at 738–39. In *Bombalicki v. Pastore,* 71 Conn.App. 835, 841, 804 A.2d 856 (2002), when the evidence showed that the defendant's actions "with respect to the plaintiff included expressing his dislike of the plaintiff, talking about the plaintiff unfavorably to other [employees], opposition to the plaintiff's promotion and an ultimate decision not to recommend the plaintiff for promotion," the court held that was insufficient evidence of extreme or outrageous behavior to support a claim for intentional infliction of emotional distress. 71 Conn.App. at 841, 804 A.2d 856.

Plaintiff contends that there is no bright line rule for determining whether conduct was extreme and outrageous, and that the facts and circumstances of each specific case should be considered. *See Crocco v. Advance Stores Co. Inc.,* 421 F.Supp.2d 485 (D.Conn.2006) (denying summary judgment on the IIED claim and finding that "reasonable minds could differ" on whether plaintiff's former supervisor and co-worker reporting false information to a police officer in order to give the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

impression that the plaintiff was stalking them could constitute extreme and outrageous conduct). In considering the threshold question for IIED claims, Connecticut courts have also considered whether an alleged harasser was in a position of authority; *Cox v. Brennan,* No. TTDCV0960000758S, 2010 WL 1665316, at *2 (Conn.Super.Mar.31, 2010) (finding that "[r]epeatedly submitting false accusations, knowing them to be false, to a rival's employer or supervisor in order to tarnish the other person's workplace reputation to enhance one's own career would appear, if true, to satisfy the high level of reprehensible conduct demanded by this tort," and denying the defendant's motion to strike); *see also Musacchio v. Cooperative Educations Svcs.,* No. CV 94 0137050 S, 1995 WL 681664 (Conn.Super.Nov.8, 1995) (finding that there was a jury question as to whether a supervisor's false accusation of lying amounted to extreme and outrageous conduct).

***22** [45] Considering the facts and circumstances of the instant case, the Court concludes that the record does not support a cause of action for the intentional infliction of emotional distress. Defendant Crooks was Plaintiff's supervisor, and it may be the case that the manner in which Sergeant Crooks conducted his investigation into Plaintiff's time cards was not commendable. Sergeant Crooks reported that Plaintiffs showed up for the McCook Park assignment "two hours late. Other officers told me that he didn't report until two hours late and still billed the Town for four hours." (DVD at 1:27:12–1:27:29.) This testimony was found to be untrue (*see* Renshaw Test. at 41:17–46:16), but nothing in the record supports Plaintiff's contention that Sergeant Crooks intentionally reported false information to the Board of Selectmen (*see* Pl.'s Dep. at 80:23–81:2 (Plaintiff testified that "I don't know why [Sergeant Crooks] he [told them about the McCook Park incident]," and that he didn't know what the basis of Sergeant Crooks's statement was)). The record shows that Crooks, in uniform, went to Plaintiff's full-time employer in order to check on his whereabouts on the dates at issue (*see* Crooks Aff. ¶ 26), however, the record does not support Plaintiff's claim that Crooks accused Plaintiff of lying or being dishonest in front of his employer, or that he "conducted a hostile and unwarranted investigation at the DOT" (Pl.'s Mem. Opp'n at 16). In sum, no reasonable juror could find that Sergeant Crooks' behavior rose to the level of "extreme and outrageous" conduct under Connecticut law. Accordingly, summary judgment will enter in Crooks' favor on Count Seven.

**III. Conclusion**

For the reasons discussed above, Plaintiff's Motion for summary judgment [Doc. # 60] against the Town and Defendant Formica is GRANTED in part, as to Counts Three and Four, and DENIED in part, as to Counts Five and Six. Plaintiff's Motion for summary judgment against Defendant Crooks [Doc. # 64] is DENIED in its entirety. Defendants Town of East Lyme and Paul Formica's Motion [Doc. # 66] is GRANTED as to Count Two, and DENIED as to the remaining counts. Defendant Crooks's motion [Doc. # 63] is GRANTED as to Count Seven and DENIED as to Counts Four and Five.

IT IS SO ORDERED.

FN1. Sergeant Crooks later claimed that he had not made that statement (*see* Crooks Dep. at 224–26), and Sergeant Renshaw testified that, to the contrary of what was said during the Board of Selectmen meeting, Plaintiff reported for duty on that night in question despite not being scheduled to work, as a substitute for an on-duty police officer who had been bitten by a dog and required medical attention (Renshaw Testimony at 41:17–46:10.)

FN2. "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright,* 459 F.3d 241, 247 (2d Cir.2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2d Cir.2000).

FN3. Defendants do not cite any caselaw in support of the proposition that loss of a part-time job is not a deprivation of a protected interest. There is, however, authority suggesting that part-time government employees are entitled to pre-deprivation process. *See, e.g., Orloff v. Cleland,* 708 F.2d 372 (9th Cir.1983) (issues of fact existed as to whether part-time physician employee of a Veterans' Administration hospital had a property interest in his employment and whether the VA had accorded the physician with sufficient procedural due process upon his termination).

FN4. The Town cites to a recent Second Circuit decision, *Nnebe v. Daus,* 644 F.3d 147 (2d Cir.2011), for the proposition that post-deprivation procedures are sufficient. There, the Second Circuit determined that the City of New York was not required to provide a pre-deprivation hearing before it suspended the licenses of taxi drivers who had been arrested. 644 F.3d at 159. However, the Second Circuit did not go so far as to describe what type of process was adequate, writing, "In this case, ... we cannot yet make these determinations [of adequate process] because the evidence in the record is insufficient to establish that the post-suspension hearing the City describes to us is in fact the hearing that it offers." *Id.* at 160.

FN5. Attorney Duggan wrote, "Mr. Holmes does not have the right to union representation in matters concerning his reappointment." (*Id.*) She also wrote "Paul Holmes may submit written documentation and/or a statement to be considered by the Board ... Neither Mr. Holmes nor the Union has the right to be present in executive session. If desired, Mr. Holmes may require that the discussion be held in open session, as noted in the prior memo to him delivered on January 31, 2008." (*Id.*)

FN6. At oral argument, Defendants maintained that the action taken at the Board of Selectmen meeting was *not* a termination, and that rather, it was merely a vote concerning the non-reappointment of Mr. Holmes. However, the Court finds this distinction to be merely semantic, as the vote taken at the February 6, 2008 meeting had the effect, and the intention, of terminating Plaintiff's employment as a Special Constable with the Town of East Lyme.

FN7. In *Strasburger,* the Seventh Circuit found that while the defendant school board "ha[d] not treated Strasburger well, the record does not reflect a constitutional violation," because the plaintiff could not provide evidence of false statements made by public officials. *Id.* at 357. There, several deponents had testified that they heard "rumors" to the effect that plaintiff was a rapist, though no one was able to testify that they heard the rumors from a public official. *Id.* Thus, the Seventh Circuit affirmed the district court's grant of summary judgment on plaintiff's stigma-plus claim.

FN8. Though Defendants assert that Formica is entitled to a qualified privilege defense, a qualified privilege can be overcome by a showing of actual malice, *Mara v. Otto,* 127 Conn.App. 404, 406 (2011), and thus, this issue must be left for jury determination.

FN9. In support, Defendants cite one 1976 case, *LaFontaine v. Family Drug Stores,* 33 Conn.Supp. 66, 72, 360 A.2d 899 (1976), which held that the plaintiff could not recover on her invasion of privacy claim where she did not show that the defendant caused the publication about her, as there was no evidence that defendant notified the media. However, the issue in *LaFontaine* concerned whether a person charged with a criminal offense loses the right of privacy regarding that matter. Neither the facts nor the law in *LaFontaine* are applicable to this case.

D.Conn.,2012.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 25

--- F.Supp.2d ----, 2012 WL 1108557 (D.Conn.)

(Cite as: 2012 WL 1108557 (D.Conn.))

Holmes v. Town of East Lyme
--- F.Supp.2d ----, 2012 WL 1108557 (D.Conn.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.